IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CONE MILLS CORPORATION, *et al.*, | ) | Case No. 03–12944 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) **Hearing Date:  February 9, 2004 at 11:30 a.m. (ET)** | |
| | ) **Objections Due:  February 2, 2004 at 4:00 p.m. (ET)** | |

<u>**NOTICE OF MOTION**</u>

TO:    (I) THE UNITED STATES TRUSTEE, (II) COUNSEL TO THE DEBTORS'
PREPETITION BANK GROUP, (III) COUNSEL TO PRUDENTIAL, (IV)
COUNSEL TO THE BOND TRUSTEE, (V) COUNSEL TO BOND
COMMITTEE, (VI) COUNSEL TO WL ROSS, (VII) COUNSEL TO GECC
AND THE DEBTORS' OTHER POSTPETITION LENDER(S), (VIII)
COUNSEL TO THE OFFICIAL COMMITTEES, AND (IX) ALL PARTIES
THAT HAVE REQUESTED NOTICE IN THESE CASES.

The above-captioned debtors and debtors in possession (collectively, the
"Debtors") have filed the attached **MOTION OF THE DEBTORS FOR AN ORDER
PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE
AND RULES 2002, 6004, 6006 AND 9014 OF THE FEDERAL RULES OF
BANKRUPTCY PROCEDURE (A) AUTHORIZING THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, FREE AND CLEAR OF
LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS SUBJECT TO HIGHER
OR BETTER OFFERS; (B) APPROVING THE AMENDED AND RESTATED
ASSET PURCHASE AGREEMENT; (C) APPROVING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES IN CONNECTION WITH SUCH SALE; AND
(D) GRANTING RELATED RELIEF** (the "Motion").

Responses, if any, to the Motion must be filed with the United States
Bankruptcy Court for the District of Delaware, 824 N. Market Street, 3rd Floor,
Wilmington, Delaware 19801 on or before February 2, 2004 at 4:00 P.M. (ET) (the
"Objection Deadline").

At the same time, you must serve a copy of your response upon the
undersigned counsel.

A HEARING ON THE MOTION WILL BE HELD ON FEBRUARY 9, 2004 AT 11:30 A.M. (ET) BEFORE THE HONORABLE MARY F. WALRATH, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 N. MARKET STREET, 6TH FLOOR, WILMINGTON, DELAWARE 19801.

IF YOU FAIL TO RESPOND TO THE MOTION IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED THEREIN WITHOUT FURTHER NOTICE OR A HEARING.

Dated: Wilmington, Delaware
       January 6, 2004

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Pauline K. Morgan (No. 3650)
Joseph M. Barry (No. 4221)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

– and –

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Andrew N. Rosenberg
Brian S. Hermann
Erica G. Weinberger
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

Counsel for Debtors and Debtors in Possession.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CONE MILLS CORPORATION, *et al.*, | ) | Case No. 03–12944 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date: February 9, 2004 at 11:30 a.m. (ET)** |
| | ) | **Objections Due: February 2, 2004 at 4:00 p.m. (ET)** |

**MOTION OF THE DEBTORS FOR AN ORDER PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE AND RULES 2002, 6004, 6006 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS SUBJECT TO HIGHER OR BETTER OFFERS; (B) APPROVING THE AMENDED AND RESTATED ASSET PURCHASE AGREEMENT; (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH SUCH SALE; AND (D) GRANTING RELATED RELIEF**

Cone Mills Corporation ("Cone Mills"), CIPCO S.C., Inc. ("CIPCO"),

Cone Foreign Trading LLC ("Cone Foreign Trading") and Cornwallis Development Co.

("Cornwallis"), the above-captioned debtors and debtors-in-possession (collectively, the

"Debtors"), by and through their undersigned counsel, hereby move this Court for entry

of an Order pursuant to sections 105(a), 363 and 365 of title 11 of the United States

Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Rules 2002, 6004, 6006

and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

(a) authorizing the sale of substantially all of the Debtors' assets (the "Assets") free and

clear of liens, claims, encumbrances, and interests (collectively referred to as "Interests"),

subject to higher or better offers (the "Asset Sale"); (b) approving that certain Amended

and Restated Asset Purchase Agreement, dated as of November 6, 2003 (the "APA"), by
and among the Debtors, WLR Recovery Fund II L.P. (the "Parent"), and WLR Cone
Mills Acquisition LLC (the "Sub," together with Parent, "WL Ross");[1] (c) approving the
assumption and assignment of certain executory contracts and unexpired leases in
connection with the Asset Sale; and (d) granting related relief.  In support of this motion
(the "Motion"), the Debtors also rely upon the October 9, 2003 Declaration of William Q.
Derrough and the Debtors' October 10, 2003 Motion for Order (A) Approving Sale
Procedures; (B) Approving Buyer's Breakup Fee and Expense Reimbursement; (C)
Approving Form and Manner of Notice; (D) Scheduling a Hearing to Consider the Sale
of Substantially All of the Debtors' Assets; and (E) Granting Related Relief, each of
which is incorporated herein by reference, and respectfully represent as follows:

### JURISDICTION

        1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C.
§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is
proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory
predicates for the relief requested herein are sections 105(a), 363 and 365 of the
Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.

---

[1]    A copy of the APA is annexed hereto as Exhibit A.

## BACKGROUND

*A.    Introduction*

2.    On September 24, 2003 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.    The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.    On October 7, 2003, the Office of the United States Trustee appointed an official committee of unsecured creditors in these cases (the "Creditors' Committee"). On December 4, 2003, the United States Trustee appointed an official committee of equity security holders in these cases (the "Equity Committee," and together with the Creditors' Committee, collectively, the "Official Committees").

*B.    Company Background*

5.    Founded in 1891, Cone Mills, a North Carolina corporation, believes it is the world's largest producer of denim fabrics, one of the largest commission printers and finishers of home furnishings in North America and a major producer of decorative wide jacquard fabrics in the United States. Headquartered in Greensboro, North Carolina, Cone Mills is a public company that, as of the Petition Date, employed approximately 3,000 people and operated five domestic manufacturing facilities located in North and South Carolina.

6.    Denim, by far Cone Mills' largest product segment, accounted for approximately 82% of its revenues for the first six months of 2003. Cone Mills' denim products are used primarily in denim bottoms, such as jeans, pants and shorts. Its denim

fabrics are primarily designed for customers whose garments are targeted for the middle

and upper-middle markets, where styling and quality are important factors. Cone Mills'

largest denim customer is Levi Strauss, a customer since 1915 and for whom Cone Mills

has been the exclusive supplier of denim for Levi's 501(R) family of jeans. Cone Mills'

other customers include, Gap Inc. (The Gap, Old Navy and Banana Republic), V.F.

Corporation (Wrangler, Lee and others), American Eagle Outfitters, Calvin Klein, the

Limited brands (Express, Structure and Victoria's Secret), Abercrombie and Fitch, Polo

Ralph Lauren and JC Penney (Arizona).

       7.     In addition to its U.S. denim manufacturing facilities in North

Carolina, Cone Mills, through its Mexican subsidiary, Cone Mills (Mexico) S.A. de C.V.,

owns a 50% equity interest in Parras Cone de Mexico S.A. de C.V. ("Parras Cone"), a

low-cost producer of high quality basic denims located in Mexico. Under a marketing

APA with its equity partner in Parras Cone, Compania Industrial de Parras S.A. de C.V.,

Cone Mills markets and distributes 100% of Parras Cone's denim fabric production. In

addition to the marketing fee Cone Mills earns under its marketing arrangement with

Parras Cone, Parras Cone provides Cone Mills and its customers with a low-cost source

of high quality denim, a critical need in the increasingly competitive worldwide denim

market.

       8.     Cone Mills' other business segments – commission finishing and

jacquards – comprise a small portion of Cone Mills' overall operations. The commission

finishing segment provides custom printing and plain-shade dyeing services at Cone

Mills' Carlisle, South Carolina finishing plant. The key markets served by Cone Mills'

Carlisle plant include the home decorative, over-the-counter craft and home sewing,

specialty apparel (such as camouflage fabrics for the hunting trade and military apparel)

and baby products. Cone Mills' jacquards operation focuses on designing, styling and

manufacturing jacquard products primarily for the furniture, top-of-the-bed, outdoor and

jobber markets.

9.      The other Debtors, CIPCO, Cone Foreign Trading and Cornwallis,

are wholly-owned, non-operating subsidiaries of Cone Mills. CIPCO, a Delaware

corporation, holds certain of Cone Mills' various trademarks and trade names, including

the "Cone" name.   Cone Foreign Trading, a North Carolina limited liability company,

was organized as an accommodation to Levi Europe in connection with certain sales and

marketing arrangements between Cone Mills and Levi Europe. Finally, Cornwallis, a

North Carolina corporation, was organized in 1964 to develop raw land into residential

lots and commercial real estate in Greensboro, North Carolina. Cornwallis sold

substantially all of its assets in 1997 and has not been in operation since then.

C.      *Events Leading to Chapter 11*

10.     The general economic downturn, together with certain industry

specific and political factors, have made the domestic denim business increasingly

difficult in recent years. The textile business has become extremely competitive with

new, low-cost manufacturers from Asia, Mexico and South and Central America quickly

grabbing customer orders away from higher cost domestic manufacturers like Cone Mills.

Initiatives such as the North American Free Trade Agreement and the Caribbean Basin

Initiative have dramatically altered the balance between domestic and foreign production

such that approximately 60% of denim jeans and fabric imports into the United States now come from countries covered by these initiatives. Driven by inexpensive labor in Mexico and South and Central America, imports of denim from these regions cost far less than product manufactured domestically. In addition, since the Asian currency crisis in 1997 many Asian countries, including China, have artificially pegged their currencies to the U.S. dollar, which has helped them to drive down the cost of their goods, thereby further boosting their exports.

11.    Cognizant of the need to drive down costs to compete more effectively with its foreign competitors on price, Cone Mills has attempted to rationalize its business by refocusing on core competencies where it views itself as a leader and where it can exploit competitive advantages. As part of this strategic refocusing since 1998 Cone Mills has implemented several restructuring and downsizing initiatives, which have resulted in the closing of several manufacturing facilities and the elimination of a number of jobs.

12.    In addition, Cone Mills has tried for some time to migrate increasing amounts of its basic denim production to Mexico, including through an expansion of Parras Cone's denim capacity, and to other low cost countries in this hemisphere. This strategy, however, required new capital – which could not be obtained without a recapitalization of Cone Mills' over-leveraged balance sheet. Toward that end, in February 2002, Cone Mills retained Jefferies & Company, Inc. ("Jefferies") to serve as Cone Mills' financial advisors and capital arrangers. Beginning in the middle of 2002, Jefferies contacted no fewer than 60 financial sponsors in an effort to attract capital to

refinance Cone Mills' indebtedness and/or fund Cone Mills' capital expansion in Mexico

and Latin America. That effort has proven unsuccessful as Cone Mills' deteriorating

financial condition and the poor overall state of the U.S. textile industry, as evidenced by

the rash of recent textile bankruptcies (e.g., Galey & Lord, Burlington, Pillowtex (twice),

Westpoint Stevens), have caused investors to stay away. As a result, Cone Mills has been

unable to attract badly needed capital for its recapitalization and expansion outside of the

United States.

               13.     This already difficult situation has recently taken a sharp turn for

the worse. First, recent political decisions have had a deleterious effect on the U.S.

textile industry. New trade agreements with countries in the Far East, including with

Vietnam in May 2003, have exposed the U.S. markets to additional low-cost denim

imports, further eroding Cone Mills' overall market share. By way of example, in June

2003 alone, imports of denim from Vietnam jumped from 400,000 garments per month to

3.7 million garments per month, the equivalent of 10% of domestic denim capacity.

These numbers, staggering on their own, compound the existing problems caused by

China's continued currency manipulation described above, a practice the U.S.

government has been unable to stop. In sum, though superior in terms of product quality,

design and reliability, Cone Mills' denim products are in many instances simply unable to

compete in terms of price with its Asian competitors. As one customer aptly noted about

Cone Mills in a recent survey of denim manufacturers: "They give me what I need.

Prices have to drop."

14.    Market forces have also exacerbated the problems caused by the deluge of Asian imports.  There is not only a general oversupply of apparel and textile products throughout the supply chain, but a changing mindset among many of Cone Mills' customers as well.  Specifically, many retailers are overstocked with jeans and other denim wear that must be sold off before they will place new orders.  In addition, many of Cone Mills' customers, themselves hurt by the recession and the slow economic recovery, are under pressure to seek lower cost sources of supply for their denim and other fabrics in order to reduce costs and improve margins.  As a corollary to that, many denim buyers have been unable, due to budgetary and other constraints, to include among their product mix Cone Mills' more expensive, higher quality denim, choosing instead to "commoditize" their products by purchasing low end materials from abroad.

15.    In the face of this confluence of negative market conditions – a sluggish economy, currency effects, rising imports and general global oversupply of apparel and textiles – Cone Mills and its domestic competitors have seen orders decline and, when coupled with increased cotton costs (cotton being the primary raw material needed to manufacture denim), suffered from continually declining margins.  In the second quarter of 2003 alone Cone Mills experienced a dramatic 23.4% decrease in sales and an approximately 3% decline in gross margins from the prior year period.  Overall, for the first half of 2003 Cone Mills experienced a 14.3% decline in sales and an approximately 1.4% decline in gross margin as compared with the prior year period. Cone Mills expects this trend to continue into 2004.

16.    Unable to recapitalize and faced with an onslaught of lower priced imports, Cone Mills finds itself in a competitively disadvantageous position.  With its reduced sales volume and margins under pressure in the face of deflationary forces and higher raw material costs, Cone Mills could not generate sufficient cash flow to service its debt load, which was put in place at a time when economic times were much better.  As a result, on September 15, 2003, Cone Mills missed its regularly scheduled interest payment of $4.1 million on the Debentures.

17.    In view of their liquidity crisis and with no relief in sight for themselves or within the domestic textile industry, the Debtors determined that it was infeasible for them to continue operating as viable stand-alone companies outside of chapter 11.  Rather, the Debtors determined that chapter 11 protection was necessary to stabilize their business and preserve and ultimately maximize the value of their estates through a sale of their assets.

18.    In that regard, shortly before filing for chapter 11 protection, Cone Mills and certain of its lenders entered into a letter agreement with WL Ross & Co. LLC, believed to be Cone Mills' largest secured creditor, for the sale of substantially all of the Debtors' assets.  The terms of that letter agreement have since been incorporated into the APA.

## RELIEF REQUESTED

19.    By this Motion, the Debtors respectfully request entry of an order (a) approving the APA and Asset Sale to WL Ross, or such other purchaser(s) who submit higher or better offer(s), free and clear of all Interests and claims whatsoever,

(b) approving the assumption and assignment of all Assumed Contracts (as that term is defined in the APA), (c) eliminating or reducing the ten (10)-day stay period provided by Bankruptcy Rule 6004(g), and (d) granting the Debtors such other and further relief as is just and proper.

A.    *A Stand-alone Reorganization is Not Feasible*

20.    Given the state of the domestic textile industry and the Debtors' financial condition, the Debtors believe that the preservation and maximization of their estates requires that the Debtors pursue two goals: (a) prompt migration of their production facilities to low cost environments such as Mexico and South and Central America and (b) preserving customer confidence.  The first goal requires financing, and the second goal requires that the Debtors quickly signal to their customers that the Debtors are capable of filling future orders.  As described below, a sale – as opposed to a stand-alone reorganization – is the best means by which the Debtors can achieve these goals.

21.    The Debtors' operations do not generate sufficient liquidity to fund the investments necessary to a migration of their production facilities to low cost environments, and third-party sources of capital have proven to be unavailable to the Debtors.  Since early 2002, the Debtors, with the aid of their advisors, have sought third-party financing to fund their expansion to low cost environments, but these efforts have been unsuccessful.  In the meantime, the Debtors' financial condition has continued to deteriorate, as sales have decreased and margins eroded.  Thus, as stand alone companies, the Debtors' operating position has only worsened.  And as the textile markets continue

to open to Asian textile manufacturers, there is little reason to believe that the capital markets will become more hospitable to the Debtors. These factors all point to the great difficulty and risk associated with a stand-alone reorganization funded either by internal operations or third-party investments.

22.    An asset sale also furthers the Debtors' second goal, which is to signal to their customers that the Debtors are and will be capable of filling future orders. A stand-alone restructuring would entail (i) additional time and costs of searching for third-party sources of capital and then accessing new plants, and (ii) consensus amongst the numerous lenders in the Debtors' fractured capital structure – many of whom have stated their opposition to any type of reorganization. In sum, it would be fraught with uncertainty. Moreover, historically, few U.S. apparel manufacturers have emerged as stand-alone companies. Based on this track record, absent a viable and realistic plan to maintain the Debtors' business, customers will naturally lose confidence in the Debtors' ability to fill orders and shift their business to the Debtors' competitors. A sale, by contrast, should lessen the Debtors' customers' uncertainty over the Debtors' ability to fill future orders, and thus serves as an appropriate exit strategy. Customers are more likely to have confidence in the Debtors' ability to supply them if the Debtors can credibly maintain that their operations will continue, albeit under new ownership.

23.    In short, an asset sale is the proper response to the challenges the Debtors face in attempting to maximize the value of their estates. The Assets are likely to generate the highest returns if the Debtors' businesses are sold to an entity (like WL Ross) with access to capital and/or production facilities in lower cost environments.

B.    *The Marketing Process*

24.    From early 2002 until a few months before the Debtors' chapter 11 cases, the Debtors had focused their efforts on raising capital to fund a recapitalization and expansion into Mexico. In January, 2003, Cone Mills entered into a letter of intent with WL Ross & Co. LLC pursuant to which WL Ross & Co. LLC agreed to purchase up to $27 million of convertible notes – the proceeds of which were to be used to fund the Debtors' expansion into lower cost production facilities. That letter agreement was subject to a number of contingencies and conditions, including the negotiation of a final agreement with WL Ross & Co. LLC, the consent of Cone Mills' senior lenders and bondholders, approval of certain elements of the transaction by Cone Mills' shareholders, and registration with the SEC. This transaction ultimately failed, however, on account Cone Mills' deteriorating operating results in 2003 and its inability to obtain requisite lender and shareholder approvals.

25.    In August, 2003, in the face of rapidly deteriorating operating results, the Debtors and Jefferies met again with their senior lenders to discuss restructuring alternatives. At that time, WL Ross & Co. LLC indicated its interest in purchasing the Debtors' assets. Throughout the remainder of August and September, the Debtors and Jefferies worked with the Debtors' senior lenders, WL Ross & Co. LLC, and their respective advisors to refine WL Ross & Co. LLC's proposal and to finalize a letter of intent. As mentioned above, this letter of intent served as the basis for the APA, which the Debtors filed with this Court on November 7, 2003.

26.    On October 10, 2003, the Debtors filed the Sale Procedures Motion, which, among other things, proposed a procedure and schedule for soliciting and

entertaining competing bids for the Assets (as subsequently modified, the "Sale Procedures") and sought authorization to pay a breakup fee to WL Ross in the event that the Debtors sell the Assets to a party other than WL Ross.  On November 7, 2003, this Court entered an order (the "Sale Procedures Order") approving the Debtors' Sale Procedures and the buyer protections requested in the Sale Procedures Motion.

27.    Since this Court's entry of the Sale Procedures Order, the Debtors and Jefferies has been actively marketing the Assets by, among other things, contacting potential purchasers and establishing a data room, and otherwise providing due diligence support to prospective buyers.

C.    *The Sale Procedures*

28.    The Sale Procedures establish January 23, 2004 (the "Bid Deadline") as the deadline for filing competing bids for all or a portion of the Assets and February 9, 2004 as the hearing (the "Sale Hearing") to consider the proposed sale of the Assets.  In addition, the Sale Procedures (a) set the standards for determining whether proposed bidders are capable of consummating a transaction with the Debtors, (b) outline the manner in which the Debtors and their advisors will provide due diligence to Qualified Bidders, and (c) establish uniform requirements concerning the form and content of competing bids.

29.    Pursuant to the Sale Procedures Order, the Debtors served notice of the Auction and the Sale Hearing on, among others, all entities identified by the Debtors or creditor stakeholders as having expressed an interest in a transaction with the Debtors.

30.    Three aspects of the Sale Procedures promote the Debtors'
objective of maximizing the value of their estates through a sale of the Assets. First, by
establishing a Bid Deadline of January 23, 2004, prospective purchasers will have had
nearly three months from the entry of the Sale Procedures Order to conduct due diligence
and prepare bids for the Assets. In the context of similarly sized chapter 11 cases, this is
an above-average amount of time for post-petition due diligence.

31.    Second, by allowing bids for individual Assets as well as bids for
substantially all of the Assets,[2] the Sale Procedures obviously expand the universe of
potential buyers for the Assets. Given that the Debtors have three distinct business lines,
this bidding format will allow the Debtors to attract buyers who are interested in one or
more business lines, but not the whole.

32.    Third, the Sale Procedures include protective measures to ensure
that the successful bidder(s) are capable of consummating the proposed Asset Sale. To
become Qualified Bidders under the Sale Procedures, prospective bidders must submit
financial information evidencing their ability to consummate a transaction. The Sale
Procedures also require all such Qualified Bidders to confirm that their offers shall
remain open until the closing of a Sale Transaction. These protective measures serve to
lessen the risk of loss if, for some reason, the bidder(s) that submits the highest bid(s) at
the Auction prove unable to consummate a sale transaction.

---

[2]    The Sale Procedures permit bids for substantially all of the Debtors' assets or one or
more of the Debtors' (a) surplus assets, (b) denim business line, (c) Carlisle finishing
business line, or (d) jacquards business line.

D.    *Need for Immediate Sale*

      33.    In conjunction with their advisors, the Debtors have determined that an expeditious sale of the Assets is critical to maximizing the value of their estates. For the reasons noted in ¶¶ 20-23 above, any delay in consummating the Asset Sale is likely to ensure only significantly diminished returns for the Debtors' assets.

      34.    Accordingly, the Debtors believe that the sale of the Assets in accordance with the Sale Procedures will maximize the value of the Debtors' estates and is in the best interests of the Debtors, their creditors and other parties in interest.

E.    *The Proposed Sale of the Debtors' Assets* [3]

      35.    Pursuant to the APA, Cone Mills proposes to sell, assign and transfer to WL Ross the Assets free and clear of all Interests, with such Interests to attach to the proceeds of the Sale. The significant terms of the APA are as follows:

      a)    Purchase Price. The aggregate purchase price (the "Purchase Price"), payable at Closing, is $46,000,000 (i) plus or minus, as the case may be, the Professional Costs Adjustment and (ii) subject to the EBITDA Adjustment.[4]

      b)    Purchased Assets. All of Sellers' rights, title and interest in and to all of their Assets and Properties, other than the Excluded Assets, as such Assets and Properties exist on the Closing Date, including the following Assets and Properties: (i) the Assets and Properties of the Sellers described on Schedule 1.01 of the Company's Disclosure Schedule; (ii) the Purchased Equity Interests; (iii) the Real Property; (iv) the Real Property Leases; (v) the Assumed Contracts; (vi) the Inventory; (vii) accounts receivable (other than accounts receivable sold pursuant to the GECC Securitization Facility); (viii) cash, cash equivalents, deposits and accounts, other than the Purchase Price and any Excluded Assets;

---

[3]    Capitalized terms used in this section and not otherwise defined herein shall have the meanings ascribed to them in the APA.

[4]    The definitions of both Professional Costs Adjustment and the EBITDA Adjustment are contained in paragraph 1.04 of the APA.

(ix) Tangible Personal Property; (x) Personal Property Leases; but, where the Company is a party to such leases, only to the extent that such leases or subleases are Assumed Contracts; (xi) prepayments and prepaid expenses; (xii) all of Sellers' Intellectual Property Rights (including goodwill therein), subject to the rights of third party licensees pursuant to licenses under which Sellers are the Licensor; (xiii) all of Sellers' licenses (including applications therefor), but, where such licenses are held by the Sellers, only to the extent that such licenses are an Assumed Contract; and (xiv) all Sellers' rights under any confidentiality agreement relating to the sale of the Business.

      c)    Excluded Assets.  Includes the following Assets and Properties of the Company and its subsidiaries:  (i) the rights of the Sellers in, to and under all Contracts that are not Assumed Contracts; (ii) all preference actions, fraudulent conveyance actions, rights of setoff and other claims or causes of action except for rights against customers, parties to contracts and other similar ordinary course of business claims relating exclusively to the conduct of the Business and not specified or arising under the Bankruptcy Code; (iii) the Sellers' rights under the APA; (iv) any Purchased Assets excluded from purchase pursuant to Section 1.01(b) of the APA; (v) all capital stock of the Sellers; (vi) all claims of the Sellers against their officers, directors and shareholders, and all related insurance claims; (vii) the Books and Records relating exclusively to the Excluded Assets and Excluded Liabilities (the "Retained Information"), and copies of any Books and Records relating to the Company's and its Subsidiaries' tax returns and financial statements, except to the extent they relate to any tax item pertaining to any Purchased Subsidiary or any asset or liability of any Purchased Subsidiary; (viii) the rights of the Sellers to any credits, refunds, rebates or abatements of any Taxes; (ix) all of the rights and claims of the Sellers for avoidance actions available to the Sellers under the Bankruptcy Code as set forth in sections 544 and 551 and related provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing; (x) subject to section 5.04 of the APA, any insurance proceeds and any return of premiums under insurance policies of the Sellers with respect to claims or actions relating to or arising in connection with the Business or the Assets and Properties in respect of any period prior to the Closing; (xi) the Assets and Properties listed on Exhibit B to the APA; and (xii) the Assets, whether held in Trust or otherwise, relating to any "employee benefit plan" (as defined in section 3(3) of ERISA) or any other employee benefit plan, practice, policy, agreement or arrangement maintained by the Company, or ERISA Affiliate, any of its Subsidiaries or any Affiliate of the Company whether or not relating to employees associated with the Purchased Assets.

      d)    Assumed Liabilities.  Buyer shall assume and agree to discharge the Assumed Liabilities, which are all Liabilities under Assumed Contracts, including Cure Costs, and all Liabilities set forth on Schedule 1.02 to the APA.

e)      Excluded Liabilities.  Notwithstanding anything to the contrary in the APA, Buyer is assuming only the Assumed Liabilities and is not assuming any other Liability of whatever nature, whether presently in existence or arising hereafter.  All such Liabilities shall be retained and remain Liabilities of the Company.  Such Excluded Liabilities shall include, but are not limited to, the following:  (i) except for the Assumed Liabilities, all Liabilities relating to or arising from the ownership or operation of the Purchased Assets prior to Closing, including contingent obligations; (ii) all Liabilities relating to or arising from the Company's Class A Preferred Stock, $100.00 par value per share; (iii) except for the Assumed Liabilities, all Liabilities of the Sellers for Taxes due or which become due with respect to all tax years or portions thereof ending on or before the Closing (including any Taxes resulting from events or activities which actually occur on or before the Closing, but are deemed under applicable Tax law to occur at some point in time after the Closing); (iv) except for Liabilities for principal, interest and fees relating to the GECC Securitization Facility or the DIP Facility, all Liabilities of the Sellers with respect to any indebtedness for borrowed money; (v) any Liabilities or obligations of the Company under any contract that is not an Assumed Contract; (vi) except for the Assumed Liabilities, any Liabilities, obligations or responsibilities whatsoever relating to any "employee benefit plan" (as defined in section 3(3) of ERISA) or any other employee benefit plan, policy, practice, agreement or arrangement maintained by the Company, any ERISA Affiliate, any Subsidiary or any Affiliate of the Company whether or not relating to employees associated with the Purchased Assets, including any such Liability (a) to the Pension Benefit Guaranty Corporation under Title IV of ERISA, (b) relating to a multiemployer plan, or (c) with respect to any non-compliance with ERISA or other applicable laws; (vii) except for the Assumed Liabilities, all Liabilities with respect to any individuals (including their respective spouses and descendants) at any time employed by the Company or its Affiliates in connection with the operation or ownership of the Business or the Purchased Assets; (viii) except for Liabilities under the Labor Agreement and any Assumed Contract, all Liabilities of the Sellers under any collective bargaining agreement, agreement with any labor union, employment agreement or severance agreement; (ix) all Liabilities of the Sellers relating to any environmental, health or safety matter (including any Liability arising under any Environmental Law) (a) relating to any property or assets other than the Purchased Assets, (b) resulting for transport, disposal or treatment of any Hazardous Substances by the Company in connection with the Business prior to Closing Date to or at any location other than the Real Property, or (c) relating to any Liability or claim for personal injury resulting from exposure to Hazardous Substances or otherwise, where such exposure or other event or occurrence occurred prior to Closing; (x) all liabilities for damages to Persons or property arising out of alleged defects in products of the Business sold by Sellers, or arising under warranties issued by Sellers; (xi) all Liabilities to repair or replace, or to refund the sales price of, products manufactured and sold or delivered by the Business prior to Petition Date that any customer claims to be

defective; (xii) all Liabilities for Professional Costs; and (xiii) all liabilities of the Sellers (or any predecessor owner of all or part of the business or assets) with respect to the Excluded Assets and all other Liabilities other than the Assumed Liabilities.

       f)    <u>Closing Conditions</u>. Sellers' and Buyers' respective obligations under the APA are conditioned upon the fulfillment of certain conditions specified in Articles VII and VIII of the APA. Such conditions include (i) that the representations and warranties of each party to the APA shall be true and correct, except where failure of such representation and warranty to be true and correct would not individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect to the other party(ies); (ii) each party to the APA shall have performed and complied with all covenants required by the APA on or before the Closing, except where the failure to perform or comply with such covenants would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect on the other party(ies); (iii) each party shall deliver to the other a certificate, dated as of the Closing Date, to the effect of (i) and (ii) as of the Closing Date; (iv) no order or Law shall be in effect as of the Closing Date restraining, enjoining or otherwise prohibiting or making illegal the consummation of the transactions contemplated by the APA; (v) all consents, approvals and actions of, filings with and notices to any Governmental Authority set forth in Schedules 7.04 and 7.05 of the Company's Disclosure Schedule shall have been obtained, made or given and shall be in full force and effect, all terminations or expirations of waiting periods imposed by any Governmental Authority with respect thereto, shall have occurred, in each case without limitation, condition or restriction that would materially adversely affect ability of Buyer to own, control or operate the Business purchased or to be purchased; (vi) the Bankruptcy Court shall have entered the Sale Order which shall become the Final Order; (vii) there shall not have occurred any Material Adverse Effect on the Company since August 24, 2003; (viii) the Labor Agreement must be in effect; (ix) all intercompany Liabilities between the Company and Parras Cone shall have been paid or otherwise discharged in full without deduction or compromise; (x) the Bankruptcy Court shall have entered the Parkdale Assumption Order; (xi) the Company shall be released of all Liabilities relating to the DIP Facility and all Liens arising thereunder to the extent affecting Excluded Assets; and (xii) the Company shall be released of all Liabilities relating to the GECC Securitization Facility and all Liens arising thereunder to the extent affecting the Excluded Assets.

## BASIS FOR RELIEF

A.    *The Proposed Sale Is an Exercise of Sound Business Judgment and Should be Approved*

36.    The Debtors submit that ample authority exists for the approval of

the proposed sale of the Assets to WL Ross pursuant to the APA or to one or more

purchasers making higher or better offers.  Section 363 of the Bankruptcy Code, which

authorizes a debtor to sell assets of the estate other than in the ordinary course of business

free and clear of liens, claims, and encumbrances, provides, in relevant part, as follows:

> (b)(1) The trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate.

*    *    *

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if -
>
> > (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> >
> > (2) such entity consents;
> >
> > (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> >
> > (4) such interest is in bona fide dispute; or
> >
> > (5) such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(b)(1), (f).  See also Fed. R. Bankr. P. 6044(f)(1) ("All sales not in the

ordinary course of business may be by private sale or by public auction.").

37.     Although section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, courts have uniformly held that approval of a proposed sale of property pursuant to § 363(b) of the Bankruptcy Code is appropriate if the transaction represents the reasonable business judgment of the debtor.  See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983); see also Stephens Industries. Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in, a Chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith."); In re Delaware & Hudson Rv. Co., 124 B.R. 169,176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the preconfirmation sale of assets).

38.     The Debtors submit that the facts described above, which require a prompt sale of the Assets to preserve value for these estates, are entirely consistent with the longstanding rationale for authorizing a sale outside of a chapter 11 plan.  See In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); Financial Associates v. Loeffler (In re Equity Funding Corporation, of America), 492 F.2d 793, 794 (9th Cir.), cert. denied 419 U.S. 964 (1974) ("Other circuits have recognized the power of the bankruptcy court under Chapter X to authorize a sale of the debtor's property under less than emergency conditions where such sale is necessary to avoid deterioration in the value of the assets.") (citations omitted).  Indeed, in view of the Sale Procedures and the Debtors' and their

advisors' marketing efforts, the Debtors believe that a Sale will obtain the maximum value for the Assets.

B.    *Sale Free and Clear of Interests*

39.    Section 363 of the Bankruptcy Code, among other things, authorizes a debtor to sell property of the estate outside the ordinary course of business free and clear of any interest in such property.  See 11 U.S.C. § 363(f).  A debtor's power to sell property free and clear of interests in such property extends, also, to claims against such property.  See In re Trans World Airlines, Inc., 322 F.3d 283, 285 (3rd Cir. 2003).  As previously noted, the Sale will be free and clear of all Interests (which includes any claims against the Assets), with such Interests transferring and attaching to the net sale proceeds with the same validity, priority, force, and effect that such Interests had on the Assets immediately prior to the closing.

40.    The Debtors submit that a sale free and clear of Interests can proceed for the reasons set forth in section 363(f) of the Bankruptcy Code.

C.    *The APA Was Negotiated at Arm's Length and In Good Faith*

41.    The terms of the APA were negotiated at arm's length, without collusion, and in good faith.  Accordingly, the Debtors request that the Court determine WL Ross to have negotiated and acted at all times in good faith and, as a result, be entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.

42.    Furthermore, the Debtors submit that the APA represents substantial value to the Debtors' estates inasmuch as it provides favorable terms for the

disposition of their Assets at a price that represents fair and reasonable consideration.

See Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635 (3d Cir.1991)

(reasonably equivalent value under the Bankruptcy Code), cert. denied, 503 U.S. 937

(1992); see Mellon Bank, N.A. v. Official Comm. Of Unsecured Creditors (In re R.M.L.,

Inc.), 92 F.3d 139 (3d Cir. 1996) (same); Salisbury v. Texas Commerce Bank-Houston,

N.A. (In re WCC Holding Corp.), 171 B.R. 972, 984 (Bankr. N.D. Tex. 1994)

(reasonably equivalent value under Texas law) (citing Besing v. Hawthorne (In re

Besing), 981 F.2d 1488, 1495 (5th Cir.), cert. denied, 510 U.S. 821 (1993) and Southmark

Corp. v. Riddle (In re Southmark Corp.), 138 B.R. 820, 829 (N.D. Tex. 1992)); In re

China Resource Prod. Ltd. v. Fayda Int'l, Inc., 856 F. Supp. 856, 866 (D. Del. 1994) (fair

consideration under Delaware law) (quoting Geyer v. Ingersoll Publications Co., 621

A.2d 784, 792 (Del. Ch. 1992)).

      43.    Based upon the foregoing, the Debtors submit that to preserve and

maximize the value of their estates, the sale of the Assets pursuant to the APA (or one or

more higher or better offers) is an exercise of sound business judgment, is in the best

interests of the Debtors and their estates, and should be approved in all respects.

*D.*    *Assumption and Assignment of Certain Unexpired Leases, License Agreements*
      *and Executory Contracts Pursuant to Section 365 of the Bankruptcy Code*

      44.    Assumption and assignment or rejection[5] of certain unexpired

leases, license agreements and executory contracts are an integral part of the proposed

---

[5]   Under § 5.02(b) of the APA, WL Ross has a limited right to require the Debtors to
reject certain contracts that WL Ross elects not to assume.

Asset Sale and should be approved by the Court. Section 365(a) of the Bankruptcy Code[6]

authorizes a debtor in possession to assume or reject executory contracts or unexpired

leases subject to the bankruptcy court's approval.

      45.      Section 365(b) of the Bankruptcy Code[7] requires such debtor in

possession to satisfy certain requirements at the time of assumption if a default exists

under the subject contract, lease or agreement to be assumed.

      46.      The standard that is applied by the Third Circuit in determining

whether to permit the assumption or rejection of an executory contract or unexpired lease

is whether the proposed assumption or rejection reflects the debtor's exercise of sound

"business judgment." Sharon Steel Corp. v. National Fuel Gas Distrib. Corp. (In re

---

[6]    Section 365(a) of the Bankruptcy Code provides:

        Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

[7]    Section 365(b) of the Bankruptcy Code states, in relevant part:

  (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --

      (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;

      (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

      (C)    provides adequate assurance of future performance under such contract or lease.

Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989); see also NLRB v. Bildisco &

Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional");

In re III Enterprises, Inc. V, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted)

("Generally, a court will give great deference to a debtor's decision to assume or reject

the contract. A debtor need only show that its decision to assume or reject the contract is

an exercise of sound business judgment – a standard which we have concluded many

times is not difficult to meet."). At the hearing to consider this Motion, the Debtors will

show that adequate business justifications exist to merit judicial approval of the Debtors'

proposed assumptions and assignments and rejections of executing contracts and

unexpired leases.

47.    The APA provides that WL Ross will be obligated to pay all cure

costs required to be paid in connection with the assumption and assignment of the

Assumed Contracts. The Debtors submit that WL Ross's commitment to pay all such

cure costs satisfies section 365(b)(1)(A)'s cure requirement.

48.    Based on the foregoing, the Debtors respectfully request that the

Court approve the assumption and assignment of the Assumed Contracts as set forth in

the APA or as required by any agreement submitted by a purchaser(s) who submits a

higher or better offer(s) for the Assets.

E.    *The Debtors' Request to Eliminate or Reduce the 10-Day Stay Under Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure*

49.    Pursuant to Bankruptcy Rules 6004(g) and 6006(d), unless the

court orders otherwise, all orders authorizing the sale of property pursuant to section 363

of the Bankruptcy Code or the assumption and assignment of leasehold interests pursuant

to section 365 of the Bankruptcy Code are automatically stayed for 10 days after entry of the order.  Fed. R. Bankr. P. 6004(g) & 6006(d).

50.    Although Bankruptcy Rules 6004(g) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, Collier on Bankruptcy suggests that the 10-day stay period should be eliminated to allow a sale or assignment to close immediately "where there has been no objection to the procedure."  10 Collier on Bankruptcy ¶ 6004.09 (15th ed.1999); see also id. at ¶ 6006.04 ("the court should eliminate the 10-day stay period and allow the assignment to close immediately in all cases where there has been no objection to the assignment.").  Furthermore, if an objection to a sale or assignment is filed and overruled, Collier on Bankruptcy provides that if the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. See id. at ¶ 6004.09, 6006.04.

51.    The Debtors respectfully submit that it is in the best interests of their estates to close the Asset Sale as soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtors hereby request that the Court eliminate or reduce the 10-day stay periods under Bankruptcy Rule 6004(g) and 6006(g).

## NOTICE

52.    No trustee or examiner has been appointed in the Debtors' chapter 11 cases.  Notice of this Motion has been provided to (i) the United States Trustee, (ii) counsel to the Debtors' prepetition bank group, (iii) counsel to Prudential, (iv) counsel to the Bond Trustee, (v) counsel to Bond Committee, (vi) counsel to

WL Ross, (vii) counsel to GECC and the Debtors' other postpetition lender(s), (viii)

counsel to the Official Committees, and (ix) all parties that have requested notice in these

cases.  The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

      53.    No previous motion for the relief requested herein has been made

to this or any other court.

## CONCLUSION

      WHEREFORE the Debtors respectfully request that this Court enter an

order, substantially in the form annexed hereto as Exhibit B, granting the relief requested

herein and such other and further relief as this Court deems just and proper.

Dated: Wilmington, Delaware
     January 6, 2004     YOUNG CONAWAY STARGATT & TAYLOR, LLP

                        Pauline K. Morgan (No. 3650)
                        Joseph M. Barry (No. 4221)
                        The Brandywine Building
                        1000 West Street, 17th Floor
                        Wilmington, DE  19899
                        Telephone:  (302) 571-6600
                        Fax:  (302) 571-1253

                        – and –

                        PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
                        Andrew N. Rosenberg
                        Brian S. Hermann
                        1285 Avenue of the Americas
                        New York, New York 10019-6064
                        Telephone:  (212) 373-3000
                        Facsimile:  (212) 757-3990

                        Counsel for Debtors and Debtors in Possession.

# Exhibit A