IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CONE MILLS CORPORATION, *et al*., | : | Case No. 03-12944 (MFW) |
| | : | |
| Debtors. | : | (Jointly Administered)<br>Re: Docket No. 896 |

**OBJECTION OF WLR RECOVERY FUND II L.P. AND WLR CONE MILLS
ACQUISITION LLC TO MOTION OF DEBTORS, PURSUANT TO
BANKRUPTCY RULE 9019, TO APPROVE STIPULATION AND ORDER
AMONG DEBTORS, PENSION BENEFIT GUARANTY CORPORATION AND
THE MASTER PENSION PLAN OF CONE MILLS CORPORATION**

WLR Recovery Fund II L.P. and WLR Cone Mills Acquisition LLC (collectively, "WL Ross") object to the Motion of the Debtors, Pursuant to Bankruptcy Rule 9019, to Approve the Stipulation and Order (the "Stipulation") Among Debtors, Pension Benefit Guaranty Corporation (the "PBGC"), and the Master Pension Plan of Cone Mills Corporation (the "9019 Motion"). As further described below, this Stipulation, if approved, could, among other things, cause the failure of the Debtors' Second Amended Chapter 11 Plan of Liquidation (the "Plan of Liquidation"). In support of this Objection, WL Ross respectfully states as follows:

**BACKGROUND**

**The WL Ross Asset Acquisition**

1. On January 6, 2004, the Debtors filed the "Motion of the Debtors for an Order Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Interests Subject to Higher or Better Offers, (B) Approving the Amended and Restated Asset Purchase Agreement, (C) Approving the Assumption and Assignment of Certain Executory

WLM\200737.1

Contracts and Unexpired Leases in Connection with Such Sale, and (D) Granting Related Relief" (the "Sale Motion"). Pursuant to the Sale Motion, the Debtors sought to sell their assets free and clear of all encumbrances and liens to WL Ross, subject to higher or better bids in exchange for $45.3 million in cash and the assumption of $41.2 million in liabilities.

2.  WL Ross was ultimately the successful bidder. Accordingly, on February 10, 2004, this Court entered an Order granting the Sale Motion (the "Sale Order"), approving the sale to WL Ross under terms intended to protect the buyer from further challenges or claims against the purchased assets, including specifically claims by government agencies such as the PBGC. To that end, the Sale Order states, among other things, that "[e]xcept as expressly provided by the [Amended and Restated Asset Purchase Agreement] or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, parties to executory contracts, customers, lenders, trade and other creditors, holding Interests [as defined in the Sale Order] of any kind or nature whatsoever against the Debtors or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Assets, the operation of the business prior to the Closing, or the transfer of the Assets to the Buyer, hereby are forever barred, estopped and permanently enjoined from asserting against the Buyer, its successors or assigns, its property, or the Assets, such persons' or entities' Interests. (Sale Order ¶ 9) (emphasis added).

3.  Furthermore, the Sale Order states that WL Ross "shall have no obligation to pay wages, bonuses, severance pay, benefits (including without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment

to employees of the Debtors." (Id. ¶ 27). The Sale Order also states that, except as otherwise expressly provided in the [Amended and Restated Asset Purchase Agreement], [WL Ross] shall have no liability with respect to any employee pension plan, employee welfare or retention, benefit and/or incentive plan to which any of the Debtors is a party (including, without limitation, arising from or related to the rejection or other termination of any such agreement), and [WL Ross] shall in no way be deemed a party to or assignee of any such agreement, and no employee of [WL Ross] shall be deemed in any way covered by a party to any such agreement, and all parties to any such agreement are hereby enjoined from asserting against [WL Ross] any and all claims arising from or relating to such agreement." (Id.) (emphasis added). This provision was specifically included in the Sale Order to prevent the very type of claim the PBGC now seeks to preserve.

4.  The transactions contemplated in both the Sale Motion and the Sale Order closed on March 12, 2004 (the "Closing Date"). On the Closing Date, the Debtors sold to WL Ross substantially all of the Debtors' domestic Assets, including the transfer of the assets of the Debtors' Mexican non-debtor subsidiaries Cone Mills (Mexico) S.A. de C.V. and Cone Tamalupas S. de R.L. de C.V. (collectively, the "Mexican Assets") to WLR CM S.A. de C.V. and WLR CM2 S.A. de C.V, both Mexican subsidiaries of WL Ross. The Asset Purchase Agreement had originally contemplated a sale of the stock of these Mexican companies, but was modified by agreement of the parties to provide for the sale of the Mexican assets instead of stock. Of the $45.3 million cash purchase price paid by WL Ross, the Debtors allocated $10 million to the Mexican Assets. That number was agreed upon between the Debtors and the creditors as constituting fair consideration for the Mexican Assets. (First Amended Disclosure

Statement at 35).[1]  WL Ross did not disagree with that allocation and has since used such amount in certain Mexican tax filings.

5.    Importantly, it appears that the Debtors, and not the Mexican subsidiaries, retained the $10 million in proceeds from the sale of the Mexican Assets, presumably either on the basis that the $10 million was dividended up from the Mexican companies, used in repayment of intercompany debt, or for some other undisclosed reason.  Regardless, $10 million of the cash purchase price was earmarked and paid specifically for the Mexican Assets from the payments made and liabilities assumed by WL Ross and therefore the Debtors have directly benefited from the sale of such assets.

**The PBGC Liability**

6.    The Debtors are contributing sponsors, as defined in Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA") pursuant to 29 U.S.C. § 1301(a)(13), of the Master Pension Plan of Cone Mills Corporation (the "Pension Plan").  The Pension Plan is a single-employer defined benefit pension plan covered by ERISA pursuant to 29 U.S.C. § 1321. The Debtors are thus primarily responsible for the satisfaction of any liability to the PBGC stemming from the underfunding of the Pension Plan or the termination of such Pension Plan. Under the ERISA statutes, the contributing sponsor and each member of its controlled group is subject to a termination liability claim of the PBGC upon the termination of any underfunded single employer pension plan equal to the total amount of the unfunded benefit liabilities and

---

[1]    According to the Debtors, "35% of that $10 million allocation remains unencumbered [and] $3.5 million of the Cash proceeds received by the Debtors under the [Amended and Restated Asset Purchase Agreement] is available under the [Plan of Liquidation] for distribution to the Debtors' unsecured creditors . . . ."  (First Amended Disclosure Statement at 35-36).

-4-

interest at a reasonable rate from the termination.  29 U.S.C. § 1362.  This claim of the PBGC arises in the event of a plan termination.  See id.

7.      The Debtors' Mexican subsidiaries described above (which sold assets to WL Ross's Mexican affiliates) never contributed to the Pension Plan, nor were any of their employees ever covered by the Pension Plan.  For purposes of ERISA, however, the Debtors' Mexican subsidiaries are members of the Debtors' "controlled group" as such term is defined in 29 U.S.C. § 1301(a)(14).  It is unclear, however, whether the Mexican courts would recognize the control group liability if enforcement/collection actions were commenced in Mexico to collect on assets of the Mexican subsidiaries for the control group liability.

8.      The PBGC had taken no action to terminate the Pension Plan as of the Closing Date pursuant to the statutory guidelines.  According to the Stipulation, the PBGC filed a complaint in the Middle District of North Carolina (the "North Carolina Proceeding"), seeking among other things, to terminate the Pension Plan, on March 23, 2004, forty-two days after the Sale Order and nine days after the Closing Date.  Now, six months later, the Pension Plan still has not been terminated.  Consequently, on the Closing Date, the PBGC did not have a claim against the Debtors' Mexican subsidiaries for any joint and several liability with respect to any unfunded benefit liability of the Pension Plan under ERISA or otherwise.

9.      Only recently, the PBGC forwarded to the buyer a draft complaint, whereby it seeks to recover from WL Ross the Mexican Assets or their monetary equivalent through some sort of fraudulent transfer action/successor liability complaint, precisely the type of action WL Ross thought it was avoiding by virtue of the Sale Order and the protections afforded therein.

**The Stipulation**

10. The Stipulation provides the following primary forms of relief:

  (a) the PBGC shall agree to reduce all of its pre-petition claims against the Debtors to a single general unsecured claim in the amount of $58.7 million;

  (b) the PBGC shall vote in favor of the Debtors' Plan of Liquidation;

  (c) the PBGC, the Debtors and the Pension Plan shall release and discharge all claims they may have against each other, which includes the PBGC's joinder to the Ad Hoc Bondholder Committee's remand motion and the North Carolina Proceeding;

  (d) the PBGC shall enter into a Trusteeship Agreement that contemplates the Pension Plan will be terminated, with a retroactive date of termination as of January 29, 2004; and

  (e) the PBGC shall retain rights to assert claims against WL Ross and any entity related thereto that arise from the Pension Plan.

11. While WL Ross as a creditor of the estates[2] has no objection to the proposed settlement of the various claims, including administrative claims, of the PBGC in return for a $58.7 million general unsecured claim, WL Ross objects to the Stipulation because the PBGC apparently has given up its claims to the $10 million attributable to the Mexican Assets and instead the PBGC appears to have focused improperly on WL Ross as purchaser of the assets, when it is readily apparent that the only viable, meaningful source of recovery for the PBGC's claims (if any) is against the Mexican subsidiaries of the Debtors or the Debtors themselves as the transferees of the proceeds of the Mexican Asset sales.

---

[2] Upon information and belief, WL Ross is the single largest creditor of these estates.

WLM\200737.1

## ARGUMENT

### A. THE PURCHASE ORDER FOREVER BARS AND ESTOPS THE PBGC FROM ASSERTING ANY PENSION PLAN-RELATED CLAIMS AGAINST WL ROSS

12. In the Stipulation, the PBGC goes to great lengths to seek to reserve causes of action against WL Ross stemming from the sales transactions between the parties. As described above, however, the PBGC has clearly misunderstood the economics of such transactions. WL Ross purchased the Mexican Assets, and paid fair value for such assets in the form of the allocated $10 million. WL Ross is thus a *bona fide* purchaser of the Mexican Assets and is not liable for any fraudulent transfers. Thus, the PBGC's claims, if any, are now claims against the cash proceeds paid for the Mexican Assets, as a purported creditor of those companies as a result of the termination of the Pension Plan. As of now, however, the $10 million that WL Ross paid for the Mexican Assets is apparently not in the hands of the non-debtor Mexican entities, but rather remains in the possession of the Debtors. So, it would appear that the PBGC is simply "barking up the wrong tree." Rather than asserting an untenable claim against WL Ross, the PBGC should instead assert claims against the Debtors. And, if any party should be subjected to a fraudulent conveyance action, WL Ross submits that the proper parties would be the Debtors and their Mexican subsidiaries for the intercompany transfer of the $10 million, and not WL Ross.

13. Even assuming *arguendo* that the PBGC is correct in its belief that it could assert claims against WL Ross, then WL Ross submits that such claims are barred and estopped by the very specific language of the Sale Order, which, as set forth above, was designed specifically to avoid these types of actions by the PBGC. Because the PBGC was a notice party on all aspects of the Debtors' chapter 11 cases, the PBGC had actual notice of both the Sale Motion and the Sale Order. The PBGC should not now be allowed to disregard the clear and unambiguous

language contained in those pleadings by attempting to preserve causes of action against WL Ross.

14.  The PBGC nevertheless goes out of its way to try to carve out actions against WL Ross as purchaser of the Mexican Assets through specific reservation language of the Stipulation and in the 9019 Motion itself.  Not surprisingly, the Debtors now propose to go along with the PBGC's reservation language because the Debtors got what they wanted – the end to their litigation and a highly favorable result by virtue of the $58.7 million unsecured settlement (worth about $900,000 in real dollars).  As part of their roadmap to litigation, the PBGC included language providing that "[n]othing contained [in the 9019 Motion] shall release any person or entity other than the parties to this Stipulation from any claims, causes of action (including those held derivatively), liabilities, obligations, suits, debts, sums of money, damages demands or judgments.  <u>Without limiting the foregoing, nothing contained [in the 9019 Motion] shall impair any claim of PBGC or the Pension Plan against W.L. Ross & Co., any entity affiliated with W.L. Ross & Co., or any entity owned in whole or in part by Wilbur Ross</u>.  (9019 Motion Exh. A ¶ 8) (emphasis added).  The 9019 Motion goes further by asserting that "[n]o order of the Court, or provision of the [Plan of Liquidation] or any subsequent plan, or of any order confirming the [Plan of Liquidation] or any subsequent plan, and no finding of the Court in connection with [the Plan of Liquidation] or subsequent plan, shall adversely affect, prejudice, limit, restrict, impair, waive or estop the rights, claims or causes of action of PBGC or the Pension Plan against any Non-Debtors, including but not limited to rights against such Non-Debtors with respect to any asset valuation or allocation of proceeds from the sale of assets."  (<u>Id.</u>).

15.  WL Ross respectfully submits that the 9019 Motion is not only misleading but is also perhaps trying to undo protections afforded to the buyer in the Sale Order (another attempt

-8-

by the PBGC at revisionist history is discussed in Section B below). The 9019 Motion is attempting to create a liability against which WL Ross specifically was given protection in the Sale Order. The Debtors themselves, however, acknowledge that WL Ross never agreed to assume liabilities under the Pension Plan. (See First Amended Disclosure Statement at 36).

16.  Thus, however misguided the PBGC may be in its belief that it may assert claims against WL Ross, the PBGC cannot now or in the future assert any claims against WL Ross because whatever "rights" or "claims" the PBGC mistakenly believes it has against WL Ross have been extinguished by the Sale Order. Simply put, the PBGC is now and forever barred from seeking any and all legal or equitable claims it thinks it may have against WL Ross. The Sale Order clearly and unambiguously demands such a result.

17.  Furthermore, as discussed above, the monies to which the PBGC is asserting the PBGC Claims (as defined in the Stipulation) now belong to the Debtors, not to WL Ross. More importantly, the PBGC Claims are claims that arose with respect to the Pension Plan, employee welfare or retention, benefit or incentive plan, to which WL Ross is not a party. The PBGC cannot and should not now, or in the future, be permitted to turn to WL Ross to satisfy the PBGC Claims, which claims should be and are more properly assessed against the Debtors or their Mexican subsidiaries.

**Approval of the Stipulation Risk the Confirmation of the Plan.**

18.  Moreover, allowing the PBGC to reserve the right to assert claims against WL Ross gravely endangers the Debtors' prospects of emergence from bankruptcy. If the Court were to approve the 9019 Motion in its entirety and allow the PBGC to carve out a liability to pursue against WL Ross, and the PBGC were somehow successful, then WL Ross would have

significant claims against the Debtors' estates on account of the Debtors' selling assets to WL Ross that were recovered by another creditor. Furthermore, if the PBGC were successful, then it would call into question whether the sale of the Mexican Assets was covered by the Sale Order at all, and whether WL Ross is entitled to appropriate relief, including possibly rescission against the Debtors and their Mexican subsidiaries. While this result is unlikely, it nevertheless remains a possibility given the way the Stipulation reads now, and WL Ross would have to protect itself by using whatever legal means are available to it to prevent any distribution by the Debtors to any of their creditors until the threat of a PBGC collateral attack on the Sale Order is finally resolved.

19.     More devastatingly to the Debtors' secured creditors, with the threat of litigation from the PBGC hanging over its head, WL Ross will _not_ distribute common stock in the new entity ITG to the eligible participants as contemplated in the Plan of Liquidation. Why would WL Ross give away this value to creditors in compromise of their claims when WL Ross is potentially not getting the full value of the deal it paid for? Moreover, the return of the assets or the purchase price by the buyer to the PBGC would devastate the balance sheet of the newly formed company that owns the purchased assets, which would significantly de-value the stock contemplated to be transferred to the other creditors.

20.     In sum, approval of the 9019 Motion will likely result in costly litigation and jeopardize the Debtors' emergence from bankruptcy as well as deprive creditors of any hope of their expected recoveries.

B.  **THE DEBTORS' AND THE PBGC'S ARTIFICIAL DESIGNATION OF JANUARY 29, 2004 AS THE TERMINATION OF THE PENSION PLAN IS A INAPPROPRIATE ATTEMPT BY THE PBGC TO CREATE RIGHTS AS A CREDITOR OF THE MEXICAN SUBSIDIARIES AND TO BOLSTER ITS FRAUDULENT TRANSFER CLAIMS AGAINST WL ROSS**

21.    As described above, one of the seemingly innocuous provisions of the Stipulation is the agreement between the parties to set January 29, 2004 as the termination date of the Pension Plan. The termination date of a single-employer plan that is terminated by the PBGC in an involuntary termination in accordance with section 4042 of ERISA, is the date established by the PBGC and agreed to by the plan administrator, or in any case in which there is no agreement between the plan administrator and the PBGC (or the trustee), the date established by the Court. 29 U.S.C. § 4048(a). The setting of the January 29, 2004 termination date, however, seems designed for a different purpose. By selecting a date <u>prior</u> to the Closing Date, the PBGC seems to be artificially establishing a factual predicate for its anticipated fraudulent conveyance argument against WL Ross, *i.e.*, that the PBGC was somehow a creditor of the Mexican subsidiaries as part of the control group on the Closing Date. The PBGC, however, does not even become a creditor of the members of the control group until <u>after</u> the Pension Plan has been terminated. And it was not until March 23, 2004, eleven days after the Closing Date that the PBGC instituted the North Carolina Proceeding seeking an order from the Middle District Court of North Carolina: (a) terminating the Pension Plan; (b) appointing the PBGC as the statutory trustee of the Pension Plan; and (c) establishing January 29, 2004 as the termination date of the Pension Plan. The North Carolina Proceeding is currently pending, and the Pension Plan will first be terminated in September 2004, if and only if the Court approves the Stipulation. So, with the asset sale closing before termination of the Pension Plan, the PBGC was not a creditor of the

Mexican subsidiaries until after the Closing Date, and thus cannot have any claims against the assets transferred to WL Ross.

22. Simply put, the agreement between the Debtors, as the plan administrator, and the PBGC to select January 29, 2004 as the retroactive termination date in accordance with the provisions of 29 U.S.C. 1348, cannot establish any retroactive joint and several liability of the Mexican subsidiaries with respect to unfunded benefit liabilities that arise upon the termination of the Pension Plan, notwithstanding the effectiveness of this date as the termination date for other purposes under ERISA. Thus, while it may be appropriate for the Debtors and the PBGC to agree on a retroactive termination date for the Pension Plan for other purposes, because of the other elements of the Stipulation, WL Ross believes the PBGC's action is merely an attempt to position itself as a creditor of the Mexican subsidiaries prior to the Closing Date, to bolster its fraudulent transfer claims against WL Ross.

23. WL Ross therefore respectfully submits that the Debtors' and the PBGC's designation of January 29, 2004 as the termination date of the Pension Plan for purposes of establishing the PBGC as a creditor and in order to bolster the PBGC's fraudulent conveyance claims against WL Ross in the guise of the 9019 Motion is an inequitable and improper exercise, which this Court should deny.

WLM\200737.1

## CONCLUSION

WHEREFORE, in light of the foregoing, WL Ross respectfully requests that both the 9019 Motion be DENIED in its entirety and that WL Ross be granted such other and further relief as the Court deems just and proper.

Dated: September 13, 2004
       Wilmington, Delaware

/s/ Michael R. Lastowski
**DUANE MORRIS LLP**
Michael R. Lastowski (DE I.D. 3892)
Christopher M. Winter (DE I.D. 4163)
1100 North Market Street
Suite 1200
Wilmington, DE 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901

-and-

**STROOCK & STROOCK & LAVAN LLP**
Lewis Kruger, Esq.
Christopher R. Donoho, Esq.
180 Maiden Lane
New York, NY 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

Counsel for WLR Recovery Fund II L.P. and WLR Cone Mills Acquisition LLC

WLM\200737.1