UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Case No. 03-12944
                                    .
                                    .
CONE MILLS CORPORATION,             .
  et al.,                           . 824 Market Street
                                    . Wilmington, Delaware 19801
                  Debtor,           .
                                    . September 16, 2004
. . . . . . . . . . . . . . . .     . 11:30 a.m.


TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:              Young Conaway Stargatt & Taylor,
                                 LLP
                              By:  PAULINE K. MORGAN, ESQ.
                              The Brandywine Building
                              1000 West Street, 17th Floor
                              Wilmington, DE 19801

For the Committee:            Hahn & Hessen LLP
                              By:  MARK S. INDELICATO, ESQ,
                              488 Madison Avenue
                              14th & 15th Floor
                              New York, NY 10022

Audio Operator:               Monique Edwards

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-Mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No.   (609) 587-3599**



APPEARANCES (Cont'd.):

For Bank of America,                Richards, Layton & Finger, P.A.
  as Agent:                         By:  MARK COLLINS, ESQ.
                                    One Rodney Square
                                    920 King Street
                                    Wilmington, DE 19899

For Pension Benefit                 Arent Fox PLLC
  Guaranty Corp.:                   By:  MARY JOANNE DOWD, ESQ.
                                    1050 Connecticut Avenue, N.W.
                                    Washington, DC 20036

For the Bondholder                  Jones Day
  Committee:                        By:  RICHARD ENGMAN, ESQ.
                                    222 East 41st Street
                                    New York, NY 10017

For W.L. Ross and Company:          Strook & Strook & Lavan LLP
                                    180 Madison Lane
                                    New York, NY 10038

3

 1          THE COURT:  Good morning.

 2          MS. MORGAN:  Good morning, Your Honor.  Pauline

 3  Morgan from Young Conaway Stargatt & Taylor on behalf of the

 4  Debtors.  Your Honor, the first two items on the agenda are

 5  being adjourned by agreement of the parties.  Items 3, 4, and 5

 6  on the agenda, Your Honor, we have reached a resolution with

 7  the North Carolina Self-Insurance Guaranty Association, and the

 8  parties are in the process of preparing settlement

 9  documentation.

10          THE COURT:  Okay.

11          MS. MORGAN:  We will submit those, in all likelihood,

12  under certificate of counsel.

13          THE COURT:  All right.

14          MS. MORGAN:  Your Honor, Item 6, the South Carolina

15  Department of Health and Environmental Control's motion for

16  payment of an administrative claim, we also have reached a

17  settlement in principle with DHEC and we are in the process of

18  preparing settlement papers to be presented to the Court.

19          THE COURT:  All right.

20          MS. MORGAN:  Your Honor, the Pretrial Conference,

21  Item 7 is the subject f Item 10 on the agenda, so I suggest we

22  just skip that over for now.  Items 8 and 9 I believe Your

23  Honor has signed orders yesterday.

24          THE COURT:  I did.

25          MS. MORGAN:  So that does bring us to the motion of

4

1  the Debtors at Item 10 on the agenda for an order under
2  Bankruptcy Rule 9019 approving a stipulation and order among
3  the Debtors, the PBGC, and the Master Pension Plan of Cone
4  Mills Corporation.  Your Honor, one matter before I go to the
5  merits.  There was a reply and a motion for leave to reply
6  filed yesterday by the PBGC.  I understand Your Honor may not
7  have received that.

8          THE COURT:  I didn't get it so I'll deny the motion.
9          MS. MORGAN:  That's fine, Your Honor.  The PBGC is
10  here today and I think they can address the Court.

11          THE COURT:  All right.

12          MS. MORGAN:  Your Honor, as you will learn from the
13  evidence to be presented and from others here today the Debtors
14  believe this proposed settlement is extremely beneficial to the
15  estates and it is supported by the Debtors' significant
16  creditor constituencies, including the Committee, the Secured
17  Bank Lenders, and the Secured Bondholders.  In fact, Your
18  Honor, it may be for the firs time in this case that all of
19  those constituents have been on the same side of an issue.  The
20  only objection was filed by the buyer of the Debtors' assets,
21  WLR Recovery Fund and WLR Cone Mills Acquisition.  However,
22  Ross was careful to point out in its objection that as a
23  creditor of the estates it, "has no objection to a proposed
24  settlement of the various claims."  In fact, the objection also
25  characterized the settlement --- and this is at Paragraph 14 --

**J&J COURT TRANSCRIBERS, INC.**

5

1  as a highly favorable result.  Your Honor, the Debtors
2  certainly agree with that, and I think it makes sense for us to
3  just proceed with a proffer of testimony if that's acceptable
4  to the Court.

5              THE COURT:  Any objection by any party?

6                     (No verbal response)

7              THE COURT:  All right, I'll hear a proffer.

8              MS. MORGAN: Your Honor, Mr. Michael Dappalonia, who
9  is present in the courtroom today and he's seated at counsel
10 table, is President of Nightingale Associates LLC, a management
11 consulting firm specializing in financial restructurings and
12 turnarounds.  If Mr. Dappalonia was called to testify today he
13 would state that he has been with Nightingale since 1986, has
14 been the President of Nightingale since 2001, and he has served
15 as the Chief Restructuring Officer or the Chief Executive
16 Officer of numerous financially troubled companies.  He would
17 also state that he was engaged by the Debtors as their Chief
18 Restructuring Officer in early October, 2003.  He was retained
19 to, among other things, lead negotiations with creditor groups
20 and potential bidders regarding the terms of an Asset Purchase
21 Agreement between the company and W.L. Ross and direct and
22 oversee the sale process.  Since the closing on the sale on
23 March 12, 2004, Mr. Dappalonia has served as the Debtors' sole
24 officer.  He would state that he was extensively involved in
25 the negotiation of the settlement between the Debtors and the

1 PBGC, which is the subject of this hearing.  And he is aware of
2 the various claims asserted by the PBGC against the Debtors, as
3 well as the Debtors causes of action asserted against the PBGC
4 as set forth in the adversary complaint in Adversary 04-53729.
5 In addition, he has reviewed the W.L. Ross objection and is
6 familiar with it.

7          If Mr. Dappalonia would testify today he would state
8 that he believes this settlement is exceedingly beneficial to
9 the estates.   It would fully and finally resolve several
10 litigation matters pending between the parties and others that
11 would be commenced without this settlement.  First, the PBGC
12 has filed three separate groups of claim against each of the
13 four Debtors.   These 12 claims fall within three categories;
14 for unliquidated damages allegedly owed for the PBGC's
15 insurance premiums, interest and penalties, for alleged
16 unfunded benefit liability for the pension plan in the amount
17 of 58.7 million, and for unliquidated administrative and
18 priority claims for a portion of that 58.7 million.  Through
19 their complaint in the adversary proceeding the Debtors have
20 objected to each of those claims.  Absent a settlement the
21 Debtors would vigorously contest the administrative claim
22 alleged by the PBGC to exceed 5.6 million as well as the yet
23 unliquidated priority claims.  With respect to the general
24 unsecured claims alone there would be significant litigation
25 regarding the PBGC's calculation of its claim, including

1  whether proper actuarial data was used and whether a proper
2  interest factor was used.  Those types of calculations utilized
3  by the PBGC has been hotly contested in other courts and we
4  believe it would have been hotly contested here, as well.  The
5  litigation would be expensive, protracted, and would involve
6  the retention of additional professionals, including actuarial
7  experts.  The same would be true for the PBGC's priority and
8  admin claims.

9          Following the Debtors' rejection of their pre-
10 petition agreement with the PBGC it also field a rejection
11 damages claim in the amount of 58.7 million, and the PBGC has
12 informed the Debtors that they believe those claims are not
13 duplicative of the other PBGC claims.  Although the pending
14 complaint does not address these, without the settlement the
15 Debtors would also be objecting to those claims.  The PBGC has
16 also informed the Debtors, Mr. Dappalonia would testify, that
17 they believe they have claims against the Debtors' non-debtor
18 Mexican subsidiaries under Federal Law which provides that all
19 members of a company's control group are jointly and severally
20 liable t the PBGC for unfunded benefit liabilities.  The PBGC
21 asserts that such control group claims entitle them allegedly
22 as a direct creditor of the Debtors' non-debtor Mexican subs to
23 the proceeds of the sale of those Mexican subsidiary assets
24 ahead of the creditors of these estates.  While the Debtors
25 believe this control group claim ultimately would not be

1  enforceable in Mexico against the Mexican subs, there is no
2  certainly that the Debtors would prevail.  The litigation would
3  be protracted, costly, and complicated and would necessarily
4  involve, among other things, evaluation of the Mexican subs and
5  the Court's consideration of issues of first impression.  Mr.
6  Dappalonia would state that he is informed that there are no
7  reported cases addressing the PBGC's control group theory in
8  connection with foreign subsidiaries, and he believes that no
9  matter what the result it is likely that multiple appeals could
10 ensue following the decision.

11          This settlement will also resolve litigation pending
12 in the District Court for the Middle District of North Carolina
13 commenced by the PBGC to terminate the pension plan, appoint
14 the PBGC as a trustee, and establish a retroactive termination
15 date of January 29, 2004.  Absent a settlement the Debtors
16 would also be required to defend this litigation, including the
17 litigation of issues regarding the retroactive termination
18 date.  Again, although the Debtors believe they have a strong
19 argument, the PBGC is traditionally afforded considerable
20 discretion in these types of proceedings in other courts.  This
21 settlement resolves this litigation and relieves the Debtors of
22 their fiduciary obligations to administer the plan as well as
23 the cost of continuing that administration.

24          The settlement also resolves the adversary proceeding
25 commenced by the Debtors in this court, which includes not only

1  the objections to claims, but affirmative causes of action for
2  the recovery of alleged preferential and fraudulent transfers
3  in the amount of approximately thirteen-and-a-half million.  To
4  prevail on these claims the Debtor would need to prove that
5  payments to its own pension plan could be recovered under a
6  fraudulent and/or preferential transfer theory and that the
7  Debtors were insolvent at various times within the last four
8  years.  The litigation would be lengthy, expensive, and we
9  believe complicated.  It would necessitate the retention of
10  insolvency experts and would also require the Court to rule on
11  the novel issues of law raised by the complaint.  Mr.
12  Dappalonia is informed and believes that although the Debtors
13  have strong positions, the outcome of this litigation is also
14  uncertain.

15        Finally, the settlement provides that the PBGC would
16  not object to confirmation of the Debtors' pending Chapter 11
17  plan, which is scheduled for confirmation on the 18th of
18  October.  Saving the estate from this litigation is also
19  significant.  Absent the settlement Mr. Dappalonia has reason
20  to believe that the PBGC would object to the plan, arguing that
21  its administrative priority and control group claims are not
22  being treated fairly and equitably and challenging the
23  valuation attributed by the Debtors to the Mexican assets for
24  purposes of the plan.  In addition, if there is a valuation
25  fight over the Mexican assets Mr. Dappalonia believes that this

1  could lead to litigation  over the allocation of the entire
2  purchase price and a possible need to value the domestic
3  assets, as well.  These allocation and valuation issues would
4  add significant costs and uncertainty to the confirmation
5  process and could delay confirmation, thereby jeopardizing
6  certain distributions provided for under the plan.

7         With respect to W.L. Ross' objection to the
8  settlement and the threat of future litigation against the
9  Debtors Mr. Dappalonia would testify that even if the PBGC
10  successfully asserts causes of action against Ross in Mexico
11  and North Carolina and whatever jurisdiction they deem
12  appropriate and that thereafter Ross has grounds to assert
13  claims against the Debtors' estate the value of this PBGC
14  settlement which settles real substantial and current claims of
15  the estate outweighs the risk of a potential lawsuit by the
16  Ross Organization against the Debtors.

17         Mr. Dappalonia would testify that in contrast to the
18  benefits just outlined above relating to claims that would be
19  resolved the concessions being given by the Debtors are few.
20  We -have conceded to the appointment of the PBGC as the trustee
21  for the pension plan and the termination of the plan as of
22  January 29th, 2004, and the Debtors have conceded to the
23  allowance of the PBGC's general unsecured claim, one claim in
24  the amount of $58.7 million.  Again, although the Debtors
25  believe they have good arguments, the outcome of the litigation

1   is uncertain.  And again, Mr. Dappalonia has been informed of
2   recent case law in the United Airways case -- I'm sorry, the
3   U.S. Airways case, that would support the low statutory rate of
4   interest used by the PBGC in calculating its claim.  He would
5   testify that this settlement, without a doubt, is in the best
6   interest of creditors.  What the Debtors are giving up, mainly
7   the allowance of the claim and the stated amount of the claim,
8   is worthwhile and supportable in comparison to the risk to the
9   estates if the PBGC prevails in its multi prong litigation with
10  the Debtors.  The Debtors would be relieved of all liability
11  for the admin and priority and control group claims, any one of
12  which if allowed would be required to be paid dollar for dollar
13  under the plan.  He estimates that absent this settlement the
14  PBGC would be seeking more than one-third of the distributable
15  value to the estates on account of one or more of its priority
16  claims.  In contrast under this settlement the PBGC will
17  receive its one general unsecured claim, which under the plan
18  is expected to recover less than a million dollars,
19  approximately $900,000.  Although the Debtors do believe they
20  have good claims, the Debtors have determined that it is in the
21  best interest of their estates to dismiss these claims in
22  exchange for the elimination of all of the senior claims of the
23  PBGC.  This stipulation provides finality, relieves the Debtors
24  of risks and uncertainties of litigation and relieves the
25  Debtors of their continuing obligation to administer the

1 pension plan.

2          He would testify that in light of the multiple
3 complicated issues to be litigated before this and other
4 Courts, the novel issues to be presented, the valuation and
5 actuarial experts needed to properly prepare for each trial,
6 the cost to litigate could cost the estate more than $5
7 million. He would testify that in his business judgment the
8 settlement is not only justified by the benefits, but is
9 imperative for confirmation of the plan. And that would
10 conclude the proffer.

11          THE COURT: All right. Does anybody wish to cross
12 examine Mr. Dappalonia?

13                     (No verbal response)

14          THE COURT: All right, I'll accept the proffered
15 testimony.

16          MS. MORGAN: And, Your Honor, that would conclude the
17 Debtors' evidence.

18          THE COURT: Does anybody else wish to present any
19 evidence?

20                     (No verbal response)

21          THE COURT: All right, I'll hear argument.

22          MS. MORGAN: Thank you, Your Honor. Your Honor,
23 based on the evidence you just heard and the factors to be
24 evaluated in determining whether a settlement is appropriate
25 under 9019 the Debtors believe they have easily satisfied the

1    standards.  Mr. Dappalonia described the litigation matters

2    that would be resolved by this and also identified the

3    challenges to be overcome if we choose to litigate rather than

4    settle.  His testimony also demonstrates that approval of the

5    settlement promotes the paramount interest of creditors.  The

6    objection by W.L. Ross does not take issue with very much of

7    this and even admits that the settlement represents "a highly

8    favorable result"; nevertheless, Ross acting not as a creditor,

9    but acting in its own parochial interest as a buyer urges the

10   Court to reject the settlement essentially because the

11   settlement does not protect Ross enough.  Because this

12   objection is posed not in its creditor capacity, Your Honor,

13   the Debtors would assert that Ross doesn't even have standing

14   to be heard and that the objection should be disregarded.  But

15   even if the Court chooses to consider it it should consider it

16   for what it is and it's attempted by Ross to basically hold the

17   settlement up to extract a release for itself.  The objection

18   specifically complains about the PBGC's reservation of rights

19   against third parties, including Ross, but the stipulation does

20   not confer any new rights on the PBGC and the PBGC can't

21   reserve rights it does not have.  So if Ross is correct that

22   the Sale Order provides strong protection and the Debtors

23   intended to provide strong protection in the Sale Order then

24   there is nothing in this stipulation that changes that.

25            The Debtors did work hand in hand with Ross to obtain

1  a sale order and to structure the sale in a manner that would
2  provide the greatest possible protections.  And it's true that
3  the Sale Order contemplates that Ross only assumed very limited
4  liabilities.  The Sale Order also specifically says that Ross
5  does not assume pension plan liability, but the Debtors were
6  not capable of delivering releases from third parties on ever
7  potential legal theory that could be framed and the Debtors did
8  not agree to indemnify Ross for such claims.  Ross is an
9  important creditor -- the largest creditor, we believe, in the
10  estates -- and clearly he is willing to exert that influence to
11  potentially disrupt this settlement.  In its objection it
12  threatens to refuse to distribute stock to secured bondholders
13  as promised in the plan and it suggests that in the future it
14  might sue the Debtors for recision if the PBGC successfully
15  pursues the claim, although it concedes -- and this is
16  Paragraph 18 -- that such a result is unlikely.

17         The Debtors agree that that is unlikely, that
18  threatened litigation claims against the estate are remote and
19  far fetched because the Sale Order did provide broad protection
20  to the buyer and the Debtors conveyed to Ross everything it
21  could and everything it asked for in the Sale Order.  The value
22  of the pending PBGC settlement which settles real and
23  substantial claims asserted by the PBGC today far outweigh the
24  risk that, again, the PBGC would prevail against Ross would in
25  turn prevail against the Debtors down the road.  In any event,

15

1  Your Honor, not approving the settlement would have no bearing
2  on whether the PBGC can sue Ross.  They can sue Ross today
3  whether we have a settlement or not.  Not approving the
4  settlement simply means that the PBGC can sue us and Ross and
5  us -- the estate, Your Honor, is what Your Honor should be
6  legally concerned with protecting.

7          With respect to Ross' threat to disrupt the plan.
8  It's certainly possible that even when Ross puts its creditor
9  ha back on it may want to do that.  We can't predict how far
10 Ross would be willing to push this, but we do know that a lot
11 has already been invested in the plan process.  Ross is the
12 largest creditor and stands to benefit if the plan is
13 confirmed.  In any event, the Debtors believe they have a
14 confirmable plan even if Ross does object to it.  And, Your
15 Honor, the Debtors are not aware of case law under 9019 that
16 would suggest that a settlement that is beneficial to the
17 estate should be rejected because of something that might
18 happen in the future.  The Debtors urge the Court to view this
19 settlement on its own.  The settlement is important to the
20 estate; it's important enough that we'll simply have to deal
21 with whatever actions Ross may take in the future with respect
22 to the plan process.  But we believe that the settlement
23 standing on its own is clearly beneficial to the estate and
24 outweighs all of the risks, including those articulated by
25 Ross.

1        THE COURT:   Thank you.   Anybody else want to speak in

2   support of the settlement?

3        MR. INDELICATO:   Good morning, Your Honor.   Mark

4   Indelicato from Hahn & Hessen on behalf of the Official

5   Unsecured Creditors Committee.   Your Honor, right after the

6   sale was concluded in meetings with the Debtor we targeted and

7   we realized that unless a resolution with the PBGC was reached

8   getting to confirmation would be difficult and exceedingly

9   expensive.   We were happy when the Debtor informed us that they

10  were able to negotiate a settlement with the Debtor (sic).   We

11  believe this settlement -- for all of the reasons as stated by

12  Mr. Dappalonia and counsel, we believe this settlement is in

13  the best interest of the estate and we urge you that over the

14  objection of Wilbur Ross that it be approved.   We point out

15  that we think the Debtor is right that since Ross is objecting

16  in his hat as purchaser that he lacks standing to object to the

17  settlement in this case; and as a creditor he is supporting it

18  so we believe that the objection, in fact, should be ignored

19  and the settlement should be approved.

20        THE COURT:   All right, thank you.

21        MR. COLLINS:   Good morning, Your Honor.   For the

22  record, Mark Collins of Richards, Layton & Finger on behalf of

23  Bank of America.   Your Honor, for many of the reasons stated by

24  Ms. Morgan and the proffered testimony of Mr. Dappalonia Bank

25  of America does very much support the Debtors' motion.

1    THE COURT:  Thank you.

2    MS. DOWD:  Good morning, Your Honor.  Mary Jo Dowd

3  appearing on behalf of the PBGC.  We're here obviously to

4  support the settlement that we've signed with the Debtor and

5  also to emphasize that there was an important reservation of

6  rights, as explained by the Debtor, with respect to the PBGC's

7  claims against non-debtors which the PBGC is in the process of

8  pursuing in the North Carolina Federal District Court.  The

9  Sale Order that Your Honor entered in February approving the

10  sale of the Debtors' assets did just that.  The Asset Purchase

11  Agreement proposed to transfer assets that the Debtor owned and

12  stock that the Debtor owned in non-debtor subsidiaries.  The

13  Court approved that.  In the objection to the sale the buyer is

14  now purporting to expand that protection to include assets that

15  he alleges he acquired post sale order pursuant to an amended

16  Asset Purchase Agreement and to which the Sale Order simply

17  doesn't provide any protections whatsoever.  Asset is a defined

18  term in the Asset Purchase Agreement and in the Sale Order and

19  it doesn't include assets of non-debtors.

20    Another point that we'd like to draw the attention of

21  the Court to is the proceeding that is pending also in the

22  North Carolina Federal District Court with respect to the

23  involuntary termination of the Debtors' pension plan was filed

24  as the Ross objection point out in March, which was after the

25  sale.  However, the termination date for the pension plan

1  predates both the Sale Order and the closing.  The termination

2  date is January 29th of 2004.  The case law in support of

3  setting of a termination date in this context where you're

4  doing an involuntary termination of a plan is clear.  There's

5  case law in the Second, Third, and Fourth Circuits.  The late

6  reply that we filed that Your Honor hasn't had an opportunity

7  to review has the case cites in there.  Your Honor, I'm happy

8  to read those into the record.

9           THE COURT:  That's fine.

10          MS. DOWD:  The case law establishes that if the plan

11 and the PBGC cannot agree on a termination date in the context

12 of an involuntary termination then the Federal District Court

13 will determine that date, and they look at two factors, when

14 was notice given of the intended date that the PBGC selected

15 for termination of a plan and what would the harm be to the

16 PBGC of a delayed termination.  And under those factors January

17 29th, 2004 is the appropriate termination date and there's

18 nothing retroactive about it.  Notice was published of the

19 termination date in newspapers in North and South Carolina on

20 January 29th, 2004 and te debtors and the relevant parties had

21 notice of it at that time.  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          MR. ENGMAN:  Thank you, Your Honor.  Richard Engman

24 of Jones Day on behalf of the ad hoc Bondholders Committee.

25 We, too, are in support of the settlement between the Debtors

1 and the PBGC and would echo the comments made by their counsel.
2 I would also echo Ms. Dowd's description of the sale process.
3 The order -- the Purchase Agreement that was filed that was
4 before the Court when Your Honor in a close decision granted
5 the sale applied to the assets of the Debtor; it specifically
6 stated that the Debtor was selling it's stock -- the stock of
7 its foreign subsidiaries.  Apparently after the Sale Order was
8 entered at some point the parties agreed that instead of
9 selling the stock of the foreign subsidiaries they would
10 transfer assets of the foreign subsidiaries.  There wouldn't be
11 a question if it was actually the stock of the foreign
12 subsidiaries, whether the liabilities that are associated with
13 those companies were also acquired.  The only reason that there
14 is an issue is because a post Sale Order amendment was made
15 that Your Honor wasn't aware of.

16            THE COURT:  All right.  Anybody else?

17                 (No verbal response)

18            THE COURT:  All right.  I'll hear the objecting
19 parties.

20            MR. DONOHO:  Your Honor, Christopher Donoho of Strook
21 & Strook & Lavan on behalf of W.L. Ross and Co..  Just a couple
22 of clarification points to get started because I think there
23 may be some misunderstanding as to what it is that we're really
24 objecting to as part of the settlement and the scope of the
25 Sale Order because I think that's been muddled both by the

1  language of the stipulation and by what's been said here today
2  and perhaps even by our own pleadings.  So to help clarify that
3  I want to start off by saying there's nothing about our
4  objection that's trying to expand the protections of the Sale
5  Order in any way.  And really to the contrary, our objection on
6  that issue was to the language that was ut into the stipulation
7  that seeks to go beyond what was originally in the Sale Order
8  and the protections afforded both to the seller as the seller
9  of the assets that were sold as well as to the buyer, the
10  protections that are afforded all buyers of debtor assets in
11  Chapter 11 cases.  There's a provision -- and probably
12  wondering okay, what are you talking about -- Paragraph A of
13  the stipulation that settles the claim -- well let me start
14  with -- Paragraph 7 refers to in each instance not waiving
15  claims or limiting claims against no-debtors, which is what
16  we'd expect it to say.  The same thing is true is in -- later
17  on at the bottom of Paragraph 8 - and we're not contesting that
18  The PBGC certainly has the ability to chase non-debtors because
19  they are not covered by the Sale Order and, in fact, they've
20  already commenced a litigation yesterday in North Carolina
21  against some of the non-debtor entities, I believe, if I have
22  the various names of the entities right.  But what Paragraph 8
23  does is it has a provision at the second sentence -- it says
24  that without limiting the foregoing nothing contained herein
25  shall impair any claim of PBGC or the pension plan against W.L.

1 Ross and Co. and any entity affiliated with W.L. Ross and Co.
2 or any entity owned in whole or in part by Wilbur Ross.  Well
3 we read that and follow the next sentence that says that no
4 order of the Court or provision of the plan or any subsequent
5 plan or of any order confirming the plan so on and so forth
6 shall adversely affect, prejudice, limit, restrict, impair
7 waiver, stop the rights, claims, or causes of action of the
8 PBGC or the pension plan against non-debtors.  Well it's the
9 language prior to that, the language that refers to claims
10 against W.L. Ross and Co. that is, we think, too broad.

11        THE COURT:  Why is it too broad?  Nothing in this
12 order -- in this stipulation impairs any claim against W.L.
13 Ross.

14        MR. DONOHO:  What claims could they have against W.L.
15 Ross?  I mean, there --

16        THE COURT:  Who cares?

17        MR. DONOHO:  Well we care as the buyer of the assets.

18        THE COURT:  Well who cares because nothing in this is
19 impairing those claims?  It's not creating any claims, but it's
20 not impairing those.  That's all it says, nothing we're doing
21 impairs any claims they may have against Ross.

22        MR. DONOHO:  Okay.  And nothing that's happening by
23 the stipulation is similarly going to reduce or limit the prior
24 order that you have entered with respect to the sale.  That's
25 really the confirmation that we're looking for here.

1          THE COURT:  Well nothing in it says that it does.

2          MR. DONOHO:  Okay.  Then I guess I perhaps read it

3  differently and I guess I'm happy to hear that the Court

4  believes that that doesn't give them --

5          THE COURT:  I don't think the parties said anything

6  differently.

7          MR. DONOHO:  Okay.  Then I --

8          THE COURT:  Nothing is creating or impairing any

9  rights.

10         MR. DONOHO:  Okay.  Then I'll move on to the next

11  point --

12         THE COURT:  Okay.

13         MR. DONOHO:  -- which is really the -- the strange

14  thing about this -- we had said in our objection that we don't

15  object to this as a creditor because taking the perspective of

16  Wilbur Ross holding both secured and bank debt claims and bond

17  claims here it's a good deal for the estate and it's a good

18  deal for Ross in that capacity, but what's going to happen here

19  -- what's already started is the PBGC is going to bring claims

20  against the Mexican entities as well as I think the U.S.

21  entities effectively as transferees, recipients of these non-

22  debtor asset sales.  The seller of those assets was presumably

23  those non-debtor entities.  The proceeds of those sales is, not

24  surprisingly, in the hands of the Debtor, and it's the Debtor

25  that's going to be distributing out the proceeds of those

1  sales.  So maybe it's a paternalistic view or something, but
2  what's going to happen is the PBGC is going to -- has this
3  litigation -- assume the worst -- assume that they get a claim
4  against -- or they proceed against a claim against Ross
5  effectively as a non-bonafide purchaser on a fraudulent
6  transfer basis.  Well Ross paid a purchase price, obviously,
7  got the assets.  Our argument will be is we're a bonafide
8  purchaser.  Your claim, your best claim is against the
9  recipient of the proceeds of that sale.

10        THE COURT:  And they've settled with the recipient?
11        MR. DONOHO:  And they settled with them.  But --
12        THE COURT:  Okay, so?  We don't ever have litigation
13 where one party settles out?

14        MR. DONOHO:  They may, but I don't -- I'm not sure
15 that that's what they think is happening.  I think they think
16 that Ross is the transferee -- is the recipient of these
17 fraudulent transfers.

18        THE COURT:  Well they may, but I don't have that
19 litigation in front of me.

20        MR. DONOHO:  Well I hope that you will.  They have
21 brought these claims --

22        THE COURT:  You think PBGC -- I have jurisdiction
23 over a claim by PBGC against W.L. Ross?

24        MR. DONOHO:  I think that you will and here's why.
25 If to the extent that the PBGC is successful -- well --

1  following along their litigation, they're suing Ross, if they
2  win and they get a claim against the acquirer of the assets
3  then there's a damage claim that the buyer, Ross, has against
4  the seller, the Debtors --

5       THE COURT:  Well there may be or may not be.  I may
6  have jurisdiction over that, but it's not before me today.

7       MR. DONOHO:  But it will be and that's what we're
8  trying to --

9       THE COURT:  Well so what.

10      MR. DONOHO:  -- fend off is -- what's going to end up
11 happening is we're going to have -- Ross buyer will have a
12 claim back against te Debtor.  They're going to file an
13 administrative claim ver shortly now that this litigation has
14 been commenced.  We'll then have a plan that would be
15 effectively derailed.  Let's say --

16      THE COURT:  You may be objecting to the plan, then
17 I'll deal with it then.

18      MR. DONOHO:  If what you're saying is you can see
19 that the PBGC ma have claims and that they're walking away from
20 them and --

21      THE COURT:  They may have claims against the Debtor.
22 They're settling those claims against the Debtor.

23      MR. DONOHO:  And by doing so -- that's fine.  Again,
24 we have no objection to that aspect, but what's going to happen
25 -- and you're saying if it happens it happens and we'll deal

1 with it when we get there –

2          THE COURT:  Right.

3          MR. DONOHO:  -- is the plan that they've put forth is

4 going to, I think, unravel because of the potential claims

5 against us, and there's no way that Ross is going to vote in

6 favor of a plan that would distribute out the proceeds of the

7 sale.

8          THE COURT:  Well that's a different issue, that's for

9 October 18th, but I don't think it affects whether the

10 settlement in and of itself should be approved.

11          MR. DONOHO:  Okay.  That's really the point we have.

12 I don't think there's much more to say about it if you --

13          THE COURT:  All right.

14          MR. DONOHO:  -- don't view the settlement as

15 impacting -- or if the impact of the settlement on the plan is

16 irrelevant for determining the appropriateness and the

17 approvability of the settlement then --

18          THE COURT:  Well I'm not sure that I can determine

19 conclusively its effect on the plan.  I don't know what the

20 votes are on the plan.  The objections to the plan haven't been

21 filed.  You may settle with the PBGC, you may not.  You may win

22 in the litigation in North Carolina against the PBGC.  There

23 are a lot of speculative factors here that I don't think are

24 really -- well they certainly aren't before me.

25          MR. DONOHO:  Okay.  Can I turn to the last issue --

1        THE COURT:   Yes.

2        MR. DONOHO:   -- which is the termination date?

3        THE COURT:   Yes.

4        MR. DONOHO:   Now I'm not a ERISA attorney so all the

5  impact of the termination dates I'm not as familiar with, and

6  on another day I would have had a PBGC familiar -- ERISA

7  familiar attorney with me, but because of the Jewish holiday I

8  don't have that support today.   But the termination date that

9  they're proposing, which is the 29th of January, by doing so

10 they're trying to effectively retroactively create a claim

11 against the sellers when, in fact, the sale is really the date

12 on which the plan would have terminated.   They didn't terminate

13 the plan -- they still haven't terminated the plan.   It's the

14 settlement that they're executing today with the Debtors that

15 will institute the termination date.   And the termination date

16 really, as far as I understand, really does two things.   Number

17 one -- well there's a bunch of things, but the two most

18 important things are it helps employees understand when their

19 benefits stop accruing and it also sets a date on which the

20 claim arises for purposes of the control group liability.   So

21 they're saying okay, even though you, Ross, bought the assets

22 in March and there was no claim at that time and there was no

23 lien that could have arisen at that time, nevertheless, we have

24 a claim back in time in January and we're going to use that

25 claim that didn't exist when you bought the assets to bring our

1  claim against you now going back in time, which is really a
2  bizarre concept.

3          THE COURT:  Well to the extent you have defense to
4  that and say that the termination should not have been
5  effective earlier can you raise that in the North Carolina
6  litigation?

7          MR. DONOHO:  Not really.  Again, this is not my area
8  of expertise, but my understanding is that if the plan
9  administrator, which is the Debtors in this case, and the PBGC
10 agree on the date then that's the date.  I don't think there's
11 anything more you can do about that.  And that's obviously a --

12         THE COURT:  Then what standing do you have to object
13 to their agreement to a date?

14         MR. DONOHO:  Well they're asking you.  See normally
15 they would go -- if they can't agree on a date they would go to
16 the North Carolina Court.

17         THE COURT:  But if they --

18         MR. DONOHO:  The reason they have agreed on a date is
19 because it's par of this larger settlement that they're
20 implementing and they're coming to you to approve the date.

21         THE COURT:  Well let's posit that they agreed amongst
22 themselves and went to North Carolina.  You would have no
23 standing to object to that date.

24         MR. DONOHO:  Honestly I don't know the answer to that
25 question.  I don't know that we do.

1          THE COURT:  If the parties agree -- and the parties

2   are the plan administrator and the PBGC -- that's the date.

3   Isn't that the law?  So whether they agree and I approve it or

4   don't approve it isn't really relevant under ERISA, is it?

5          MR. DONOHO:  I think if taken in isolation you're

6   right.  I think they're coming to you for approval as par of

7   the settlement process.

8          THE COURT:  Because it doesn't hurt the Debtor one

9   way or the other.

10          MR. DONOHO:  That's right, the debtor doesn't care --

11          THE COURT:  Right.

12          MR. DONOHO:  -- and so they're conceding the point in

13   exchange for getting a good deal --

14          THE COURT:  Right.

15          MR. DONOHO:  -- on the buyer's, you know -- to the

16   buyer's detriment effectively.

17          THE COURT:  I'm still not sure why the date really is

18   relevant to you --

19          MR. DONOHO:  Well we bought assets on --

20          THE COURT:  -- if it terminated the day you bought

21   the assets --

22          MR. DONOHO:  Well, I mean, they didn't even commence

23   their action to terminate the plan until after the assets had

24   been sold.

25          THE COURT:  But you concede that the plan would have

1  been terminated the day you bought the -- the minute you bought

2  the plan because the assets --

3          MR. DONOHO:  Well no.  If I conceded that I didn't

4  mean to.  Again, it's not -- again, I am speaking out of my

5  area of expertise.  I don't know when the date -- I don't know

6  that the date would have been at the same instant or -- but I

7  assume it has to be after the sale.

8          THE COURT:  Why after the sale?

9          MR. DONOHO:  Because they were continuing to operate

10 under the plan up until the instant of the sale.

11         THE COURT:  Right.

12         MR. DONOHO:  I would imagine that if the sale takes

13 place then the next moment afterwards the plan would terminate.

14         THE COURT:  It can't happen simultaneously?

15         MR. DONOHO:  Again, I've been put in a really bad

16 position in that I've been -- you know -- given the settlement

17 on short notice set for, you know, a Jewish holiday and I just

18 don't have -- you know, there's really no one at my firm who is

19 familiar with -- sufficiently familiar with ERISA Law who is

20 available so I really can't answer the questions.

21         THE COURT:  Well in considering a settlement I have

22 to consider the effect on the estate, not the effect on anybody

23 else, even the buyer, so I'm not even sure it's relevant.  It

24 may harm you, it may not, but it's of no moment to the Debtor.

25 And there is some law cited by the PBGC to the effect if there

1  is some case law that supports their legal position the Debtor

2  is willing to concede that point as part of the overall

3  settlement.  I think it should be approved.

4          MR. DONOHO:  Thank you, Your Honor.

5          MS. MORGAN:  Your Honor, may I approach with --

6  there's two orders, one approving the 9019 Motion and one

7  dismissing the adversary?

8          THE COURT:  Yes, you may.  All right, I will enter

9  both orders then.

10          MS. MORGAN:  Thank you, Your Honor.  Your Honor, the

11  next item on the agenda is the interim fee applications for

12  professionals.  Most, but not all the professionals are

13  represented here today, and we are available to answer any

14  questions the Court ma have.

15          THE COURT:  All right.  I have no questions about

16  any, and I'll enter the orders approving them.

17          MS. MORGAN:  Thank you, Your Honor.  I do have an

18  Omnibus order.

19          THE COURT:  Okay.  Thank you.  That's it.

20          MS. MORGAN:  Your Honor, one more thing if we may beg

21  the Court's indulgence, a housekeeping matter I believe the

22  Committee would like to address.

23          THE COURT:  Okay.

24          MR. INDELICATO:  Thank you, Your Honor.  Mark

25  Indelicato on behalf of the Committee.  Your Honor, in the

1  context of the plan solicitation this Court approved the

2  disclosure statement which has gone out.  Both to local counsel

3  and our office has received some calls from creditors

4  requesting some guidance as to the Committee's view.  It was

5  originally anticipated that we would include a letter along

6  with the solicitation materials.  For whatever reason that did

7  not go out.  We believe since the disclosure statement has

8  approved and we're recommending that creditors support the plan

9  that we did not need to get that approved by the Court.  But

10 out of an abundance of caution we're informing the Court that

11 we would like authority to send out a letter informing

12 creditors that the Committee does support the plan and what the

13 two classes are for unsecured creditors and the threshold at

14 which they might want to consider reducing their claims to

15 receive -- go into one class or another.  So if the Court has

16 no objection we would like to send out that letter as quickly

17 as possible.

18          THE COURT:  All right.  Does anybody else wish to be

19 heard on that?

20          MR. INDELICATO:  We have provided copies of the

21 letter to the Debtor, Your Honor, just in case they had any

22 issues.

23          THE COURT:  All right.

24          MR. INDELICATO:  Thank you, Your Honor.

25          THE COURT:  Since you don't need my approval I won't

1  give it, but I won't tell you you can't do it.

2          MR. INDELICATO:  Thank you, Your Honor.

3          MS. MORGAN:  Thank you, Your Honor.  That does

4  conclude our agenda.

5          THE COURT:  All right.  We'll stand adjourned then.

6  Thank you.

7                          * * * * *

8                  **C E R T I F I C A T I O N**

9          I, Lori Auletta, court approved transcriber,

10  certify that the foregoing is a correct transcript from the

11  official electronic sound recording of the proceedings in the

12  above-entitled matter.

13  _____                September 27, 2004

14  LORI AULETTA

15  J&J COURT TRANSCRIBERS, INC.

16

17

18

19

20

21

22

23

24

25