IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CONE MILLS CORPORATION, *et al.*, | ) | Case No. 03-12944 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | Hearing Date: February 28, 2005 at 10:30 a.m. |
| | | **Re: Docket Nos. 998 and 1137** |

**DEBTORS' CONSOLIDATED OBJECTION TO WLR
RECOVERY FUND II L.P., WLR CONE MILLS ACQUISITION
LLC AND INTERNATIONAL TEXTILE GROUP, INC.'S MOTIONS
SEEKING (1) ENFORCEMENT OF THE COURT'S SALE ORDER INJUNCTION
OR, (2) ALTERNATIVELY, (i) ALLOWANCE OF ADMINISTRATIVE CLAIMS, OR
(ii) RESCISSION OF THE DEBTORS' ASSET SALE**

Cone Mills Corporation ("Cone Mills"), CIPCO S.C., Inc. ("CIPCO"), Cone Foreign Trading LLC ("Cone Foreign Trading") and Cornwallis Development Co. ("Cornwallis"), the above-captioned debtors (collectively, the "Debtors"), by and through their undersigned attorneys, hereby submit this consolidated objection (the "Objection") to the two motions filed by the purchasers of the Debtors' assets and their successor, and captioned as follows: (I) Motion of WLR Recovery Fund II L.P. and WLR Cone Mills Acquisition LLC for (1) Order Enforcing Sale Order Injunction Against the Debtors and the Pension Benefit Guaranty Corporation, or Alternatively (2) for Allowance of an Administrative Claim pursuant to 11 U.S.C. §§ 105(a), 363 and 503(a) or (3) for Rescission of the Sale (the "PBGC Motion") and (II) Motion of International Textile Group, Inc. for an Order (1) Granting it an Administrative Claim Against the Debtors pursuant to 11 U.S.C. §§ 105(a), 363 and 503(a), or, Alternatively (2) to Set Aside the Sale Order and Rescind the Sale (the "Crompton

Motion," and together with the PBGC Motion, collectively, the "Motions"). In support hereof, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1. More than one year ago, this Court presided over a two-day, hotly contested hearing to consider the Debtors' sale of substantially all of their assets to WLR Recovery Fund II L.P. and WLR Cone Mills Acquisition LLC (collectively, the "Buyer"). Subsequently, the Debtors, their creditors and the Buyer engaged in further litigation over the propriety of this Court's approval of the Debtors' asset sale to the Buyer. Ultimately, the Debtors closed on their asset sale and embarked on the next phase of these cases – to develop, prosecute and confirm their plan of liquidation (the "Plan"), which was filed with this Court on August 20, 2004. The Plan was "consensual" – the product of months of negotiations amongst the Debtors and their multiple stakeholders – and the Debtors hoped that the "litigation phase" of these chapter 11 cases was over.

2. Unfortunately, the Debtors have been dragged back into yet another litigation morass. This time, the Debtors find themselves caught unwillingly in the middle of litigation between multiple non-debtor third parties – those are, the Buyer and its successor by merger, International Textile Group ("ITG," and together with the Buyer, collectively, the "Movants"), on the one hand, and the PBGC, the New Jersey Department of Environmental Protection ("NJDEP"), Crompton Corp. and Crompton Colors, Inc. (collectively, "Crompton"), on the other.[1]

---

[1] This litigation in turn has spawned yet more litigation in the context of what was a wholly consensual plan. The Movants have now objected to the Plan; this objection is based in large part on the argument that the Plan is not feasible due to the administrative claims asserted by the Movants which are the subject of this Objection. See Objection of WLR Recovery Fund II, L.P. and International Textile Group, Inc. to Confirmation of the Debtors' Second Amended Chapter 11 Plan of Liquidation at ¶ 23.

3. It is unclear what exactly the Movants' legal basis is for seeking relief against the Debtors on account of litigation commenced against them by various non-debtor parties. The Motions are – to say the least – purposely vague on this basic point. As an initial matter, the Movants seek to force the Debtors to "comply with the Sale Order." What the Movants are seeking in this regard is anyone's guess. Three third parties – the PBGC, NJDEP and Crompton – are suing the Movants; the Debtors are not. There is no allegation that the Debtors have taken any action which violates the Sale Order. In sum, the Debtors are at a total loss as to how they are supposed to "comply" with the Sale Order or what they are expected to do to force the PBGC, NJDEP and Crompton to abandon their litigation. Accordingly, the Debtors will not speculate and will leave it to the Movants to explain to the Court at oral argument exactly what actions the Debtors have taken in violation of the Sale Order and why they think compliance by the Debtors is necessary.

4. Next, the Movants seek to assert administrative expense claims for any damages they may be required to pay to the PBGC, NJDEP and/or Crompton. There is, however, no legal basis for such claims. The stated bases for such claims – *i e*, that the Debtors breached the asset purchase agreement or acted "tortiously," – are entirely without merit. First, there is no breach of any provision of the asset purchase agreement. Moreover, in any event, as a matter of law, there cannot possibly be any breach because the asset purchase agreement specifically provides that the representations, warranties and covenants contained therein *did not survive the closing*. APA at § 10.01. The asset purchase agreement also lacks any indemnities, escrows or holdbacks. Remarkably, the Movants nowhere mention these facts or provide a basis for proceeding with contractual breach claims in light of the foregoing.

5. Lacking any contractual breach as a basis for damages, the Movants seek a remedy in the bastion of all contractual parties without a contractual remedy – tort. In this case, lacking any recognized tort to allege, the Movants are reduced to alleging "tortious conduct," whatever that is (the tort of not delivering free and clear assets?). The specific "tortious conduct" itself is, of course, never spelled out. The bottom line is that the Buyer contractually agreed that it could not assert any breach claims after the closing and it cannot evade its bargain by conjuring up some vague "tortious conduct" claim.

6. Failing at articulating a breach or tort claim, the Movants lastly resort to the "equities" to justify their requests for administrative claims. However, as demonstrated more fully below, the equities overwhelmingly warrant denial of the Movants' requests. For starters, it bears remembering that the asset sale price was found by the Court to barely exceed "liquidation value." The secured creditors were painfully aware of the low price and insisted that they at least be guaranteed the cash purchase price provided for in the asset purchase agreement; accordingly it was contractually agreed that the Buyer would have no post-closing recourse to the Debtors. See APA at § 10.01. The grant of administrative claims here would unravel this agreement and would equate to the Debtors now indemnifying the Movants against the claims brought by the PBGC, NJDEP and Crompton. However, as noted above, parties to the asset purchase agreement purposefully excluded an indemnity or any other recourse from the Debtors and the Buyer should not now be permitted to obtain a back-door indemnity through section 503(b) of the Bankruptcy Code. Permitting the Buyer to now dip back into these estates through section 503(b) could further reduce the purchase price to the point where the Buyer may end up purchasing the Debtors' assets for free. Surely, such an outcome would not be equitable.

7. Furthermore, when considering the "equities," it must also be noted that these claims were no surprise to the Movants – they were fully aware of both the potential Crompton claims (which were scheduled as part of the APA) and PBGC claims. Also, it was the Movants who insisted on modifying the asset purchase agreement so as to purchase the Debtors' non-debtor subsidiaries' Mexican assets directly – ironically it is this structure which is now the subject of the PBGC Complaint.

8. Moreover, as for the allegations that the Debtors are somehow liable for not providing notice to Crompton, it has come to the Debtors' attention through discovery related to Crompton's separate litigation with the Movants that the Debtors did, in fact, provide notice of their asset sale to Crompton. That issue is now a red herring.

9. Finally, for the Movants' requests that the Court's order approving the sale be set aside or the sale itself be rescinded in the event the Court denies their requested administrative expense claims, such alternate forms of relief are unavailable. There is no allegation of fraud or mistake and there are no "exceptional circumstances" to justify relief from the Court's sale order under Rule 9024 of the Bankruptcy Rules. Nor can the Movants satisfy the requisites for rescission.

10. For these reasons, all of which are articulated more fully below, the Motions should be denied in their entirety.

## BACKGROUND

A.  **Introduction**

11. On September 24, 2003 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in this Court. The Debtors continue in

possession of their properties pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12. On February 11, 2004, this Court entered an order (the "Sale Order") granting the Debtors' motion, dated January 6, 2004, seeking approval of the sale of substantially all of the Debtors' assets to the Buyer and the assumption by the Debtors and assignment to the Buyer of substantially all of the Debtors' executory contracts and unexpired leases (the "Sale"), pursuant to the Amended and Restated Asset Purchase Agreement, by and among the Buyer and the Debtors, dated November 6, 2003 (the "APA"). The Sale closed on March 12, 2004. Subsequent to the closing, the Debtors understand that the Buyer merged the assets it purchased from the Debtors with those purchased by its affiliates from Burlington Industries, Inc. ("Burlington") to form what is now ITG.

13. The Debtors filed their First Amended Disclosure Statement Accompanying Second Amended Chapter 11 Plan of Liquidation (the "Disclosure Statement") and the Plan on August 20, 2004. The hearing on confirmation of the Plan is scheduled for February 28, 2005.

**B.    The PBGC Litigation**

14. On September 14, 2004, the Pension Benefit Guaranty Corporation ("PBGC") filed a complaint in the United States District Court for the Middle District of North Carolina against the Buyer and certain of its affiliates. On November 4, 2004, the PBGC filed its first amended complaint (the "PBGC Complaint") to include as defendants various non-debtor entities that are related to the Debtors. The PBGC Complaint is premised on liabilities arising out of a single-employer defined benefit pension plan (the

"Pension Plan") of which Cone Mills was the employer-sponsor, and asserts (i) claims against the Buyer and its affiliates, as transferees of certain assets of the Debtors' non-debtor Mexican subsidiaries under a fraudulent transfer theory and (ii) a claim for unfunded benefit liabilities of approximately $58.7 million under a "successor liability" theory against the Buyer and its affiliates under federal common law. Specifically, Count III of the PBGC Complaint alleges that the WL Ross defendants named herein are successors to the Debtors and certain of the Debtors' non-debtor subsidiaries, and as such are liable to the PBGC for the alleged debts of those entities to the PBGC. PBGC Complaint at ¶¶ 36 – 45 (a copy of which is attached to the PBGC Motion).

15. On October 14, 2004, the Buyer filed the PBGC Motion seeking (i) to enforce the Sale Order and to bar the PBGC from obtaining the relief requested in the PBGC Complaint, or alternatively, (ii) allowance of an administrative expense claim against the Debtors' estates or rescission of the Sale.

C. **The Crompton Litigation**

16. On August 19, 2004, the NJDEP filed a complaint in the Superior Court of New Jersey, Law Division, Essex County (the "Crompton Action") against the Buyer and Crompton in connection with certain real property located at 52 Amsterdam Street in Newark, Essex County, New Jersey that is owned by Crompton. The Crompton Action is premised on liabilities arising out of alleged violations of New Jersey's Spill Compensation and Control Act, and, as against the Buyer, it is premised on a theory of successor liability.

17. On October 19, 2004, Crompton filed an answer in the Crompton Action, and cross-claimed against the Buyer for contribution and unjust enrichment, also under a theory of successor liability.

18. On December 13, 2004, Crompton filed a proof of claim in these cases in the amount of $4.2 million plus an unspecified amount for natural resource damages.

19. On January 7, 2005, the Buyer moved in this Court for an order directing NJDEP and Crompton to comply with the Sale Order ("Motion to Enforce the Sale Order"), alleging that the successor liability claims asserted in the Crompton Action violate the Sale Order.

20. On January 11, 2005, the Buyer commenced an adversary proceeding against the NJDEP and Crompton seeking declaratory and injunctive relief and damages. Discovery is currently taking place in the adversary proceeding. That same day, the Buyer also filed a Motion for a Temporary Restraining Order ("TRO Motion") and a Motion for a Preliminary Injunction seeking to enjoin the NJDEP and Crompton from proceeding with the Crompton Action in the Superior Court of New Jersey in violation of the Sale Order.

21. On or about January 12, 2005, Crompton filed an opposition to the Buyer's TRO Motion, and on or about January 18, 2005, the NJDEP filed an objection and cross-motion to dismiss the Buyer's complaint.

22. On January 27, 2005, the Court conducted a hearing on the Buyer's Motion to Enforce the Sale Order. At the hearing, the Court did not rule on the Motion to Enforce the Sale Order but scheduled an additional hearing for February 24, 2005 (which was subsequently adjourned to February 28, 2005) to determine whether NJDEP and

Crompton are bound by the terms of the Sale Order, and whether Crompton received notice of the Sale.

23. On February 8, 2005, NJDEP moved for relief from the Sale Order (the "NJDEP Motion"), alleging that the provisions of the Sale Order that bar environmental liability actions by government agencies based on a theory of successor liability should not apply to NJDEP.

24. On February 10, 2005, ITG filed the Crompton Motion seeking an administrative claim against the Debtors' estates or rescission of the Sale.

25. On February 21, 2005, ITG filed an objection to the NJDEP Motion arguing that, among other things, the NJDEP Motion is procedurally deficient under Rule 60(b) of the Federal Rules of Civil Procedure.

26. Also on February 21, 2005, ITG filed a supplement to the Motion to Enforce the Sale Order, stating that newly discovered evidence shows that Crompton received *actual* notice of the Sale.

## ARGUMENT

### A.   The Debtors Have Not Violated the Sale Order.

27. As its first request for relief in the PBGC Motion, the Buyer seeks to enforce the Sale Order against the Debtors. Similarly, in other sections of the PBGC Motion, the Buyer asks the Court to direct the Debtors "to enforce the clear terms of the APA and the Sale Order . . . ." See, e.g., PBGC Mot. at ¶ 24. These requests, however, are puzzling to say the least. For starters, the Debtors have complied fully with the terms of the APA and the Sale Order. Moreover, only this Court is capable of enforcing the Sale Order; the Debtors certainly cannot enforce a judicial order.

28.  Apparently, the Buyer takes the view that any collateral challenge to the Sale Order by a third-party necessarily must somehow be the Debtors' "fault." Of course, that is not the case. The Debtors have no control over the PBGC, Crompton, NJDEP or others who may claim that the Buyer is a successor of the Debtors or did not take certain of the Debtors' assets "free and clear" of interests. Those disputes are squarely between the Buyer, on the one hand, and the PBGC, NJDEP and Crompton, on the other. The Debtors are not parties to those disputes and, in consequence, there is no basis for the Court to somehow enforce the APA or the Sale Order "against the Debtors."

29.  Of course, the obvious parties against whom the Sale Order should be enforced, if anyone, are those parties who are ignoring its express terms. The PBGC, NJDEP and Crompton's alleged successor liability claims against the Movants are plainly violative of the Sale Order, and the Movants' request that the Court enforce the Sale Order's injunctive provisions to prohibit successor liability claims should be granted. The Sale Order could not be clearer on the "successor liability" point; it provides, in relevant part, as follows:

> The Buyer is not a successor to the Debtors or their bankruptcy estates by reason of any theory of law or equity, and the Buyer shall not assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their bankruptcy estates, except as otherwise expressly provided in the APA.

See Sale Order at ¶ R.[2] The Sale Order further provides that:

---

[2] Nothing in the APA obligates the Buyer to assume the liabilities alleged to be due and owing to the PBGC, NJDEP or Crompton

> The Buyer shall have no successor or vicarious liabilities of any kind or character, including but not limited to any theory of successor or transferee liability, de facto merger, or substantial continuity ... with respect to the Debtors or any obligations of the Debtors arising prior to the Closing.

See Sale Order at ¶ 31.

30. The Movants clearly should not be liable to a third party under a successor liability theory. The PBGC, NJDEP and Crompton's assertions to the contrary conflict directly with the Sale Order.[3]

31. The Debtors presented to this Court, and this Court subsequently entered, the form of Sale Order specifically requested by the Buyer, and the Debtors have fully complied with the terms of the Sale Order and the APA. The Debtors cannot be expected to do more than that.

### B. The Court Should Deny the Movants' Requests for Administrative Claims Against the Debtors' Estates.

32. The crux of the Movants' Motions, however, is not the enforcement of the Sale Order against the Debtors. The Movants seek allowance as administrative expense claims the amounts that the PBGC ($58.7 million) and NJDEP and Crompton ($4.2 million) seek to recover from the Movants in their respective lawsuits against the Movants and their affiliates, as well as the Movants' costs of defending such lawsuits. Section 503(b)(1)(A) provides for the allowance as administrative expenses of "the actual, necessary costs and expenses of preserving the estate ...." 11 U.S.C. §503(b)(1)(A). It is well established that the "actual" and "necessary" test has been interpreted narrowly by courts to preserve the

---

[3] The Debtors take no position with the Buyer's allegation that the Sale Order's free and clear language applies to the assets transferred to the Buyer's Mexican affiliates by the Debtors' non-debtor Mexican subsidiaries.

debtor's estate for its prepetition unsecured creditors. In re Harnischfeger Industries, Inc., 239 B.R. 650, 659 (Bankr. D. Del. 2003). According to the controlling case law in this Circuit, for an expenditure to qualify as an administrative expense claim, the creditor must demonstrate that the claim (i) arises out of a post-petition transaction with the debtor-in-possession; and (ii) the debtor's estate benefited from such transaction. In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 532-33 (3d Cir. 1999).

33. To support their administrative expense claim requests, the Movants allege very generally that the Debtors somehow breached the APA or engaged in "post-petition tortious conduct." PBGC Mot. at ¶ 31; Crompton Mot. at ¶ 23. The Movants are wrong on both accounts and, in consequence, are not entitled to administrative expense claims in these cases.

   1.   *The Debtors did not Breach the APA.*

34. The natural starting point for an administrative expense claim arising out of a post-petition contract is necessarily the contract itself. The Movants are plainly not entitled to an administrative expense claim under a breach of contract theory. To begin with, the Debtors have not breached the APA. Tellingly, the Movants fail to point to a single specific provision of the APA that has been breached. Rather, in the Motions the Movants aver multiple times only that "[t]he Debtors' failure to deliver the assets sold to the Buyer free and clear of liabilities to the PBGC clearly contravenes *core provisions of the APA,*" PBGC Mot. at ¶ 31; see Crompton Mot. at ¶ 23, whatever that means, or that the Debtors have "breached" some heretofore unidentified provision of the APA. However, reciting the same vague allegations over and over again does not make them any more valid than they were to begin with.

35. Nevertheless, whether or not the Debtors hypothetically ran afoul of any representations, warranties or covenants, is wholly irrelevant. Section 10.01 of the APA states, in relevant part, that "[n]o representations, warranties or covenants in this Agreement or in any instrument delivered pursuant to this Agreement (other than covenants which contemplate performance following the Closing) shall survive beyond the Closing." See APA at §10.01. Not surprisingly, the Movants' Motions are silent on this point – there is simply nothing they can say in light of the express no-post closing recourse language of the APA. The Buyer did not bargain for any representations, warranties, or covenants to survive the closing; the APA contains no indemnities, escrows or holdbacks of any sort. Hence, there cannot possibly be any contractual basis for the Movants' claims. It is that simple.

36. Moreover, even if there were somehow surviving representations or warranties in the APA, the Movants cannot claim "breach" based upon an alleged failure of the Debtors to notify Crompton of the Sale. To begin with, it has now come to light in connection with the Buyer's separate litigation with Crompton in this Court that Crompton did in fact receive notice of the Sale from the Debtors.[4] In addition, pursuant to Section 5.01 of the APA, the Debtors were required to provide the Buyer with copies of "any motion, application and supporting paper and notice prepared relating in any substantial way to Buyer, [the APA] or the transactions contemplated [t]hereby," prior to their filing. See APA §5.01. Accordingly, the Buyer had every opportunity to inspect the service list and make sure it included all known or suspected creditors.

---

[4] See generally Supplement to Motion of ITG for Order Directing NJDEP and Crompton to Comply with the Sale Order

37. Finally, it is beyond dispute that no breach has been committed yet. Before a claim for breach even ripens, the PBGC, NJDEP and/or Crompton must succeed in their litigation with the Movants over whether their alleged claims somehow survive the Sale and attach to the Debtors' assets in the hands of the Movants. Until such time, there can be no breach. What claim for breach exists today -- that the Debtors failed to prevent third parties from challenging the Sale Order? The Debtors never undertook such an obligation, nor could they have. The bottom line is that any claims for breach and any resultant damages are not only barred by the APA, but they are in any event speculative at best.

2. *The Debtors Have Not Committed a Tort.*

38. The Movants' allegations of tortious conduct are even more specious than their breach of contract claims. Just as the Movants cannot point to any specific breach; similarly they cannot articulate the specific tort that the Debtors have committed. Instead, the Movants merely allege that the Debtors have engaged in some unspecified form of post-petition "tortious conduct." PBGC Mot. at ¶ 31; Crompton Mot. at ¶ 23. The parties had a contract whose representations, warranties and covenants expressly *did not survive the closing*. The Movants, in a fruitless attempt to get around this express agreement, now allege some type of undefined "tortious conduct." Because there is no tort of "failing to deliver free and clear" (which tort, if it even existed, the Debtors did not in any event commit), this claim must necessarily fail.

3. *There is no Basis in Equity to Award Movants Administrative Claims.*

39. Unable to articulate any viable breach of contract or tort claim, the Movants resort to that ultimate bastion of last resorts; i.e., this Court's equitable powers

under section 105(a) of the Bankruptcy Code. However, section 105(a) only applies to the extent "necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. §105(a). It is well established that section 105(a) does not empower a court to order relief in near blank check fashion. Instead, to prevail through the use of section 105(a), the Movants must point to a provision of title 11 that will be furthered by this Court's exercise of its equitable powers. There is, of course, no such provision.

40. In any event, the equities here overwhelmingly favor the Debtors. *First*, the allowance of administrative claims in these circumstances would be akin to providing the Movants with an indemnity from the Debtors against claims like the ones prosecuted by the PBGC, NJDEP and Crompton. This Court has found that the Buyer paid little more than "liquidation value" for the Debtors' assets. As noted above, the Debtors and their creditors were aware of the "low" price and wanted to ensure that every dollar paid could be distributed to creditors. Accordingly, the APA contains no indemnities, escrows or holdbacks, and the fact is that the Debtors would never have agreed to provide same. The Buyer should not now be entitled to obtain through the back-door of section 503(b) that which it could not obtain directly as part of the good faith, arm's length negotiations over the APA.[5]

41. Similarly, the Buyer, by asserting what amounts to whopping administrative claims that, if allowed in full, exceed the Debtors' remaining cash on hand, seeks to lower the already "low price" even further. If the Buyer succeeds, it could end up essentially requiring the Debtors *to pay the Buyer* for taking their assets off of their hands.

---

[5] Nor should creditor recoveries be further diluted by allowing what are unsecured claims in the hands of the PBGC, NJDEP and/or Crompton to be elevated to priority status in the Buyer's hands.

That result would be absurd and plainly not the "equitable" outcome the Movants claim it would be.

42. Finally, when reviewing the equities, the Debtors note that the PBGC and Crompton claims were not a "surprise" to the Buyer. Each of the PBGC and Crompton claims were fully disclosed.[6] For instance, schedules 2.09 and 2.12 of the APA specifically disclosed the assertion by Crompton of possible environmental claims.[7] The Buyer was similarly aware of the Debtors' alleged pension under-funding and the PBGC's Notice of Determination to terminate Debtors' pension plan effective January 29, 2004 – six weeks prior to the closing of the Sale. And, when it comes to the PBGC claim, it was the Buyer that insisted on modifying the APA to provide for the sale directly to the Buyer's Mexican affiliates of the assets of the Debtors' non-debtor Mexican subsidiaries, which direct sale is the basis of several of the PBGC's claims.

### C. The Court Should Deny the Movants' Request to Set Aside the Sale Order or Rescind the Sale.

1. *There Exists no Basis to Set Aside the Sale Order.*

43. Assuming the Movants' administrative claim requests are not granted, then the Movants seek, in the alternative, to set aside the Sale Order or rescind the Sale. Neither remedy is warranted here.

44. Relief under Civil Rule 60(b) is appropriate "only upon a showing of exceptional circumstances and where, absent such relief, an extreme and unexpected

---

[6] While these claims were known to the Buyer, the Debtors do not mean to suggest that the Buyer agreed in any way to assume an successor liability with respect to these claims See Fn 2, supra

[7] See APA Disclosure Schedule 2.09: Litigation ("Cone has been notified by Crompton & Knowles, who purchased its former Otto B. May facility in 1980 located in Newark, NJ of a potential claim for soil and groundwater contamination . . . ); see also APA Disclosure Schedule 2.12: Environmental Matters (same).

hardship will result." In re Vision Metals, Inc., 311 B.R. 692, 698 (Bankr. D. Del. 2004) (Walrath, J.) (citation omitted); see also Mayberry v. Maroney, 558 F.2d 1159, 1163 (3d Cir. 1997) (collecting cases and stating that "it is settled that such relief is extraordinary and may be granted only upon a showing of exceptional circumstances.").

  45. As the Third Circuit Court of Appeals stated in Mayberry,

> a party seeking such relief must bear a heavy burden of showing circumstances so changed that 'dangers, once substantial, have become attenuated to a shadow,' and that, absent such relief an 'extreme' and 'unexpected hardship' will result. We think *a healthy respect for the finality of judgments demands no less*.

558 F.2d at 1163 (emphasis added, internal citations omitted).

  46. Here, the Movants are unable to demonstrate any exceptional circumstances which would warrant Rule 60(b)(6) relief. To the contrary, the Movants bargained for the terms of the Sale Order and cannot now claim "an extreme or unexpected hardship" that will result therefrom when any such consequences were clearly foreseeable. Since the Movants are unable to satisfy the heightened standard under Rule 60(b)(6), the Movants' request to set aside the Sale Order must be denied.

  2. *Rescission would be Inappropriate.*

  47. The Movants' related claim for rescission also must fail. To demonstrate entitlement to rescission, the Movants must show that (i) there was a material breach of contract, (ii) the injury resulting from the material breach is irreparable, and (iii) either damages at law are inadequate or such damages would be difficult or impossible to determine. Johnny's, Inc. v. Njaka, 450 N.W.2d 166, 168 (Minn. Ct. App. 1990) (granting rescission where it was impossible to ascertain monetary damages for the misuse of trademarks and trade names); EarthInfo, Inc. v. Hydrosphere Resource Consultants, Inc.,

900 P.2d 113 (Colo. 1995) (granting remedy of rescission where party's breach of the contract was substantial, damages were difficult to assess and the parties mutually consented to rescission). When a buyer rescinds, he renounces the contract and his ownership of the property obtained thereunder and invests the seller with the ownership as if the contract had not been made. Butler Mfg. Co. v. Elliott & Cox, 233 N.W. 669 (Iowa 1930). Since rescission requires the parties in essence to undo the contract, rescission is a difficult remedy to obtain. Id.

48. There are multiple obstacles to the Movants' attempts at rescission here. *First* and foremost, as demonstrated above, the Movants have failed to demonstrate any breach of contract by the Debtors. *Second*, the Movants are unable to prove that either damages at law are inadequate or that such damages would be difficult or impossible to ascertain. Quite to the contrary, any damages are readily calculable in that they presumably would be equal to the amount of any judgment obtained by the PBGC, NJDEP and/or Crompton against the Movants. This is perfectly obvious from the Movants' own calculations of their alleged administrative claims. Finally, it is unclear how, in practice, the Sale can be rescinded. As the Debtors' Disclosure Statement makes clear, the Buyer long ago merged the assets it acquired from the Debtors with those it acquired from Burlington to form ITG.[8] That egg seems incapable of being unscrambled now.

49. For these reasons, the Movants' request for rescission must be denied.

---

[8] See Debtors' First Amended Disclosure Statement Accompanying Second Amended Chapter 11 Plan of Liquidation dated August 12, 2004 at Section V I 5(b)

WHEREFORE, the Debtors respectfully request that this Court (i) deny the Motions, and (ii) grant such other and further relief as is just and proper.

Dated: Wilmington, Delaware
February 22, 2005

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Pauline K. Morgan (No. 3650)
Joseph M. Barry (No. 4221)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6600

-and-

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Andrew N. Rosenberg
Brian S. Hermann
Lori E. Kata
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

Attorneys for Cone Mills, CIPCO S.C., Inc., Cone Foreign Trading LLC and Cornwallis Development Co., debtors and debtors in possession