IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CONE MILLS CORPORATION, *et al*, | ) | Case No. 03–12944 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Ref. Docket No. 776, 777, 835, 855** |

**CERTIFICATION OF COUNSEL REGARDING DISCLOSURE STATEMENT
ACCOMPANYING SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION**

On August 16, 2004, the Court held a hearing (the "Hearing") to consider the

approval of the *Disclosure Statement Accompanying First Amended Chapter 11 Plan of Liquidation*

(as amended on August 13, 2004, the "First Amended Disclosure Statement") [*see* Docket Nos.

776, 777, 835, 855]. At the Hearing, counsel to the Debtors reported to the Court that the only

formal response filed in opposition to approval of the First Amended Disclosure Statement, namely

the *Response of North Carolina Self-Insurance Guaranty Association* filed on August 9, 2004 [*see*

Docket No. 843], had been consensually resolved. Although no formal objections to the approval

of the First Amended Disclosure Statement remained, at the Hearing, counsel to the Debtors

indicated that they had undertaken negotiations to resolve several informal objections (collectively,

the "Informal Objections") to the First Amended Disclosure Statement communicated to Debtors'

counsel by various parties-in-interest. At that time, the Debtors indicated that they would continue

to attempt to resolve the Informal Objections and file an amended disclosure statement and plan of

liquidation in furtherance thereof. To this end, the parties have reached a settlement of the Informal

Objections as memorialized in the *First Amended Disclosure Statement Accompanying Second*

*Amended Chapter 11 Plan of Liquidation* (the "Second Amended Disclosure Statement") and the

*Second Amended Joint Plan of Liquidation* (the "Second Amended Plan"), copies of which are

annexed hereto as Exhibits A-1 and B-1, respectively. At the Court's request, the Debtors have

attached as Exhibits A-2 and B-2, blacklined versions of the Second Amended Disclosure Statement

and Second Amended Plan, indicating all changes made to the First Amended Disclosure Statement since it was filed on August 13, 2004.

Contemporaneously herewith and under separate cover, the Debtors have submitted a revised proposed form of order approving the Second Amended Disclosure Statement (the "Amended Disclosure Statement Order"). Based on the foregoing, the Debtors respectfully request that the Court enter the Amended Disclosure Statement Order at the Court's earliest convenience.

Dated:  Wilmington, Delaware
        August 20, 2004

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Pauline K. Morgan (No. 3650)
Joseph M. Barry (No. 4221)
Sean T. Greecher (No. 4484)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

- and -

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Andrew N. Rosenberg
Brian S. Hermann
Lori E. Chasen
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

Counsel to the Debtors and Debtors in Possession

WP3:1032175 1                                                                56309 1001

# Exhibit A-1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CONE MILLS CORPORATION, *et al.*, | ) | Case No. 03–12944 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

# FIRST AMENDED
## DISCLOSURE STATEMENT
## ACCOMPANYING SECOND AMENDED
## CHAPTER 11 PLAN OF LIQUIDATION

PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
Andrew N. Rosenberg
Brian S. Hermann
Lori E. Chasen
1285 Avenue of the Americas
New York, New York  10019-6064
(212) 373-3000

YOUNG CONAWAY STARGATT &
  TAYLOR, LLP
Pauline K. Morgan
Joseph M. Barry
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19899-0391
(302) 571-6600

Dated: August 20, 2004

# Table of Contents

Page

I. INTRODUCTION ...................................................................................................... 4
    A.    Holders of Claims and Interests Entitled to Vote ...........................6
    B.    Voting Procedures ...........................................................................7
    C.    Confirmation Hearing ......................................................................8

II. OVERVIEW OF THE PLAN ...................................................................... 8
    A.    Introduction ....................................................................................8
    B.    Summary of Distributions ...............................................................9
    C.    Summary of Classification and Treatment of Claims and Interests
            Under the Plan .............................................................................12

III. OVERVIEW OF CHAPTER 11 ....................................................................... 18

IV. DESCRIPTION OF THE DEBTORS' BUSINESSES ......................................... 19
    A.    The Debtors ..................................................................................19
    B.    The Businesses ..............................................................................19
    C.    The Capital Structure ....................................................................20
    D.    Events Leading to Chapter 11 Filing .............................................21

V. THE CHAPTER 11 CASES ............................................................................. 23
    A.    Significant "First Day" Motions During the Chapter 11 Cases.................23
    B.    Official Committee of Unsecured Creditors ..................................24
    C.    Official Committee of Equity Security Holders .............................24
    D.    Ad hoc Bondholder Committee .....................................................24
    E.    The Selection of a Plan Administrator ..........................................24
    F.    The Debtors' Workers' Compensation Liabilities ..........................25
    G.    Claims Process ..............................................................................25
            1.    Last Date to File Proofs of Claim ....................................25
            2.    Claims Reconciliation .....................................................26
    H.    Preparation of Claims Estimates ...................................................27
    I.    Sale of Substantially All of the Debtors' Assets ...........................27
            1.    The Decision to Sell ........................................................27
            2.    Prepetition Restructuring Efforts .....................................28
            3.    Postpetition Marketing Efforts .........................................29
            4.    The Sale Hearing and Subsequent Litigation ...................30
            5.    The Amended and Restated Asset Purchase Agreement...............32
    J.    Debtors' Pension Plan ...................................................................36
            1.    Master Pension Plan .........................................................36
            2.    North Carolina Proceeding ...............................................36
    K.    Other Assets ..................................................................................37
            1.    PBGC Litigation ..............................................................37
            2.    Causes of Action and Avoidance Claims .........................40

         3.     Other Remaining Assets ............................................................40
  L.    Other Matters .....................................................................................40
         1.     Priority Basket Litigation ........................................................40
         2.     Environmental Matters .............................................................42
         3.     Worker's Compensation Matters..............................................43

VI. SUMMARY OF THE PLAN ................................................................ 44
  A.    Introduction.......................................................................................44
  B.    Substantive Consolidation.................................................................45
  C.    Overall Structure of the Plan ............................................................46
  D.    Classification and Treatment of Administrative Claims, Claims and
      Interests Under the Plan.....................................................................46
         1.     Unclassified — Administrative Claims....................................48
         2.     Unclassified — Priority Tax Claims.........................................49
         3.     Class 1 — Other Priority Claims.............................................49
         4.     Class 2 — Other Secured Claims ............................................50
         5.     Class 3 — Trade and Employee Claims ...................................51
         6.     Class 4 — Secured Priority Claims ..........................................51
         7.     Class 5 — Secured Lender Claims ...........................................52
         8.     Class 6 — Secured Prudential Claim........................................52
         9.     Class 7 — Secured Noteholder Claims .....................................52
         10.    Class 8 — Other General Unsecured Claims ............................53
         11.    Class 9A — Subordinated Claims ............................................54
         12.    Class 9B — Equity Interests....................................................54
         13.    Special Provision Regarding Unimpaired Claims.....................54
  E.    Bar Dates for Administrative Claims .................................................54
  F.    Fee Claims.........................................................................................55
  G.    Treatment of Executory Contracts and Unexpired Leases ........................55
  H.    Provisions Regarding Corporate Governance and Management of
      Reorganized CMC .............................................................................56
         1.     Continued Corporate Existence; Dissolution of
               Reorganized CMC ....................................................................56
         2.     Amended Certificate of Incorporation, Amended By-Laws..........56
         3.     The Plan Administrator.............................................................56
         4.     Directors and Officers; Effectuating Documents; Further
               Transactions.............................................................................57
         5.     Insurance..................................................................................58
         6.     Authority to Object to Claims and Interests and to Settle
               Disputed Claims and Interests .................................................58
         7.     Authority to Settle Causes of Action........................................59
  I.    Creditors' Committee and Plan Committee ........................................59
         1.     Creation of Plan Committee; Procedures .................................60
         2.     Function and Duration; Compensation and Expenses ...................60
         3.     Liability...................................................................................60
  J.    Method of Distribution Under the Plan ..............................................61
         1.     Distributions for Claims Allowed as of the Effective Date ...........61
         2.     Interest On Claims ...................................................................61

ii

|  | 3. | Distributions by Reorganized CMC | 61 |
|  | 4. | Date and Delivery of Distributions | 61 |
|  | 5. | Distribution of Unclaimed Property | 61 |
|  | 7. | Distributions to Holders as of the Record Date | 62 |
|  | 8. | Distribution of Cash | 62 |
|  | 9. | Fractional Dollars; De Minimis Distributions | 62 |
| K. | Disputed Claims | | 63 |
|  | 1. | Objection Deadline; Prosecution of Objections | 63 |
|  | 2. | No Distributions Pending Allowance | 63 |
|  | 3. | Accounts and Reserves | 63 |
|  | 4. | Funding of the Reserves | 63 |
| L. | Operating Reserve | | 66 |
| M. | Allocation of Consideration | | 66 |
| N. | Indenture Trustee Fees and Expenses | | 66 |
| O. | Debtors' Purchase of the Purchased New Equity Interests | | 66 |
|  | 1. | WL Ross's Acquisition of Burlington Industries | 67 |
|  | 2. | WL Ross's Combination of Burlington with the Debtors | 68 |
|  | 3. | The Purchased New Equity Interests | 69 |
| P. | Stock Purchase Agreement | | 70 |
| Q. | Allocation of Purchased New Equity Interests | | 71 |
| R. | Securities to be Canceled Pursuant to the Plan | | 71 |
| S. | Release of Liens | | 72 |
| T. | Implementation and Effect of Confirmation of the Plan | | 72 |
|  | 1. | Determination of the Priority Basket Amount | 72 |
|  | 2. | Cone Mills's Purchase of the Purchased New Equity Interests | 72 |
|  | 3. | Amended Reorganized CMC Certificate of Incorporation, Amended Reorganized CMC By-Laws and Other Implementation Documents | 72 |
|  | 4. | Revesting of Assets | 73 |
|  | 5. | Releases | 73 |
|  | 6. | Discharge of Claims – Termination of Interests | 74 |
|  | 7. | Exculpation and Limitation of Liability | 74 |
|  | **8.** | **Injunction** | 75 |
|  | 9. | Term of Bankruptcy Injunction and Stays | 76 |
|  | 10. | Preservation/Waiver of Causes of Action | 76 |
|  | 11. | Votes Solicited in Good Faith | 76 |
|  | 12. | Administrative Claims Incurred after the Confirmation Date | 76 |
|  | 13. | Preservation of Insurance | 77 |
| U. | Retention of Jurisdiction | | 77 |
| V. | Miscellaneous Provisions | | 78 |
|  | 1. | Payment of Statutory Fees | 78 |
|  | 2. | Amendment or Modification of the Plan | 78 |
|  | 3. | Governing Law | 78 |
|  | 4. | Filing or Execution of Additional Documents | 78 |

iii

5.   Withholding and Reporting Requirements .......................................78
6.   Exemption From Transfer Taxes ...................................................78
7.   Waiver of Federal Rule of Civil Procedure 62(a)............................79
8.   Headings ..................................................................................79
9.   Exhibits ...................................................................................79
10.  Notices ....................................................................................79
11.  Plan Supplement .......................................................................80
12.  Conflict ....................................................................................80
13.  Setoff by the United States .........................................................80

VII. CERTAIN RISK FACTORS TO BE CONSIDERED...................................... 80
1.   Possible Dilution of Claims and Interests.......................................81
2.   Possible Inability to Acquire the New Equity Interests.................81
3.   Risks Associated with Purchased New Equity Interests.................81
4.   The Debtors' Valuation of the Mexican Subsidiaries
     adopted by the Bankruptcy Court ................................................83
5.   The Debtors may have Less Cash on the Effective Date
     than Projected ..........................................................................83
6.   Certain Bankruptcy Law Considerations .....................................84
7.   Certain Tax Matters ...................................................................84

VIII. CONFIRMATION PROCEDURE............................................................... 84
A.   Solicitation of Votes ..................................................................84
B.   The Confirmation Hearing...........................................................87
C.   Confirmation.............................................................................87
1.   Acceptance ...............................................................................87
2.   Unfair Discrimination and Fair and Equitable Tests ....................88
3.   Feasibility ................................................................................88
4.   Best Interests Test......................................................................89

IX. EFFECTIVENESS OF THE PLAN .............................................................. 90
A.   Confirmation of the Plan ............................................................90
B.   Conditions Precedent to Effectiveness .........................................90
C.   Waiver of Conditions..................................................................90
D.   Effect of Failure of Conditions ...................................................91
E.   Vacatur of Confirmation Order ...................................................91

X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
     PLAN .................................................................................................. 91

XI. SECURITIES LAWS MATTERS ................................................................ 91
A.   Bankruptcy Code Exemptions from Registration Requirements.............92
1.   Initial Offer and Sale of Purchased New Equity Interests............92
2.   1145 Finding.............................................................................92
3.   Subsequent Transfers of Plan Securities ......................................93
4.   Certain Transactions by Stockholders ..........................................95

XII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN........... 95

    A.    Regular Federal Income Tax ........................................................96

    B.    Alternative Minimum Tax:..........................................................96

    C.    Federal Income Tax Consequences to Holders of Claims and
         Interests.....................................................................................96

    D.    Information Reporting and Backup Withholding ........................97

    E.    Importance of Obtaining Professional Tax Assistance ...............98

XIII. CONCLUSION AND RECOMMENDATION........................................... 98

ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. ALL CREDITORS AND INTEREST HOLDERS SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN. SEE "CERTAIN RISK FACTORS TO BE CONSIDERED" SECTION VII.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE. THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTORS, THEIR BUSINESSES, AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES, HAS BEEN OBTAINED FROM VARIOUS DOCUMENTS, AGREEMENTS, AND OTHER WRITINGS RELATING TO THE DEBTORS. NEITHER THE DEBTORS NOR ANY OTHER PARTY MAKES ANY REPRESENTATION OR WARRANTY REGARDING SUCH INFORMATION.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY THE DEBTORS,

2

ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING, ADVERSARY PROCEEDING OR OTHER ACTION INVOLVING THE DEBTORS, OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.

3

# I.

# INTRODUCTION

Cone Mills Corporation ("Cone Mills"), CIPCO S.C., Inc. ("CIPCO"), Cone Foreign Trading LLC ("Cone Foreign Trading") and Cornwallis Development Co. ("Cornwallis"), the above-captioned debtors (collectively, the "Debtors"), submit this disclosure statement (the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), to holders of Claims against and Interests in the Debtors in connection with (i) the solicitation of acceptances of the Second Amended Chapter 11 Plan of Liquidation dated August 20, 2004, as such plan may be amended (the "Plan"), filed by the Debtors with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for October 18, 2004, at 2:00 p.m., prevailing Eastern Time. Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

The Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on September 24, 2003. Concurrently with the filing of this Disclosure Statement, the Debtors filed their Plan which sets forth how Claims against and Interests in the Debtors will be treated. This Disclosure Statement describes certain aspects of the Plan, the Debtors' prior operations, significant events occurring in the Debtors' Chapter 11 Cases and other related matters. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.

The Plan provides for the liquidation of the Debtors' remaining assets and, in large measure, the use of the proceeds thereof (together with the net proceeds of the already completed sale of substantially all of the Debtors' assets to direct or indirect subsidiaries of WLR Recovery Fund II L.P. and WLR Cone Mills Acquisition LLC (collectively, "WLR" or "WL Ross"), such proceeds, the "Sale Consideration") to make distributions to creditors in order of their relative priority of distribution under the Bankruptcy Code. The Debtors are not reorganizing their businesses; they are liquidating, and do not now, nor will they following confirmation of the Plan, conduct any business operations.

The Plan contemplates and is predicated upon the liquidation of all of the Debtors' remaining assets. The Plan further contemplates that, upon consummation, Cone Mills shall remain in existence for the limited purpose of implementing the Plan and making distributions to creditors as provided in the Plan. A Plan Administrator selected by the Debtors, after consultation with the Stakeholders and approved by the Bankruptcy Court, will serve as the sole officer and director of Reorganized CMC. The Plan Administrator will be responsible for implementing and administering the Plan in accordance with the Plan's terms, the Plan Administrator Agreement and applicable law.

4

Attached as Exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A);

- Order of the Bankruptcy Court (the "Solicitation Procedures Order"), which, among other things, approves the Disclosure Statement and establishes certain procedures with respect to the solicitation and tabulation of votes to accept or to reject the Plan (Exhibit B);

- The Stock Purchase Term Sheet to acquire shares of International Textile Group Inc. (Exhibit C);[1]

- The Corporate Structure Chart for International Textile Group Inc. (Exhibit D);[2]

- A list of International Textile Group Inc.'s top executives and a brief description of their backgrounds (Exhibit E);

- The Projected Balance Sheet for International Textile Group Inc. as of October 3, 2004 (Exhibit F);

- A copy of Cone Mills Corporation's most recent 10-K filing with the SEC (Exhibit G); and[3]

- A copy of Burlington Industries, Inc.'s most recent 10-K filing with the SEC (Exhibit H).[4]

In addition, a proposed Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims that the Debtors believe are entitled to vote to accept or reject the Plan.

On August __, 2004, the Bankruptcy Court signed the Solicitation Procedures Order, a copy of which is annexed hereto as Exhibit B, approving this

---

[1] See Section VI.O for a description of International Textile Group Inc.

[2] See note 1 above.

[3] Due to the cost involved, Exhibits G and H have not been attached to the Disclosure Statement, however, these Exhibits will be available at the Debtors' expense, upon written request to the Debtors' court-appointed voting, solicitation and tabulation agent, The Altman Group, Inc., 60 East 42nd Street - Suite 405, New York, New York 10165, Attention: Cone Mills Corporation, or online at *www.altmangroup.com/Cone Mills*

[4] See note 3 above.

5

Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment about whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Solicitation Procedures Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the Record Date for voting purposes, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read in their entirety the Disclosure Statement, the Plan, the Solicitation Procedures Order and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

### A.    Holders of Claims and Interests Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of "allowed" claims or equity interests in classes of claims or equity interests that are "impaired" are entitled to vote to accept or reject a proposed chapter 11 plan. Classes of claims in which the holders of claims are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.

Classes 1 and 2 of the Plan are unimpaired. Holders of Claims in Classes 1 (Other Priority Claims) and 2 (Other Secured Claims) are conclusively deemed to have accepted the Plan. Classes 3 (Trade and Employee Claims), 4 (Secured Priority Claims), 5 (Secured Lender Claims), 6 (Secured Prudential Claims), 7 (Secured Noteholder Claims), 8 (General Unsecured Claims), 9A (Subordinated Claims) and 9B (Equity Interests) of the Plan are impaired. To the extent Claims in Classes 3, 4, 5, 6, 7 and 8 are Allowed Claims, the holders of such Claims are entitled to vote to accept or reject the Plan. Holders of Subordinated Claims and Equity Interests in Classes 9A and 9B, respectively, are deemed to have rejected the Plan and are therefore not entitled to vote. Accordingly, the Debtors are soliciting acceptances only from holders of Allowed Claims in Classes 3, 4, 5, 6, 7 and 8.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Section VIII, "Confirmation Procedure."

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or interests. Under that section, a plan may be confirmed by a court if it does not

Doc #:NY6:803056.2

"discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section VIII.C.2, "Confirmation Procedure — Unfair Discrimination and Fair and Equitable Tests." The Debtors intend to seek confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to Classes 9A and 9B, which are deemed to reject the plan.

In addition, if any other impaired class of claims or interests entitled to vote shall not accept the Plan by the requisite majorities provided in section 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, the Debtors reserve the right to seek to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code. If the Bankruptcy Court denies confirmation of the Plan on the grounds that Classes 4 through 7 must be combined into one (1) Class of Claims, the Plan shall be deemed amended to provide for such combined Class of Claims; and any votes received from holders of Claims which will be placed in such combined Class shall be deemed to be votes of such Class. In the event such new Class of Claims is Impaired and shall not accept the Plan by the requisite majorities provided in section 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, the Debtors reserve the right to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code. The determination as to whether to seek confirmation of the Plan under such circumstances will be announced before or at the Confirmation Hearing.

### B.      Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold Claims in more than one class, and you are entitled to vote Claims in more than one class, you will receive separate Ballots which must be used for each separate class of Claims. Please vote and return your Ballot(s) to:

CONE MILLS CORPORATION
c/o The Altman Group, Inc.
60 East 42nd Street – Suite 405
New York, New York 10165
Attn: Cone Mills Corporation Balloting Center

DO NOT RETURN YOUR SECURITIES WITH YOUR BALLOT.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN 4:30 P.M., PREVAILING EASTERN TIME, ON OCTOBER 6, 2004 (THE "VOTING DEADLINE").

Any claim in an impaired class as to (i) which an objection or request for estimation is pending or (ii) a proof of claim has not been filed and which is scheduled by the Debtors as unliquidated, disputed or contingent, is not entitled to vote unless the holder of such claim has obtained an order of the Bankruptcy Court temporarily allowing

7

such claim for the purpose of voting on the Plan. For additional information on voting, see Section VIII.A, "Confirmation Procedure — Solicitation of Votes."

Pursuant to the Solicitation Procedures Order, the Bankruptcy Court set August 16, 2004 as the Record Date for voting on the Plan. Accordingly, only holders of record as of August 16, 2004 that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call The Altman Group at (212) 681–9600, attention: The Cone Mills Corporation Balloting Center.

## C.    Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on October 18, 2004 at 2:00 p.m., prevailing Eastern Time, before the Honorable Mary F. Walrath, Chief United States Bankruptcy Court Judge for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before October 6, 2004 at 4:30 p.m., prevailing Eastern Time, in the manner described below in Section VIII.B, "Confirmation Procedure — The Confirmation Hearing." The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO MAXIMIZE THE RECOVERY TO THEIR CREDITORS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THE DEBTORS THEREFORE URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.

## II.

## OVERVIEW OF THE PLAN

## A.    Introduction

On February 11, 2004, the Bankruptcy Court granted the Debtors' motion, dated January 6, 2004, seeking approval of the sale of substantially all of the Debtors' assets to WL Ross and the assumption by the Debtors and assignment to WL Ross of substantially all of the Debtors' executory contracts and unexpired leases (the "WL Ross Asset Sale"). The WL Ross Asset Sale closed on March 12, 2004 (the "Closing Date"). The purchase price for the assets was approximately $45.3 million in Cash. See Section V.H, "The Chapter 11 Cases - Sale of Substantially all of the Debtors' Assets."

8

The Debtors will continue to pay their operating costs, including the fees of the Plan Administrator, from their Cash balance. The Debtors' existing Cash balance as of June 30, 2004 was approximately $42.0 million, which, together with the Cash derived from the liquidation of its remaining non-cash assets (which is expected to be *de minimis*) will be used to fund Cash payments and, if applicable, the Debtors' purchase of the New Equity Interests as provided under the Stock Purchase Agreement and as set forth in the Plan.

### B.    Summary of Distributions

Under the Plan, Claims against and Interests in the Debtors are divided into Classes. Certain unclassified Claims, including Administrative Claims and Priority Tax Claims, will be paid in full in Cash once their Claims become Allowed Claims. All other Claims and Interests will be divided into nine Classes and will receive the distributions and recoveries (if any) described in the table below.

The table (set forth below in Section II.C.) briefly summarizes the classification and treatment of Claims and Interests under the Plan. For a discussion of the process used by the Debtors in preparing their estimates of Allowed Claims, see Section V.G, "The Chapter 11 Cases — Preparation of Claims Estimates."

The Debtor's cash on hand as of June 30, 2004 was approximately $42 million. The Debtors estimate that after the completion of the claims reconciliation and claims objection processes currently underway, the amount of Allowed Administrative (including Professional Fee Claims), Priority (Class 1), and Other Secured Claims (Class 2) and the costs of administering the chapter 11 case through the Effective Date, will aggregate approximately $3.8 million, consisting mostly of Professional Fee Claims.[5] Each of these Claims is unimpaired and will be paid or otherwise satisfied in full under the Plan. The Debtors also estimate that approximately $500,000 will be placed into an Operating Reserve which will be used after the Effective Date for necessary expenses of Reorganized CMC to complete the liquidation of the Estate. This will leave the Debtors with approximately $38 million to fund distributions to secured (Classes 4-7) and unsecured (Classes 3 and 8) creditors under the Plan.[6]

---

[5]    Approximately $5.8 million has been paid to estate professionals through June 30, 2004.

[6]    As noted in Section V.5.1, "Other Assets – the PBGC Litigation," the Debtors have commenced an adversary proceeding against the PBGC and the Debtors' pension plan in which the Debtors seek to recover approximately $13.5 million. The $38 million projection of funds available for distribution to creditors does not include any recovery from the PBGC Litigation or any other causes of action the Debtors may have, including any that are discovered from the Creditors' Committee's investigation of whether there exist any viable claims or causes of action that the Debtors' estates may have against insiders, including the Debtors' former officers and directors. The Debtors believe that the PBGC Litigation could likely result in additional funds being

9

The Lenders and Prudential comprise Classes 4, 5 and 6, and will each receive Cash under the Plan. Holders of Claims in Class 4 will receive their pro rata share of Cash equal to the Allowed amount of their Class 4 Priority Secured Claims. The Lenders and Prudential have asserted that the Priority Basket Amount is $28 million. Holders of Claims in Class 5 will receive their pro rata share of the Secured Lender Cash. Holders of Claims in Class 6 will receive their pro rata share of the Secured Prudential Cash.

The Noteholders comprise Class 7 under the Plan. The Noteholders will receive Cash under the Plan, provided, however, that, subject to Section X of the Plan, any Noteholder that chooses will have the opportunity to use its Class 7 and Class 8 Cash distributions on the Initial Distribution Date to acquire the New Equity Interests of International Textile Group Inc. ("ITG"), the successor to Cone Mills for purposes of section 1145(a)(1) of the Bankruptcy Code. Specifically, subject to Section X of the Plan, the Debtors will use Cash otherwise distributable on the Initial Distribution Date to Noteholders that elect to be Eligible Electing Equity Recipients on account of their Allowed Claims in Classes 7 and 8 to purchase the Purchased New Equity Interests from ITG for distribution to such Eligible Electing Equity Recipients on account of their Allowed Claims against the Debtors. Any Class 7 Noteholder that does not elect to be an Electing Equity Recipient will only receive Cash on account of its Allowed Claims. For a detailed discussion of the distributions to be made under the Plan to holders of Allowed Class 7 Claims and the Purchased New Equity Interests see Sections VI.D.9 and VI.O, "Summary of the Plan – Classification and Treatment of Administrative Claims and Interests Under the Plan – Class 7 – Secured Noteholder Claims" and "Summary of the Plan – Debtors' Purchase of the Purchased New Equity Interests."

The two classes of unsecured creditors will share in a $3.5 million cash pool. Class 3 Unsecured Trade and Employee creditors will receive Cash in an amount equal to up to 5% of their Allowed Claims, not to exceed $1 million in the aggregate for all Class 3 Allowed Claims. The estimated recovery to the holders of Class 3 is based upon the Debtors' current estimates of Allowed Claims. The aggregate amount of Class 3 Claims, as reflected in proofs of claim filed by holders of Class 3 Claims or, in the event no proof of claim was filed, in the Schedules, is approximately $20 million excluding (i) Class 3 Claims for which no amounts were specified, (ii) unliquidated Class 3 Claims, and (iii) duplicate Class 3 Claims. In compiling these estimates, the Debtors have assumed that all General Unsecured Claims in an amount less than $2,100,000 will be Class 3 Trade and Employee Creditors. Based on these estimates, the Debtors believe that the Allowed Class 3 Trade and Employee Claims will be between approximately $18-20 million and accordingly, Class 3 Trade and Employee Creditors should receive a 5% recovery (i.e., $20 million x 5% equals $1 million).

Class 8 General Unsecured Creditors will receive their pro-rata share of the $3.5 million in Cash available for distribution to all Class 3 and Class 8 unsecured

---

available for distribution to creditors; however, it is difficult to estimate the precise amount at this time.

Doc #:NY6:803056.2

creditors and the net Cash and non-Cash proceeds, after deducting all costs of collection from, and prosecution of the Causes of Action. Excluding the Class 3 Claims, the aggregate amount of Class 8 Claims, as reflected in proofs of claim filed by holders of Class 8 Claims (including any Secured Creditor Deficiency Claim) or, in the event no proof of claim was filed, in the Schedules, is approximately $197 million excluding (i) Class 8 Claims for which no amounts were specified, (ii) unliquidated Class 8 Claims, and (iii) Class 8 Claims the Debtors believe are duplicates.

Class 8 is expected to consist of the Secured Creditor Deficiency Claims in the amount of approximately $138 million and the PBGC Claims (as defined below) which the Debtors expect will range from $0 - $58.7 million. Accordingly, Class 8 recoveries will range from approximately 1.6% - 2.2%. To the extent that the actual amount of Allowed Claims varies from the amount estimated by the Debtors, the percentage recovery of holders of Allowed Class 3 and Class 8 Claims may be higher or lower than the estimated amounts. In addition, the actual percentage recovery on account of the Secured Creditor Deficiency Claims will be less since the holders of such Claims will be deemed to have directed that a portion of their recovery on account of their Class 8 Claims be made to holders of Allowed Class 3 Claims, see Section VI.D, "Summary of the Plan – Classification and Treatment of Administrative Claims, Claims and Interests Under the Plan."

ALTHOUGH THE DEBTORS BELIEVE THAT THE ESTIMATED PERCENTAGE RECOVERIES IN THE TABLE BELOW ARE REASONABLE AND WITHIN THE RANGE OF ASSUMED RECOVERIES, THERE IS NO ASSURANCE THAT THE ACTUAL AMOUNTS OF ALLOWED CLAIMS IN EACH CLASS WILL NOT MATERIALLY EXCEED THE ESTIMATED AGGREGATE AMOUNTS SHOWN IN THE TABLE BELOW. The actual recoveries under the Plan by the Debtors' creditors will be dependent upon a variety of factors including, but not limited to, whether, and in what amount, contingent claims against the Debtors become non-contingent and fixed and whether, and to what extent, Disputed Claims are resolved in favor of the Debtors rather than the claimants. Accordingly, no representation can be or is being made with respect to whether each Estimated Recovery shown in the table below will be realized by the holder of an Allowed Claim in any particular class.

The primary factor which will determine the recoveries for Classes 4-7 (as well as the distributions of Class 8 recoveries among the holders of Secured Creditor Deficiency Claims) will be the outcome of the litigation among the Lenders, Prudential and the Noteholders over the Lenders and Prudential's asserted entitlement to the Priority Basket Amount, see Section V.K.1, "The Chapter 11 Cases – The Priority Basket Litigation." All else being equal, if the Priority Basket Amount is $28 million (the amount asserted by the Lenders and Prudential), then the Noteholders will receive as little as an approximately 8% recovery. By contrast, if the Priority Basket Amount is $0, then the Noteholders could receive as much as an approximately 23% recovery.

C.   **Summary of Classification and Treatment
     of Claims and Interests Under the Plan**[7]

| Class and Estimated Amount | Type of Claim Or Interest | Treatment | Estimated Recovery[8] |
|---|---|---|---|
| -- Approximately $0[9] | Administrative Claims | **Non-Voting.**  Unless agreed otherwise, each holder will receive payment in full (in cash) of the unpaid portion of an Allowed Administrative Claim on the Plan effective date (the "Effective Date") or as soon thereafter as practicable. The Debtors anticipate that the allowed amount of Administrative Claims will be $0.[10] | 100% |
| -- Approximately $900,000 | Priority Tax Claims | **Non-Voting.**  Unless agreed otherwise, each holder will receive payment in full (in cash) of an Allowed Priority Tax Claim on the Effective Date or as soon thereafter | 100% |

---

[7]   This table is only a summary of the classification and treatment of Claims and Interests under the Plan.  Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

[8]   See note 6.

[9]   The North Carolina Self-Insurance Guaranty Association ("NCSIGA") asserts entitlement to estimated Administrative Claims of (i) $220,000.00 for post-petition workers' compensation claims and claims-related expenses, plus additional costs and expenses that allegedly have been and will be incurred by NCSIGA in protecting its rights in these cases, and (ii) $1 million for claims and claims-related expenses arising from the Debtors' alleged breach of the Stipulation and Consent Agreement between the Commissioner of the State of North Carolina and Cone Mills Corporation dated February 12, 2004 (the "NC Stipulation and Consent Agreement").  A portion of the NCSIGA's asserted Administrative Claim is premised upon what NCSIGA contends was its role in the negotiation of the NC Stipulation and Consent Agreement.  The Debtors dispute such Claims.

[10]   Approximately $5.8 million has been paid to estate professionals through June 30, 2004.

12

Doc #:NY6:803056.2

| Class and Estimated Amount | Type of Claim Or Interest | Treatment | Estimated Recovery[8] |
|---|---|---|---|
| | | as practicable. The Debtors anticipate that the allowed amount of Priority Tax Claims will be $900,000. | |
| 1 Approximately $0 | Other Priority Claims | **Unimpaired; Non-Voting.** Unless agreed otherwise, each holder will receive payment in full (in cash) of an Allowed Other Priority Claim on the Effective Date or as soon thereafter as practicable. The Debtors anticipate that the allowed amount of Other Priority Claims will be $0. | 100% |
| 2 Approximately $0 | Other Secured Claims | **Unimpaired; Non-Voting.** Class 2 consists of Secured Claims not otherwise classified. Unless agreed otherwise, at the Debtors' option, (i) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as is practicable, or (ii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as is practicable. The Debtors anticipate that the allowed amount of Other Secured Claims will be $0. | 100% |

13

| Class and Estimated Amount | Type of Claim Or Interest | Treatment | Estimated Recovery[8] |
|---|---|---|---|
| 3 Approximately $20,000,000[11] | Trade and Employee Claims | **Impaired; Voting.** Class 3 Trade and Employee Claims consist of any Claim which would otherwise be a Class 8 General Unsecured Claim that (i) is Allowed in an amount of $1,000,000 or less, or (ii) is Allowed in the amount of greater than $1,000,000 but which is reduced to $1,000,000 by the election of the holder thereof pursuant to the holder's ballot. Each holder of a Class 3 Trade and Employee Claim will receive payment in an amount equal to 5% (the "Payment Percentage") of an Allowed Trade and Employee Claim on the Effective Date or as soon thereafter as practicable. No Secured Noteholder Claim, Secured Prudential Claim or Secured Lender Claim may be a Trade and Employee Claim (whether by election or otherwise). The total distributions to Class 3 shall not exceed $1 million; the Payment Percentage shall be reduced as necessary to provide that Class 3 distributions do not exceed $1 million. | 5% |
| 4 Approximately $0-28 million | Secured Priority Claims | **Impaired; Voting.** Class 4 consists of the Lenders' and Prudential's Claims for Priority Senior Obligations under the Priority Security Agreement and Intercreditor Agreement. The | 100% |

---

[11]    NCSIGA asserts an estimated Class 3 Claim for pre-petition workers' compensation claims and claims-related expenses, plus additional costs and expenses that allegedly have been and will be incurred by NCSIGA in protecting its rights in these cases, as set forth in its proof of claim filed with the Court. The Debtors dispute such Claims.

14

| Class and Estimated Amount | Type of Claim Or Interest | Treatment | Estimated Recovery[8] |
|---|---|---|---|
| | | holders of Class 4 Claims will receive their pro rata share of Cash equal to the Priority Basket Amount, when such amount is determined by an unstayed order. | |
| 5 Approximately $50,474,872.72 (less pro rata share of Priority Basket Amount)[12] | Secured Lender Claims | **Impaired; Voting.** Class 5 consists of the Lenders' Secured Claims under the Credit Agreement and General Security Agreement. The holders of Class 5 Claims will receive their pro rata share of the Secured Lender Cash. | 44% - 22%[13] |
| 6 Approximately $21,600,634.04 (less pro rata share of Priority Basket Amount) | Secured Prudential Claim | **Impaired; Voting.** Class 6 consists of Prudential's Secured Claim under the Prudential Note Agreement and General Security Agreement. The holders of Class 6 Claims will receive their pro rata share of the Secured Prudential Cash. | 44% - 22%[14] |

---

[12]  The Secured Lender Claims are as of the Petition Date. Subsequent to the Petition Date, there was a $1.75 million drawing under a letter of credit posted by the Lenders under the Credit Agreement. The APA provides that the proceeds of such drawing are to be returned to the Lenders by WLR. Accordingly, such amount is not reflected above. If such amount is not returned, the Secured Lenders Claims will increase by $1.75 million.

[13]  These percentages are an aggregate recovery of the Lenders' Class 4, Class 5 and Class 8 Claims. The top amount assumes that the Priority Basket Amount is $28 million; the bottom amount assumes that the Priority Basket Amount is $0.

[14]  These percentages are an aggregate recovery of Prudential's Class 4, Class 6 and Class 8 Claims. The top amount assumes that the Priority Basket Amount is $28 million; the bottom amount assumes that the Priority Basket Amount is $0.

Doc #:NY6:803056.2

| Class and Estimated Amount | Type of Claim Or Interest | Treatment | Estimated Recovery[8] |
|---|---|---|---|
| 7<br><br>Approximately $104,265,625.00 | Secured Noteholder Claims | **Impaired; Voting.** Class 7 consists of the Noteholders' Secured Claims under the Indenture and General Security Agreement. The holders of Class 7 Claims will receive their pro rata share of the Secured Noteholder Cash, provided, however, that, subject to Section X of the Plan, any holder of an Allowed Class 7 Claim that elects to be an Electing Equity Recipient shall receive an amount of Purchased New Equity Interests purchased by Cone Mills with Cash otherwise distributable to such holder on the Initial Distribution Date on account of its Class 7 and Class 8 Claims. Subject to Section X of the Plan, the amount of Cash required for Cone Mills to acquire the Purchased New Equity Interests for Eligible Electing Equity Recipients shall be used by Cone Mills to do so in lieu of such amount of Cash being distributed to such Eligible Electing Equity Recipients on the Initial Distribution Date. | 8% - 23%[15] |

---

[15]  The percentages are an aggregate recovery of the Noteholder's Class 7 and 8 Claims. The top amount assumes that the Priority Basket Amount is $28 million; the bottom amount assumes that the Priority Basket Amount is $0.

16

| Class and Estimated Amount | Type of Claim Or Interest | Treatment | Estimated Recovery[8] |
|---|---|---|---|
| 8<br>Approximately $138,000,000 to $196,700,000 | General Unsecured Claims | **Impaired; Voting.** General Unsecured Claims consist of the Unsecured Claims that are not Class 3 Trade and Employee Claims. General Unsecured Claims will receive their pro rata share of (i) (a) $3.5 million in Cash (to be shared with Allowed Class 3 Claims), and (b) the net Cash and non-cash proceeds, after deducting all costs of collection and prosecution, of the Causes of Action. Class 5, 6 and 7 Creditors will be deemed to have directed that a portion of the distributions on account of their Secured Creditor Deficiency Claims shall be made to the holders of Class 3 Trade and Employee Claims to the extent that the Class 3 Trade and Employee Claims will be receiving a higher percentage recovery than Class 8 General Unsecured Creditors. | 2.2% - 1.6%[16] |
| 9A<br>Approximately $0 | Subordinated Claims | **Impaired; Non-Voting.** Class 9A consists of claims subordinated pursuant to section 510(b) of the Bankruptcy Code. Class 9A shall receive no distributions. | 0% |

---

[16]  This Class includes an aggregate Secured Creditor Deficiency Claim of approximately $138 million. It also includes a single PBGC Claim in the asserted amount of $58,700,000; the PBGC Claims are the subject of an objection by the Debtors, see Section V.J.1, "Other Assets – PBGC Litigation." The top amount assumes that the PBGC Claims are $0; the bottom amount assumes that they are Allowed in the amount of $58 million. As noted in footnotes 13 - 15, the Class 8 recoveries for holders of Secured Creditor Deficiency Claims are included in the Class 5, 6 and 7 recoveries, as applicable.

17

| Class and Estimated Amount | Type of Claim Or Interest | Treatment | Estimated Recovery[8] |
|---|---|---|---|
| 9B | Equity Interests | **Impaired; Non-Voting.** Class 9B consists of existing common and preferred stock, warrants, options to purchase existing common stock, or other similar interests in the Debtors. Class 9B shall receive no distributions. | 0% |

## III.

## OVERVIEW OF CHAPTER 11

Chapter 11 is one of the principal business chapters of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and interest holders. Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or interest holder of a debtor.

After a plan has been filed, the holders of claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against and Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

IV.

## DESCRIPTION OF THE DEBTORS' BUSINESSES

### A.    The Debtors

Cone Mills, a North Carolina corporation, was a leading producer of denim fabrics, one of the largest commission printers and finishers of home furnishings and a major producer of decorative wide jacquard fabrics in the United States. Headquartered in Greensboro, North Carolina, Cone Mills is a public company that, as of the Petition Date, had 3,000 employees and five domestic manufacturing facilities located in North and South Carolina. The other Debtors, CIPCO, Cone Foreign Trading and Cornwallis, are wholly-owned, non-operating subsidiaries of Cone Mills. CIPCO, a Delaware corporation, held certain of Cone Mills' various trademarks and trade names, including the "Cone" name. Cone Foreign Trading, a North Carolina limited liability company, was organized as an accommodation to Levi Europe in connection with certain sales and marketing arrangements between Cone Mills and Levi Europe. Finally, Cornwallis, a North Carolina corporation, was organized in 1964 to develop raw land into residential lots and commercial real estate in Greensboro, North Carolina. Cornwallis sold substantially all of its assets in 1997 and has not been in operation since then.

### B.    The Businesses

Denim, by far Cone Mills' largest product segment, accounted for approximately 82% of its revenues for the first six months of 2003. Cone Mills' denim products are used primarily in denim bottoms, such as jeans, pants and shorts. Its denim fabrics are primarily designed for customers whose garments are targeted for the middle and upper-middle markets, where styling and quality are important factors. Cone Mills' largest denim customer was Levi Strauss, a customer since 1915 and for whom Cone Mills had been the exclusive supplier of denim for Levi's 501(R) family of jeans. Cone Mills' other customers included, Gap Inc. (The Gap, Old Navy and Banana Republic), V.F. Corporation (Wrangler, Lee and others), American Eagle Outfitters, Calvin Klein, the Limited brands (Express, Structure and Victoria's Secret), Abercrombie and Fitch, Polo Ralph Lauren and JC Penney (Arizona).

In addition to its U.S. denim manufacturing facilities in North Carolina, Cone Mills, through its Mexican subsidiary, Cone Mills (Mexico) S.A. de C.V. ("Cone Mexico"), owned a 50% equity interest in Parras Cone de Mexico S.A. de C.V. ("Parras Cone"), a low-cost producer of high quality basic denims located in Mexico. Under a marketing Letter Agreement with its equity partner in Parras Cone, Compania Industrial de Parras S.A. de C.V., Cone Mills marketed and distributed 100% of Parras Cone's denim fabric production. In addition to the marketing fee Cone Mills earned under its marketing arrangement with Parras Cone, Parras Cone provided Cone Mills and its customers with a low-cost source of high quality denim, a critical need in the increasingly competitive worldwide denim market.

Cone Mills' other business segments -- commission finishing and jacquards -- comprised a small portion of Cone Mills' overall operations. The commission finishing segment provided custom printing and plain-shade dyeing services at Cone Mills' Carlisle, South Carolina finishing plant. The key markets served by Cone Mills' Carlisle plant include the home decorative, over-the-counter craft and home sewing, specialty apparel (such as camouflage fabrics for the hunting trade and military apparel) and baby products. Cone Mills' jacquards operation focused on designing, styling and manufacturing jacquard products primarily for the furniture, top-of-the-bed, outdoor and jobber markets.

## C.    The Capital Structure

The Debtors' capital structure is quite complex, particularly given their size. The Debtors' secured debt includes a bank facility, senior notes and public debentures. Specifically, Cone Mills is a borrower under an $80 million revolving credit facility (as amended, the "Bank Facility"), of which approximately $50.5 million is outstanding (excludes letter of credit drawn after the Petition Date), with Bank of America, N.A., as agent, and certain lenders party thereto. Cone Mills also issued $75 million of 8.0% (original interest) senior notes due March 15, 2004 (as amended, the "Senior Notes") to The Prudential Insurance Company of America ("Prudential"), pursuant to that certain Note Letter Agreement, dated as of August 13, 1992. Approximately $21.6 million of Senior Notes remain outstanding. Finally, pursuant to that certain Indenture between Cone Mills and The Bank of New York (as successor to Wachovia Bank, N.A.), as indenture trustee (the "Indenture Trustee" or "Bond Trustee"), dated as of February 14, 1995 (as amended, the "Indenture"), Cone Mills issued to the public approximately $100 million (original principal amount) of 8 1/8% debentures due March 15, 2005 (the "Notes"). Except with respect to the Priority Senior Obligations (discussed below), the amounts outstanding under the Bank Facility, the Senior Notes and the Indenture rank pari passu, are each guaranteed by CIPCO and Cone Foreign Trading (among others), and are secured by a first priority Lien on and security interest in substantially all of the assets of Cone Mills, CIPCO, Cone Foreign Trading and other of Cone Mills' nondebtor subsidiaries, as well as 65% of the capital stock of Cone Mills' foreign subsidiaries.

The Lenders and Prudential assert that they share in a "priority basket" of collateral to secure amounts owing to them as Priority Senior Obligations in an aggregate amount not to exceed $28 million, as adjusted from time to time. Whether the Lenders and Prudential hold a valid and enforceable senior lien and, if so, the precise amount of the "priority basket," is the subject of a pending lawsuit commenced in the Bankruptcy Court by Bank of America, N.A., and Prudential Insurance Company of America against The Bank of New York Company, Inc., as Bond Trustee, ALJ Capital Management, Highland Capital Management, L.P. and Daugherty Investment Group (the "Priority Basket Litigation"). The resolution of the Priority Basket Litigation is a condition to the Plan's effectiveness. For a discussion of the Priority Basket Litigation, see Section V.K.1, "The Chapter 11 Cases – The Priority Basket Litigation."

In addition to the foregoing, Cone Mills was party to that certain $60 million Receivables Purchase and Servicing Letter Agreement, dated as of September 1, 1999, by and among Cone Receivables II LLC ("CRIILLC"), as Debtors, Redwood Receivables Corporation ("Redwood"), as Buyer, Cone Mills, as servicer, and General Electric Capital Corporation ("GECC"), as operating and collateral agent (as amended, the "GE Facility"). CRIILLC is a special purpose entity whose sole business purpose was the ongoing purchase and subsequent resale to GECC of certain of Cone Mills' eligible trade receivables. The GE Facility provided Cone Mills with an important source of operating liquidity by allowing it to securitize its eligible trade receivables. All amounts advanced under the GE facility have been fully repaid.

Finally, Cone Mills has issued and outstanding 340,768 shares of Class A preferred stock and 25,941,475 shares of common stock. Substantially all of Cone Mills' issued and outstanding Class A preferred stock is held by Cone Mills' 1983 Employee Stock Ownership Plan. Cone Mills' common shares are publicly held and, until their recent suspension, were traded on the New York Stock Exchange under the ticker symbol "COE."

### D.    Events Leading to Chapter 11 Filing

The general economic downturn, together with certain industry specific and political factors, have made the domestic denim business increasingly difficult in recent years. The textile business has become extremely competitive with new, low-cost manufacturers from Asia, Mexico and South and Central America taking customer orders away from higher cost domestic manufacturers like Cone Mills. Initiatives such as the North American Free Trade Agreement and Caribbean Basin Initiative have dramatically altered the balance between domestic and foreign production such that approximately 60% of denim jeans and fabric imports into the United States now come from countries covered by these initiatives. Due to the availability of inexpensive labor in Mexico and South and Central America, imports of denim from these regions cost far less than product manufactured domestically. In addition, since the Asian currency crisis in 1997 many Asian countries, including China, have artificially pegged their currencies to the U.S. dollar, which has helped them to drive down the cost of their goods, thereby further boosting their exports.

Cognizant of the need to drive down costs to compete more effectively with its foreign competitors on price, Cone Mills attempted to rationalize its business by refocusing on core competencies where it viewed itself as a leader and where it could exploit competitive advantages. As part of this strategic refocusing, since 1998 Cone Mills implemented several restructuring and downsizing initiatives, which resulted in the closing of several manufacturing facilities and the elimination of thousands of jobs.

Part of this strategic refocusing included the proposed "migration" of increasing amounts of its basic denim production to Mexico, including through an expansion of Parras Cone's denim capacity, and to other low cost countries in this hemisphere. Completion of this strategy, however, required new capital – which could not be obtained without a recapitalization of Cone Mills' over-leveraged balance sheet.

Doc #:NY6:803056.2

Toward that end, in February 2002, Cone Mills retained Jefferies & Company, Inc. ("Jefferies") to serve as Cone Mills' financial advisors and capital arrangers. Beginning in the middle of 2002, Jefferies contacted no fewer than 60 financial sponsors in an effort to attract capital to refinance Cone Mills' indebtedness and/or fund Cone Mills' capital expansion in Mexico and Latin America. That effort proved unsuccessful as Cone Mills' deteriorating financial condition and the poor overall state of the U.S. textile industry, as evidenced by the rash of recent textile bankruptcies (e.g., Galey & Lord, Burlington, Pillowtex (twice), Westpoint Stevens), caused investors to stay away. As a result, Cone Mills was unable to attract badly needed capital for its recapitalization and expansion outside of the United States.

This already difficult situation then took a sharp turn for the worse in the second quarter of 2003. New trade agreements with countries in the Far East, including Vietnam in May 2003, exposed the U.S. markets to additional low-cost denim imports, further eroding Cone Mills' overall market share. By way of example, in June 2003 alone, imports of denim from Vietnam jumped from 400,000 garments per month to 3.2 million garments per month, the equivalent of 10% of domestic denim capacity. These numbers, staggering on their own, compounded the existing problems caused by China's fixed exchange rate described above, a practice the U.S. government has been unable to stop. In sum, Cone Mills' denim products were in many instances simply unable to compete in terms of price with its Asian competitors.

Market forces in 2003 also exacerbated the problems caused by the deluge of Asian imports. There was not only a general oversupply of apparel and textile products throughout the supply chain, but a changing mindset among many of Cone Mills' customers as well. Specifically, many retailers were overstocked with jeans and other denim wear that had to be sold off before they would place new orders. In addition, many of Cone Mills' customers, themselves hurt by the recession and the slow economic recovery, were under pressure to seek lower cost sources of supply for their denim and other fabrics in order to reduce costs and improve margins. As a corollary to that, many denim buyers were unable, due to budgetary and other constraints, to include among their product mix Cone Mills' more expensive, higher quality denim, choosing instead to "commoditize" their products by purchasing low end materials from abroad.

In the face of this confluence of negative market conditions – a sluggish economy, currency effects, rising imports and general global oversupply of apparel and textiles – Cone Mills and its domestic competitors saw orders decline and, when coupled with increased cotton costs (cotton being the primary raw material needed to manufacture denim), suffered from continually declining margins. In the second quarter of 2003 alone Cone Mills experienced a dramatic 23.4% decrease in sales and an approximately 3% decline in gross margins from the prior year period. Overall, for the first half of 2003 Cone Mills experienced a 14.3% decline in sales and an approximately 1.4% decline in gross margin as compared with the prior year period.

Unable to recapitalize and faced with an onslaught of lower priced imports, Cone Mills found itself in a competitively disadvantageous position. With its reduced sales volume and margins and higher raw material costs, Cone Mills could no

22

longer generate sufficient cash flow to service its debt load, which was put in place at a time when economic times were much better. As a result, on September 15, 2003, Cone Mills missed its regularly scheduled interest payment of $4.1 million on the Notes.

In view of their liquidity crisis and with no relief in sight for themselves or within the domestic textile industry, the Debtors believed that it was infeasible for them to continue operating as viable stand-alone companies outside of chapter 11. Rather, the Debtors determined that chapter 11 protection was necessary to stabilize their businesses and preserve and ultimately maximize the value of their estates through a sale of their assets or reorganization.

In that regard, shortly before filing for chapter 11 protection, Cone Mills entered into a letter agreement with WL Ross & Co., LLC, believed to be Cone Mills' largest secured creditor, providing for the acquisition of substantially all of the Debtors' assets. That letter agreement was superseded by the formal Amended and Restated Asset Purchase Agreement, by and among, WL Ross and the Debtors, dated November 6, 2003 (the "Asset Purchase Agreement" or the "APA"), a copy of which was filed with the Court on November 7, 2003.

## V.

## THE CHAPTER 11 CASES

On September 24, 2003 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue in possession of their properties pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### A.    Significant "First Day" Motions During the Chapter 11 Cases

On the Petition Date and during the first few weeks of the Chapter 11 Cases, the Bankruptcy Court entered several orders authorizing the Debtors to pay various prepetition Claims. These orders were designed to ease the strain on the Debtors' relationships with customers, employees and others as a consequence of the filing. The Bankruptcy Court entered orders authorizing the Debtors to, among other things, pay their prepetition obligations owing to trade and other vendors, to Parras Cone and to employees.

In addition, the Debtors filed numerous motions seeking orders from the Bankruptcy Court authorizing the Debtors to retain professionals. Specifically, the Debtors filed motions for authorization to retain (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") and Young, Conaway, Stargatt & Taylor, LLP ("Young Conaway"), as co-counsel, (ii) Jefferies, as financial advisor, (iii) Schell Bray Aycock Abel & Livingston, P.L.L.C., as special corporate counsel to the Debtors, (iv) McGladrey & Pullen, LLP and RSM McGladrey, Inc., as auditors and accountants, (v) Robinson Lerer & Montgomery, as public relations specialists, (vi) certain ordinary course professionals, and (vii) The Altman Group, as claims and noticing agent. The Debtors

23

also filed motions seeking relief from certain administrative requirements of the Bankruptcy Code.

### B.    Official Committee of Unsecured Creditors

On October 7, 2003, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee") in the Chapter 11 Cases.

The Creditors' Committee is currently comprised of Parkdale Mills, Inc., Union of Needletraders Industrial & Textile Employees ("UNITE"), Dunavant Enterprises, Inc., and Brenntag Southeast, Inc. The Creditors' Committee has, with the Bankruptcy Court's approval, employed and retained Hahn & Hessen LLP and Cozen O'Connor as co-counsel and Ernst & Young Corporate Finance LLC as its restructuring advisors and Ernst & Young LLP as its accounting, tax and valuation consultants.

### C.    Official Committee of Equity Security Holders

On December 4, 2003, the United States Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee") in the Chapter 11 Cases.

The Equity Committee is comprised of Robert C. Klass, Sr., Erwin A. Kelen, Laurence S. Zipkin, Joseph F. Bond, Jr., and James D. Holder, shareholders of Cone Mills. The Equity Committee has, with the Bankruptcy Court's approval, and subject to the Bankruptcy Court's requirement of a $125,000 fee cap, employed and retained Kirkland & Ellis LLP and Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C. as its co-counsel and Libra Securities, LLC as its financial advisor. Subsequently, the Bankruptcy Court stated at a March 5, 2004 hearing, that once the Sale closed, there would be no further need for the Equity Committee going forward. Since the Sale closed on March 12, 2004, the Equity Committee no longer has an active role in these cases.

### D.    Ad hoc Bondholder Committee

Prior to the Petition Date, an Ad hoc Bondholder Committee was formed by certain holders of the Debtors' Notes, including ALJ Capital Management, Highland Capital Management, L.P. and Daugherty Investment Group, together representing approximately 50% of the outstanding Notes. The Ad hoc Bondholder Committee has employed and retained Jones Day and Rosenthal, Monhait, Gross & Goddess, P.A. as co-counsel. In addition, the Bond Trustee has employed Dechert LLP as its counsel and Barrier Advisors as its financial advisor.

### E.    The Selection of a Plan Administrator

As a result of the WL Ross Asset Sale, the Debtors have only one remaining employee (Michael R. D'Appolonia, their Chief Restructuring Officer) — virtually all of their employees having accepted employment from WL Ross in connection with the Asset Sale. Accordingly, on or before the Confirmation Date, the

24

Debtors shall select the Plan Administrator to provide consulting and management services relating to the wind-down of their Estates.

**F.    The Debtors' Workers' Compensation Liabilities**

Cone Mills operated in North Carolina as a licensed self-insurer with regard to its workers' compensation liabilities. As a self-insurer, Cone Mills was a member of the North Carolina Self-Insurance Guaranty Association (the "NCSIGA") as mandated by N.C. Gen. Stat. § 97-93, § 97-94, and § 97-130 *et seq.* (hereinafter, the "Guaranty Act"). According to NCSIGA, as a precondition to Cone Mills's receiving a license to self-insure, Cone Mills was required to post a bond to secure its self-insured obligations pursuant to N.C. Gen. Stat. § 97-185 (and statutory predecessors of the current Guaranty Act), which it did through U.S. Fire Insurance Company (the "Surety Bond"). As of the Petition Date, the Surety Bond had a value of $1.25 million.

Prior to the Petition Date, the North Carolina Department of Insurance (the "NCDOI") issued an Order of Revocation, notifying Cone Mills that its license to self-insure workers' compensation liabilities in North Carolina would be revoked within 45 days. The Order of Revocation was purportedly based upon Cone Mills's deteriorating financial condition. NCSIGA asserts that, according to the Guaranty Act, once a NCSIGA self-insured member becomes insolvent, the NCSIGA is subject to contingent liability for unpaid workers' compensation claims against the self-insured member. Therefore, according to NCSIGA, as a statutory successor, upon the default by Cone Mills on its workers' compensation liabilities, the NCSIGA effectively becomes a co-debtor on these liabilities. As of the Petition Date, Cone Mills estimated its workers' compensation liabilities at approximately $1.9 million, secured only by the Surety Bond.

NCSIGA asserts that the NCDOI Order of Revocation became effective on November 5, 2003. The Debtors disputed such Order of Revocation and its purported effect. Nevertheless, the NCDOI and Cone Mills entered into a settlement, as memorialized in the NC Stipulation and Consent Agreement. A portion of the NCSIGA's asserted Administrative Claim is premised upon what NCSIGA contends is its role in the negotiation of the NC Stipulation and Consent Agreement. NCSIGA asserts that the Debtors successfully negotiated for WL Ross to assume payment of all of Cone Mills's workers' compensation liabilities (both pre- and post-petition) as part of the consideration for the purchase of the Debtors' assets.

**G.    Claims Process**

1.    Last Date to File Proofs of Claim

On November 26, 2003, the Debtors filed a motion seeking an order (the "Bar Date Order") from the Bankruptcy Court requiring any person or entity holding or asserting a Claim against the Debtors to file a written proof of claim with Cone Mills Corporation, c/o The Altman Group, Inc., 60 E. 42nd Street – Suite 405, New York, New York 10165, on or before 4:00 p.m., prevailing Eastern Time on January 30, 2004 (the "General Bar Date"), and for Governmental Units holding a Claim against the

Doc #:NY6:803056.2

Debtors on or before 4:00 p.m., prevailing Eastern Time on March 22, 2004 (the "Government Bar Date"). Such motion requested that any person or entity (other than, among others, employees, professionals retained in the Chapter 11 Cases and holders of the Debtors' preferred stock or common stock) which fails to timely file a proof of claim will be forever barred, estopped and enjoined from voting on, or receiving a distribution under, the Plan and will be forever barred, estopped and enjoined from asserting a Claim against the Debtors, their estates, Reorganized CMC, and any of their successors or assigns. On December 11, 2003, the Bankruptcy Court entered the Bar Date Order and established January 30, 2004 as the General Bar Date and March 22, 2004 as the Government Bar Date.

2.    Claims Reconciliation

To date, the Debtors have filed two omnibus objections to proofs of claim (the "Omnibus Objections"). The Debtors filed their first omnibus objection to (non-substantive) claims pursuant to sections 105 and 502(b) of the Bankruptcy Code and Bankruptcy Rules 3001, 3003 and 3007 (the "First Omnibus Objection") on June 18, 2004. Pursuant to the First Omnibus Objection, the Debtors have asked the Bankruptcy Court to disallow and expunge (i) claims filed after the Bar Date; (ii) claims that were amended and superseded by subsequent proofs of claim; (iii) claims filed by holders of equity interests; (iv) duplicate claims; (v) claims lacking supporting documentation; and (vi) noteholder claims that were duplicative of claims filed by the Bond Trustee. The Debtors filed their second omnibus objection to (substantive) claims (the "Second Omnibus Objection") on June 21, 2004. Pursuant to the Second Omnibus Objection, the Debtors have asked the Bankruptcy Court to (i) reduce and allow certain claims which amounts do not correlate with the Debtors' books and records and/or the supporting documentation attached thereto; (ii) reclassify certain claims which do not include sufficient documentation as to why they should be entitled to priority treatment; (iii) reduce and allow, as well as reclassify, a certain claim which was asserted as a priority claim but which should be treated as a general unsecured claim in the amount reflected in the Debtors' books and records; and (iv) expunge certain claims which (a) are not reflected as liabilities on the Debtors' books and records, (b) are not otherwise justified as valid, or (c) were brought by parties with no valid claims to assert. The Bankruptcy Court conducted a hearing on July 21, 2004 to consider the Omnibus Objections. With the exception of the claim of John Graves, all claims which were the subject of the First Omnibus Objection have been resolved, either by order of the Bankruptcy Court or by agreement of the parties. The hearing to consider the objection to the claim of John Graves was adjourned to September 16, 2004 at 11:30 a.m. All claims which were the subject of the Second Omnibus Objection have been resolved, either by order of the Bankruptcy Court or by agreement of the parties.

In addition, on May 25, 2004, the Debtors filed an objection to the PBGC Claims (defined and discussed below) and asserted various counterclaims in connection therewith. For a complete discussion of the PBGC Claims and the Debtors' objection thereto and asserted counterclaims see Sections V.I and V.J.1, "Debtors' Pension Plan", and, "Other Assets – PBGC Litigation."

26

The Plan seeks authority for Reorganized CMC and the Plan Administrator to resolve Claims in specific value ranges without need for further approval of the Bankruptcy Court or any other party in interest and in other value ranges with review by the Plan Committee only, or pursuant to Bankruptcy Rule 9019, as the case may be, as described in Section VI.H.6, "Summary of the Plan — Authority to Object to Claims and Interests and to Settle Disputed Claims and Interests."

### H.    Preparation of Claims Estimates

As a result of first day motions in the cases and the WL Ross Asset Sale, many of the Debtors' prepetition unsecured creditors and the Debtors' postpetition secured lenders have been paid or the obligations for such claims have been assumed and paid by WL Ross. The Debtors, with the assistance of the Debtors' professionals, have engaged in reviewing and analyzing the remainder of the Claims which have already been and are expected to be asserted in these cases. As a result of these efforts, progress has been made in reconciling the amount and classification of outstanding Claims. In addition, the Debtors have, among other things, (i) identified Claims or categories of Claims for future resolution and (ii) identified existing or potential claims disputes.

Through these various activities, the Debtors have developed estimates of Allowed Claims in each class established under the Plan. The Debtors have prepared these estimates based primarily on the following: (i) the outcome of Claim reconciliations and Claim objections to date, (ii) projections based on anticipated future Claim reconciliations and Claim objections, (iii) the comparison of asserted Claims against the Debtors' books and records, (iv) the Debtors' experience in reconciling Claims prior to and following the commencement of the Chapter 11 Cases, (v) the historical experience of the Debtors' professionals in other chapter 11 cases, (vi) an analysis of the litigation risks associated with Disputed Claims, and (vii) other legal and factual analyses unique to particular types of Claims.

The Debtors' estimates of Allowed Claims are identified in the summary chart above and form the basis of projected recoveries. See Section II, "Overview of the Plan." *Notwithstanding the Debtors' substantial efforts in developing their estimates, the preparation of such estimates is inherently uncertain, and accordingly there is no assurance that such estimates will accurately predict the actual amount of Allowed Claims in these chapter 11 cases. As a result, the actual amount of Allowed Claims may differ significantly from the Debtors' estimates contained herein.*

### I.    Sale of Substantially All of the Debtors' Assets

1.    The Decision to Sell

Given the state of the domestic textile industry and the Debtors' financial condition, the Debtors believed that the preservation and maximization of their estates required that the Debtors pursue two goals: (a) prompt migration of their production facilities to low cost environments such as Mexico and South and Central America and (b) preserving customer confidence. The first goal required financing, and the second

goal required that the Debtors quickly signal to their customers that the Debtors were capable of filling future orders. As described below, the Debtors concluded that a sale – as opposed to a stand-alone reorganization – was the best means by which the Debtors could achieve these goals.

The Debtors' operations alone would not generate sufficient liquidity to fund the investments necessary to a migration of their production facilities to low cost environments, and since early 2002, the Debtors, with the aid of their advisors, had sought third-party financing to fund their expansion to low cost environments, but these efforts were unsuccessful. In the meantime, the Debtors' financial condition had continued to deteriorate, as sales decreased and margins eroded. Thus, as stand alone companies, the Debtors' operating position had only worsened. And as the textile markets continued to open to Asian textile manufacturers, there was little reason to believe that the capital markets would become more hospitable to the Debtors. These factors all pointed to the great difficulty and risk associated with a stand-alone reorganization funded either by internal operations or third-party investments.

An asset sale also furthered the Debtors' second goal, which was to signal to their customers that the Debtors were capable of filling future orders. A stand-alone restructuring would have entailed (i) additional time and costs of searching for third-party sources of capital and then accessing new plants, and (ii) consensus amongst the numerous lenders in the Debtors' fractured capital structure – many of whom had stated their opposition to any type of reorganization. In sum, a stand-alone reorganization would have been fraught with uncertainty. Moreover, historically, few U.S. apparel manufacturers have emerged as stand-alone companies. Based on this track record, the Debtors concluded that their customers would have lost confidence in their ability to fill orders and would have shifted their business to the Debtors' competitors. The Debtors believed that a sale, by contrast, would lessen the Debtors' customers' uncertainty over the Debtors' ability to fill future orders, and thus would serve as an appropriate exit strategy.

2.    Prepetition Restructuring Efforts.

As noted above, the Debtors' decision to sell came after considerable unsuccessful efforts to pursue stand-alone reorganization alternatives. From early 2002 until a few months before the Debtors' chapter 11 cases, the Debtors had focused their efforts on raising capital to fund a recapitalization and expansion into Mexico. To that end, throughout the third and fourth quarters of 2002, Jefferies contacted over 60 potential investors; of those contacted, approximately 26 executed confidentiality Agreements and approximately 17 conducted additional due diligence and/or met with Cone Mills management and Jefferies. These meetings yielded only two concrete proposals for new capital – one of which was from WL Ross.

In January, 2003, Cone Mills entered into a letter of intent with WL Ross pursuant to which WL Ross agreed to purchase up to $27 million of convertible notes – the proceeds of which were to be used to fund the Debtors' expansion into lower cost production facilities. That letter agreement was subject to a number of contingencies and

28

conditions, including the negotiation of a final agreement with WL Ross, the consent of Cone Mills' senior lenders and bondholders, approval of certain elements of the transaction by Cone Mills' shareholders, and registration with the SEC. This transaction ultimately failed, however, on account of Cone Mills' deteriorating operating results in 2003 and its inability to obtain requisite lender and shareholder approvals.

In August, 2003, in the face of rapidly deteriorating operating results, the Debtors and Jefferies met again with their senior lenders to discuss restructuring alternatives. At that time, WL Ross indicated its interest in purchasing the Debtors' assets. Throughout the remainder of August and September, the Debtors and Jefferies worked with the Debtors' senior lenders, WL Ross, and their respective advisors to refine WL Ross's proposal and to finalize a letter of intent. As mentioned above, this letter of intent served as the basis for the APA, which the Debtors filed with the Bankruptcy Court on November 7, 2003.

3.    Postpetition Marketing Efforts.

On October 10, 2003, the Debtors filed the Sale Procedures Motion, which, among other things, proposed a procedure and schedule for soliciting and entertaining competing bids for the Assets (as subsequently modified, the "Sale Procedures") and sought authorization to pay a breakup fee to WL Ross in the event that the Debtors sold the Assets to a party other than WL Ross. On November 7, 2003, the Bankruptcy Court entered an order (the "Sale Procedures Order") approving the Debtors' Sale Procedures and the buyer protections requested in the Sale Procedures Motion, as modified through negotiations with the Debtors' various creditor constituencies.

After the Bankruptcy Court's entry of the Sale Procedures Order, the Debtors and Jefferies continued to pursue an alternative bid(s) for all or a portion of the Debtors' assets in an effort to generate value for the Debtors' estates in excess of WL Ross's "stalking horse" bid. Jefferies spearheaded this effort and sought buyers not only for all or substantially all of the Debtors' assets, but also for the Debtors' discrete business units – denim, commission finishing and jacquards – and the Debtors' "surplus," or non-core assets, or any combination thereof.

At the outset, Jefferies compiled a thorough list of potential buyers for all or a portion of the Debtors' assets. To compile the list, Jefferies reviewed the universe of strategic buyers comprised mostly of the Debtors' competitors overall and in each of its discrete business units and identified 45 potential strategic buyers. Jefferies then expanded the list to include 84 financial buyers, mainly private equity investors, who might have been interested in acquiring all or a portion of the Debtors' assets. Finally, Jefferies identified 10 potential buyers of the Debtors' "surplus," or non-core assets. In addition, Jefferies consulted with the financial advisors retained by the Ad hoc Bondholder Committee and the Creditors' Committee and added to its own list approximately 10 potential buyers recommended by those other advisors, to arrive at a final list of 139 potential buyers.

Doc #:NY6:803056.2