IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CONE MILLS CORPORATION, *et al.*, | : | Case No. 03-12944 (MFW) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | | Related to Docket No. 509 |

Objection Deadline: November 11, 2004 at 4:00 p.m.
Hearing Date: November 18, 2004 at 10:30 p.m.

### MOTION OF WLR RECOVERY FUND II L.P. AND WLR CONE MILLS ACQUISITION LLC FOR (1) ORDER ENFORCING SALE ORDER INJUNCTION AGAINST THE DEBTORS AND THE PENSION BENEFIT GUARANTY CORPORATION, OR ALTERNATIVELY (2) FOR ALLOWANCE OF AN ADMINISTRATIVE CLAIM PURSUANT TO 11 U.S.C. §§ 105(a), 363 AND 503(a) OR (3) FOR RESCISSION OF THE SALE

WLR Recovery Fund II L.P. and WLR Cone Mills Acquisition LLC,[1] and certain of their affiliates (collectively, the "Buyer"), by and through their undersigned counsel, hereby move for an order (i) enforcing the Sale Order injunction against the Pension Benefit Guaranty Corporation (the "PBGC"), and directing the Debtors and the PBGC to comply with the Sale Order (as defined below), or alternatively (ii) for allowance of an administrative claim in favor of the Buyer against the Debtors in the estimated amount of $58.7 million pursuant to sections 105(a), 363 and 503(a) of title 11 of the United States Code (the "Bankruptcy Code") or (iii) for rescission of the sale (the "Motion"), and respectfully represent as follows:

### PRELIMINARY STATEMENT

1. The Buyer of substantially all of the assets of the Debtors and their affiliates has been collaterally attacked by a creditor, in flagrant violation of the substantive and

---

[1] WLR Cone Mills Acquisition LLC was merged into WLR Burlington Acquisition LLC on August 2, 2004, and the entity's name changed to International Textile Group, Inc.

WLM\201672.1

injunctive provisions of this Court's Sale Order, in an effort by that creditor to collect from the Buyer on obligations of the Debtors that have been discharged with respect to the Buyer. That creditor, the PBGC, has filed suit against the Buyer in Federal Court in North Carolina, asserting a $58.7 million pension liability underfunding claim which arises from the Debtors' pension plans. The Buyer brings this Motion asking the Court (i) to enforce its Sale Order injunction against the PBGC and direct the Debtors and the PBGC to comply with the Sale Order, or alternatively for the Court (ii) to allow an administrative claim in favor of the Buyer against the Debtors in the estimated amount of $58.7 million or (iii) to grant rescission of the sale, as the assertion of this liability by the PBGC completely undermines the Debtors' commitments to the Buyer and deprives the Buyer of the benefit of its bargain.

## FACTUAL BACKGROUND

### A. Terms of the Sale Order

2. On February 10, 2004, this Court entered an "Order Authorizing (A) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Interests Subject to Higher or Better Offers, (B) Approving the Amended and Restated Asset Purchase Agreement, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection With Such Sale, and (D) Granting Related Relief" (the "Sale Order"), a copy of which Sale Order is attached hereto as Exhibit "1". Pursuant to the Sale Order and the Amended and Restated Asset Purchase Agreement (the "APA") referenced therein, the Debtors sold substantially all of the assets of themselves and their affiliates to the Buyer, which transaction closed on March 12, 2004.

3. The Sale Order approved an agreement which specifically provided that the sale of the Purchased Assets defined in the APA (called the "Assets" in the Sale Order) would be free and clear of liens, claims and encumbrances including specifically:

> <u>any Liabilities, obligations or responsibilities whatsoever relating to any 'employee benefit plan' (as defined in section 3(3) of ERISA) or any other employee benefit plan, policy, practice, agreement or arrangement maintained by the Company, any ERISA Affiliate, any Subsidiary or any Affiliate of the Company whether or not relating to employees associated with the Purchased Assets, including any such Liability (a) to the Pension Benefit Guaranty Corporation under Title IV of ERISA, (b) relating to a multiemployer plan, or (c) with respect to any non-compliance with ERISA or other applicable law</u> . . . .

"<u>Excluded Liabilities</u>" definition at p.17, ¶ 35(e) of the "Motion of the Debtors For an Order Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Sale of Substantially All of the Debtors' Assets, Free and Clear of Liens, Claims, Encumbrances and Interests Subject to Higher and Better Offers; (B) Approving the Amended and Restated Asset Purchase Agreement; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Such Sale; (D) Granting Related Relief" (the "<u>Sale Motion</u>") (emphasis added).

4. The Sale Order further contained provisions (i) finding the consideration provided for the Assets to be fair and reasonable, constituting "reasonably equivalent value and fair consideration under the Bankruptcy Code <u>and under the laws of the United States</u> . . . ." (Sale Order ¶ M (emphasis added); <u>see also id.</u> ¶ 22); and (ii) providing that the transfer of Assets to the Buyer would be a legal, valid enforceable transfer free and clear of all liens, claims, encumbrances and interests including:

> <u>all debts</u> arising in any way in connection with any agreements, acts, or failures to act, <u>of any of the Debtors or any of the Debtors' predecessors or affiliates,</u> claims [], obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests, and any matters of any kind and nature, whether known or unknown, contingent or otherwise, whether arising prior or subsequent to the commencement of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise, <u>including but not limited to claims otherwise arising under doctrines of successor liability</u> (collectively, "Interests").

(<u>Id.</u> ¶ O) (emphasis added). The Sale Order also found that the Buyer would not have entered into the APA or consummated the transactions if the sale of the Assets was not free and clear of all Interests or if the Buyer would, or in the future could, be liable for any of the Interests, including the Excluded Liabilities, (<u>id.</u> ¶ P), and (iv) that those holders of Interests who did not object to the Sale or the Sale Motion are deemed to have consented. (<u>Id.</u> ¶ Q).

     5.    The "free and clear" language of the Sale Order was not mere boilerplate. It was language carefully crafted and specifically approved by the Court following a two-day hearing on objections by certain creditors to the sale of the Purchased Assets free and clear of all Interests; the Sale Order resolved those objections and reflects the clear intent of the parties and the Court.

     6.    The Sale Order goes on to provide that (i) the Debtors are authorized to perform their obligations under and comply with the terms of the APA, (<u>id.</u> ¶ 4), and to take all further actions as may be requested by the Buyer or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA, (<u>id.</u> ¶ 5); (ii) that the Order is binding on all creditors, (<u>id.</u> ¶ 6); (iii) that the APA could be modified, amended or supplemented by the parties without further order of the court provided such modification does not have a material adverse effect on the Debtors' estate, (<u>id.</u> ¶ 7); (iv) that the Assets are transferred free

-4-

WLM\201672.1

and clear of all Interests with all such Interests to attach to the net proceeds of the Sale, (id. ¶ 8); (v) that all persons including governmental authorities and other creditors holding Interests of any kind against the Debtors or the Assets "arising under or out of, in connection with, or in any way relating to the Debtors, the Assets, and the operation of the Debtors' business prior to the Closing . . . hereby are forever barred, estopped, and permanently enjoined from asserting against the Buyer, its successors or assigns, its property, or the Assets, such persons' or entities' Interests." (Id. ¶ 9) (emphasis added); and that (vi) all Interests "have been unconditionally released, discharged and terminated" with respect to the Assets. (Id. ¶ 25) (emphasis added).

       7.      Furthermore, the Sale Order provides in relevant part that "Buyer shall have no obligation to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment to employees of the Debtors. . . . Buyer shall have no liability with respect to any employee pension plan, employee welfare or retention, benefit and/or incentive plan to which any of the Debtors is a party . . . and all parties to any such agreement are hereby enjoined from asserting against Buyer any and all claims arising from or relating to such agreement." (Id. ¶ 27) (emphasis added).

       8.      In addition, the Sale Order provides in relevant part that "Buyer shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character, including but not limited to any theory of successor or transferee liability, de facto merger, or substantial continuity . . . with respect to the Debtors or any obligations of the Debtors arising prior to the Closing." (Id. ¶ 31). And "[f]ollowing the Closing, no holder of an Interest in the Debtors or the

Assets shall interfere with the Buyer's title to or use and enjoyment of the Assets based on or related to such Interest . . . ." (Id. ¶ 32) (emphasis added).

9.   The Sale Order also states that "[t]his Court retains jurisdiction to enforce and implement the terms and provisions of the APA, all amendments thereto . . . including, but not limited to, retaining jurisdiction to . . . protect the Buyer against (i) any of the Excluded Liabilities or (ii) any Interests in the Debtors or the Assets of any kind or nature whatsoever." (Id. ¶ 33) (emphasis added).

### B.   The PBGC Claims and Actions

10.   In flagrant violation of the multitude of applicable terms and provisions in this Court's Order approving the Sale Motion, to which Motion the PBGC did not object, the PBGC is seeking to impose liabilities arising under the Debtors' ERISA plans against the Buyer and its affiliates, in the amount of at least $58.7 million. On September 14, 2004, the PBGC filed a complaint in the United States District Court for the Middle District of North Carolina, Greensboro Division, against the Buyer and various of its affiliates (the "North Carolina Action"), a copy of which complaint is attached hereto as Exhibit "2".[2] The complaint is premised on liabilities arising out of the Master Pension Plan of Cone Mills Corporation (the "Pension Plan"), a single employer defined benefit plan covered by Title IV of ERISA, as to which plan Cone Mills is the contributing sponsor. The PBGC claims to have terminated the Pension Plan, and to have a statutory claim against the contributing sponsor and each member of its "Controlled Group", namely, Cone Mills' affiliates. The PBGC seeks to assert a claim for

---

[2] The defendants in the North Carolina Action are the following: WLR Cone Mills LLC, WLR Carlisle LLC, WLR Cone Mills Mexico, LLC, WLR Cone Mills Surplus LLC, WLR Cone Denim LLC, WLR CM, S.A. de C.V., WLR Cone Mills IP, Inc., WLR Jacquard LLC, Cone Foreign Trading LLC (DE), Burlington Industries, Inc., International Textile Group, Inc., and John Does A-F.

-6-

WLM\201672.1

unfunded benefit liabilities of approximately $58.7 million against the Buyer as transferees of certain of the Controlled Group Members' assets. The PBGC alleges that the "APA did not provide for a sale of the assets of the Controlled Group Members", (Compl. ¶ 18), although it acknowledges that the APA was amended on March 12, 2004 to specifically add as "Additional Sellers" certain of the Controlled Group Members, whose assets were then transferred to the Buyer. (Id. ¶ 20). The PBGC claims that the Transferor Members (as defined in the Complaint) received no consideration for the transfer of their assets to the Buyer, and that the transfer constitutes a fraudulent Transfer under the Federal Debt Collection Procedure Act. (Id. ¶¶ 21-50). Alternatively, the PBGC seeks to impose a "constructive trust" on the assets of the Buyer, and seeks to assert "successor liability" against the Buyer under Federal Common Law. (Id. ¶¶ 51-63). The PBGC's position is factually and legally erroneous and improper on all counts.

11. The PBGC's complaint violates the injunction and discharge provisions of the Sale Order. There can be no question that all parties -- the Debtors, the Buyer and the PBGC -- understood that the sale was to be free and clear of the Debtors' pension liabilities, with Interests relating to those liabilities to attach to the proceeds of sale. Contrary to the PBGC's allegations, the agreement approved by this Court contemplated both the sale of the non-debtor subsidiaries to the Buyer, and specifically identified as Purchased Assets most if not all of the assets of the two Mexican subsidiaries which Buyer believes are the real target of the PBGC's complaint, as no other assets were purchased by the Buyer from other non-debtor affiliates of the Debtors.

12. Specifically, the APA, which was presented to this Court in the Sale Motion on notice to the PBGC and other creditors, provided that at closing, the Sellers would transfer the "Purchased Assets" to the Buyer in exchange for the Purchase Price. APA ¶ 1.01(a).

WLM\201672.1

The definition of "Purchased Assets" in paragraph 11.01 of the APA included the Assets and Properties of the Sellers described in Schedule 1.01 of the Company's Disclosure Schedules, and included listed Real Property.

13. Disclosure Schedule 1.01 attached to the APA, a copy of which is attached hereto as Exhibit "3", includes a Schedule of Purchased Assets, listing, inter alia, "5. Investments: (a) Parras Cone – 50/50 Mexican denim joint venture; (b) Equity investment of approximately 7.5% of common stock of CIPSA, a Mexican denim producer. CIPSA owns 50% of Parras Cone; (c) Equity investment of approximately 8.0% of the common stock of Ashima, an Indian textile company; and (d) ASISA – 50/50 Mexican joint venture, owns and operates industrial park in Altamira, Mexico." On Schedule 1 of Disclosure Schedule 1.01, there is a list of Real Property included in the Purchased Assets, specifically including "Cone Tamaulipas, S. de R.L., Altamira, Mexico, land in industrial park in Altamira, Mexico 146 acres; and ASISA, 50% owned by Cone Mills (Mexico), Altamira, Mexico, land in industrial park in Altamira, Mexico, 158 acres." These Purchased Assets constitute the material assets of the two non-debtor Mexican affiliates of the Debtors, namely Cone Mills (Mexico) S.A. de C.V., and Cone Tamaulipas S. de R.L. de C.V. (collectively, the "Mexican Affiliates").

14. In fact, the parties have agreed to adjourn the date for transferring the title to items (b) and (c) in paragraph 13 above, pending the obtaining of necessary consents, and thus title to these assets has not yet passed. In any event, the fact that the Buyer had acquired the right to take all such assets, and that their value was included in the Purchase Price, is beyond question.

15. On March 12, 2004, the Buyer and Sellers executed a First Amendment of the APA (the "First Amendment"), which added as additional Sellers the Mexican Affiliates, and another U.S. affiliate, House 'N Home Fabrics & Draperies, Inc.[3] This First Amendment constituted a ministerial, non-adverse amendment to the APA, which the Sale Order specifically authorized the Debtors and the Buyer to make. Further, the transfer of these assets was clearly previewed by listing the specific assets of the Mexican Affiliates in the Disclosure Schedules to the APA. It was no surprise to the PBGC or any other party that the assets of the Mexican Affiliates were part of the sale to the Buyer, were included in the Purchase Price, and were intended to be transferred free and clear of the pension liabilities of the Debtors and their affiliates.

## C. Value Attributed to the Non-Debtor Assets

16. In the First Amended Disclosure Statement Accompanying Second Amended Chapter 11 Plan of Liquidation Dated August 20, 2004 (the "Disclosure Statement"), the Debtors describe the transfer of the Mexican assets to affiliates of the Buyer in lieu of the capital stock of those entities. (Disclosure Statement at 35-36). The Debtors further state that, in agreement with all of their Creditor constituencies, they allocated $10 million of value to the assets of the Mexican affiliates for purposes of Plan distributions to secured and unsecured creditors, representing a fair allocation of value to those assets. (Id.). The Debtors are holding the proceeds of the sale allocable to the assets of the Mexican affiliates, and this Court has presumptively found that the Buyer paid fair value for all of the assets, including the stock and assets of the subsidiaries.

---

[3] The Buyer did not acquire any assets from House 'N Home Fabrics & Draperies, Inc.

17. The PBGC's complaint is nothing but an end-run around this Court's Sale Order. The PBGC is subject to this Court's order and injunction, which among other things specifically held that the Purchase Price for the Assets constituted reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the United States, and the Buyer is to be protected in what could not be clearer terms, from the liabilities the PBGC now seeks to assert. This Court must enforce the terms of the Sale Order by directing the PBGC to cease and desist from pursuing its complaint against the Buyer, and by directing the Debtors to enforce the terms of their agreement with the Buyer, or be liable as an expense of administration for any damages the PBGC seeks to impose on the Buyer.

18. If liability related to the Debtors' pension obligations is imposed on the Buyer, it will mean that the Debtors definitively failed to provide the protection of a sale free and clear of all liens and encumbrances, which the Buyer expressly relied on in paying the Purchase Price, and this Court found to be the primary inducement for the Buyer to purchase the assets, and therefore the sale must fail and be rescinded.

**D.     The PBGC's Break-Up Fee Objection and Claim Settlement**

19. On or about October 10, 2003, the Debtors filed the "Debtors' Motion for Order (A) Approving Sale Procedures; (B) Approving Buyer's Breakup Fee and Expense Reimbursement; (C) Approving Form and Manner of Notice; (D) Scheduling a Hearing to Consider the Sale of Substantially all of the Debtors' Assets; and (E) Granting Relief" (the "Bid Procedures Motion"). The PBGC filed an objection to the Bid Procedures Motion (the "PBGC Objection") stating that the bid procedures set forth in the Bid Procedures Motion "do not distinguish among the assets of the Debtors and the assets of the Non-Debtors, or [provide] for allocating the proceeds of sale among the Debtors and the Non-Debtors." (PBGC Objection ¶ 7).

The PBGC also states that the proposed auction and bid procedures "do not address the Debtors' obligations under ERISA with respect to the Pension Plan or its participants." (Id. ¶ 8). The PBGC went on to request certain modifications to the proposed Bid Procedures Order, namely that bidders should state whether they intended to hire employees covered by the pension plan, whether the bidder would assume pension liabilities and assets relating to those employees, and that the value of any assumed pension liabilities and corresponding reduction in claims against the Debtors would be recognized by the parties. (Id. at 3-4). The PBGC went on to note that assets of non-debtor entities might be included in the sale, and that if they were, the bid procedures should require the Debtors to clearly identify and distinguish the respective values attributed to the assets of the Debtors and the non-debtors and the proceeds segregated and preserved for the creditors of the non-debtors. (Id. at 4-5).

       20.    The Order approving the Bid Procedures entered by this Court on November 7, 2003 (the "Bid Procedures Order"), makes no reference to the modifications requested by the PBGC. If the Debtors represented, as alleged by the PBGC in its complaint, that "nothing in connection with the bidding procedures will have any effect on the rights of creditors of the non-debtors with respect to the assets of the non-debtors", (Compl. ¶ 17), that concept was not reflected in the Bid Procedures Order or notices, nor in the Sale Motion, to which the PBGC did not object, nor in the APA, nor the Sale Order. In fact, what cannot be more crystal clear from a careful analysis of all of those documents, is that certain non-debtor assets could be and would be included in the sale to the Buyer, that the Purchase Price paid fair value for them, and it was the absolute intent of the Debtors and of the Buyer that the Buyer would not assume any pension obligations and therefore would have no liability to the PBGC

arising from or relating to the liabilities of the Debtors <u>and their affiliates</u> under the Pension Plan or under ERISA. The Buyer believes this was clearly the Debtors' understanding and intent.

21. On September 2, 2004, the Debtors filed the "Motion of the Debtors, Pursuant to Bankruptcy Rule 9019, to Approve Stipulation and Order Among Debtors, [the PBGC and the Pension Plan]" (the "<u>Stipulation Motion</u>"). The Stipulation Motion sought to settle the PBGC's claims against the Debtors on account of the Debtors' underfunding of the Pension Plan. On September 16, 2004, this Court entered an order approving the Stipulation Motion in its entirety (the "<u>Stipulation Order</u>"). The Stipulation Order provides that "[n]othing contained herein shall release any person or entity other than the parties to this Stipulation from any claims, causes of action (including those held derivatively), liabilities, obligations, suits, debts, sums of money, damages, demands or judgments." The Stipulation Order also purports to specifically preserve claims by the PBGC against WL Ross & Co. and its affiliates. (Stipulation Order ¶ 8). However, during the hearing on the Stipulation Motion held on September 16, 2004, in response to the Buyer's objection to the settlement, the Court stated that nothing contained in the Stipulation would affect, or abrogate any of the Court's prior orders, including the Sale Order:

> <u>MR DONOHO: Okay. And nothing that's happening by the stipulation is similarly going to reduce or limit the prior order you have entered with respect to the sale. That's really the confirmation we're looking for here.</u>
>
> <u>THE COURT: Well nothing [in the stipulation between the Debtors and PBGC] says that it does.</u>
>
> <u>MR. DONOHO: Okay. Then I guess I perhaps read it differently and I guess I'm happy to hear the Court believes that that doesn't give them --</u>
>
> <u>THE COURT: I don't think the parties said anything differently.</u>

-12-

<u>MR. DONOHO</u>: Okay. Then I --

<u>THE COURT</u>: <u>Nothing is creating or impairing any rights.</u>

Tr. of Omnibus Hearing Before Hon. Mary F. Walrath on Sept. 16, 2004 at 21-22 (emphasis added).

22.    For reasons that are clear only to the PBGC, it elected to settle its claims against the Debtors for a $58.0 million unsecured claim. It apparently determined to abandon any claim of constructive trust or other priority rights to the proceeds of sale of the assets of the Mexican Affiliates, which are in the possession of the Debtors. Having made that determination, the PBGC cannot circumvent the protections expressly bargained for by the Buyer and the clear language of the Sale Order by seeking to recover these proceeds as a claim against the Buyer.

## JURISDICTION AND VENUE

23.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are sections 105(a), 363 and 503(a) of the Bankruptcy Code.

## RELIEF REQUESTED

24.    The Sale Order bars government agencies such as the PBGC from pursuing claims such as the ones asserted by the PBGC in the North Carolina Action, and the Court should direct the PBGC to cease doing so. The Debtors should be directed to enforce the clear terms of the APA and the Sale Order by taking all steps necessary to ensure that the Buyer obtains the benefit of its bargain, and is not subjected to liability for the Debtors' underfunding of their Pension Plan.

25.    In the event that the PBGC prevails on its claims against the Buyer, then the Buyer has a claim against the Debtors in the amount of any judgment entered in the PBGC's favor in the North Carolina Action, based on the Buyer's breach of its obligations under the APA, and tortious, post-petition conduct toward the Buyer in failing to provide the Buyer with its bargained for rights under the APA.  Accordingly, the Buyer respectfully moves this court to allow an administrative claim against the Debtors in the estimated amount of $58.7 million – or such lesser amount as the PBGC may assert as damages against Buyer in the North Carolina Action.

## ARGUMENT

A.  **The Provisions of the Sale Order Should be Enforced by Directing the PBGC to Cease from Prosecuting the North Carolina Action, and Directing the Debtors to Take All Steps Necessary to Enforce the Sale Order and Protect the Buyer**

26.    The Sale Order is a final order, which the PBGC cannot collaterally attack. See Allegheny Health, Educ. and Research Found. v. Nat'l Union of Hospital and Health Care Employees, AFSCME, AFL-CIO, District (In re Allegheny Health Educ. and Research Found.), 2004 WL 2086056, at *5 (3d Cir. Sept. 20, 2004) ("Sales Orders, which approved the [asset purchase agreement] . . . are final orders, which . . . by virtue of collateral estoppel . . . [prevents the Court from] entertain[ing] collateral attacks upon said orders.") (citation omitted) (emphasis added); see also In re Mariner Post-Acute Network, Inc., 267 B.R. 46, 49 (Bankr. D. Del. 2001) ("[I]t is of course true that a bankruptcy court's order of confirmation [of a sale] 'is treated as a final judgment with res judicata effect . . . .'"); Rickel & Assocs., Inc. v. Smith (In re Rickel Assocs., Inc.), 272 B.R. 74, 86 (Bankr. S.D.N.Y. 2002) ("A bankruptcy court order approving a sale is a final order for res judicata purposes.").

27. The PBGC had actual notice of the Sale Motion and did not object to any of its terms, including those provisions releasing Buyer from any liabilities arising out of the Debtors' underfunded pension plans. The PBGC well knew that the assets of certain non-Debtor affiliates were being transferred as part of the Purchased Assets to the Buyer, and that the Buyer was not assuming pension liabilities relating to those Purchased Assets.

28. As noted above, the Sale Order unequivocally provides Buyer with numerous protections from claims arising from its acquisition of the Assets. Notwithstanding these provisions, the PBGC commenced the North Carolina Action seeking to recover the Debtors' pension underfunding liability from the Buyer under federal law, in the guise of asserting a fraudulent conveyance claim under the Federal Debt Collection Act. Regardless of how the PBGC has chosen to style its causes of action, the allegations contained in the PBGC's complaint make plain that the nature of the claim asserted by the PBGC is precisely the type of claim from which Buyer was protected in the APA and Sale Order. The North Carolina Action constitutes a blatant attempt to circumvent the clear provisions of the Sale Order and should not be allowed to proceed.

29. This Court retains jurisdiction to enforce the terms of the Sale Order, including protecting the Buyer from any claims barred by that Order. (Sale Order ¶ 33). Because the North Carolina Action contravenes the provisions and intent of the Sale Order, the Court's intervention is needed to prevent prosecution of that action. Even if the PBGC argues that this Court's jurisdiction does not extend to assets of a Mexican non-debtor, that jurisdiction clearly extends to American creditors such as the PBGC, and to the Buyer, and to the proceeds of those assets which are in the Debtors' possession as part of the Purchase Price.

30. There can be no dispute regarding the authority of this Court to enforce its own Orders. See Concerto Software, Inc. v. Vitaquest Int'l, Inc., 290 B.R. 448, 453 (D. Me. 2003) ("A bankruptcy court retains jurisdiction to interpret its own orders."); see also Ames Dep't Stores, Inc. et al. v. Eden Center, Inc. (In re Ames Dep't Stores, Inc.), 2004 WL 1908208, at *9 (Bankr. S.D.N.Y. Aug. 27, 2004) (stating that a bankruptcy court "has subject matter jurisdiction to enforce its orders not only because they were entered in proceedings in case under title 11 (and, indeed, in a core function) with respect to which it undoubtedly had subject matter jurisdiction, but also by reason of the power granted to any federal court to enforce its own orders."). Both the Debtors and the PBGC are responsible for complying with the terms of the Sale Order, and both are clearly subject to the jurisdiction of this Court. Enforcing the clear intent of the sale process by directing the PBGC and the Debtors to obey the terms approved by this Court, will avoid the estates' incurring sizeable additional claims, or a possible rescission of the sale, which would derail completely the plan process in these cases.

**B.    Alternatively, the Buyer is Entitled to an Administrative Claim Against the Debtors for the Debtors' Breach of the APA in the amount of approximately $58.7 Million.**

31.    The Debtors' failure to deliver the assets sold to the Buyer free and clear of liabilities to the PBGC clearly contravenes the core provisions of the APA. Buyer's claim against the Debtors for breach of contract and post-petition tortious conduct should be allowed as an administrative claim. Courts utilize a two-part test to assess a party's entitlement to an administrative claim by determining whether: (i) the claim arises out of a transaction between the proposed administrative claimant and the Debtor; and (ii) the Debtors' estate benefited from such transaction. See In re MUMA Servs., Inc., 279 B.R. 478, 489 (Bankr. D. Del. 2002). The seminal case of In re Mammoth Mart, Inc., 536 F.2d 950 (1st Cir. 1976) elaborates on that two-part test adding that, alternatively, in determining whether a claim triggered by a debtor-in-

possession's actions is entitled to priority as an expense of administration "[i]t is only when the debtor-in-possession's actions themselves that is, considered apart from any obligation of the debtor, give rise to a legal liability that the claimant is entitled to the priority of a cost and expense of administration. When the debtor-in-possession commits a tort . . . the debtor-in-possession itself caused legally cognizable injury, and the resulting claims for compensation are entitled to first priority." Id. at 955.

32.  That is exactly the case here: the Debtors' breach of the post-petition APA, entered into as a fundamental and urgent part of the administration of these cases, by failing to deliver assets to the Buyer free and clear of the pension-related liabilities of the Debtors and their affiliates, has caused injury to a third party. There is no question that the APA was beneficial to the estate, or that a party that suffers damages as a result of post-petition conduct by the debtor-in-possession is entitled to compensation as an administrative priority claim. See also In re Hildebrand, 205 B.R. 278, 286 (Bankr. D. Colo. 1997) (citing Reading Co. v. Brown, 391 U.S. 471 (1968); In re G.I.C. Gov't Sec., Inc., 121 B.R. 647, 649 (Bankr. M.D. Fla. 1990) ("Thus, the Court allowed the administrative claim, reasoning that parties subjected to loss and expense as a result of the administration of a bankruptcy case are entitled to be made whole as a matter of fundamental fairness and should be allowed an administrative claim to implement that result.").

33.  It is virtually black letter law that where a debtor has entered into a business agreement during the course of a bankruptcy case and then breached that agreement, the other party to that agreement may obtain payment of the debtor's obligations as an administrative expense. See In re BCE West, L.P., 264 B.R. 578 (9th Cir. 2001); In re UAL Corp., 299 B.R. 509 (Bankr. N.D. Ill. 2003). Pursuant to section 105(a) of the Bankruptcy Code, bankruptcy

courts possess the power to prevent an abuse of process by crafting equitable remedies. See, e.g., Sears, Roebuck & Co. v. Spivey, 265 B.R. 357, 368-69 (E.D.N.Y. 2001) ("bankruptcy courts have the power to sua sponte craft measures to ensure compliance with the rules and procedures."). Specifically, section 105(a) provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title . . . shall be construed to preclude the court from, sua sponte, taking any action . . . to prevent an abuse of process." 11 U.S.C. § 105(a). While a court's discretion under section 105(a) is not unlimited, section 105(a) does endow a court with broad equitable powers. See Noonan v. Secretary of Health & Human Servs. (In re Ludlow Hosp. Soc., Inc.), 124 F.3d 22, 27 (1st Cir. 1997) ("[s]ection 105(a) empowers the bankruptcy court to exercise its equitable powers--where 'necessary' or 'appropriate'--to facilitate the implementation of other Bankruptcy Code provisions"). Therefore, this Court possesses the power to enforce the Sale Order injunction against the PBGC, and to direct the Debtors to enforce the terms of the APA, or in the alternative, allow an administrative damage claim to the Buyer in the amount of any liability it might have to the PBGC on account of the pension liabilities of the Debtors and their affiliates, regardless of whether that liability is framed as a "fraudulent transfer", "constructive trust" or "successor liability." The PBGC asserts a claim against Buyer for over $58.0 million, which is exactly the amount the Debtors have allowed the PBGC as an unsecured claim in the case. If that claim is reduced, then the liability of the Debtors to Buyer will be reduced.

## C. Alternatively, The Sale Should be Rescinded and the Purchase Price Returned to the Buyer

34. It is beyond doubt that the Buyer's acquisition of the Assets pursuant to the APA and the Sale Order was expected, intended and understood by the parties to be free and clear of any and all non-assumed claims against those Assets. Indeed, the Debtors represented in

-18-

WLM\201672.1

the APA that the sale of Assets thereunder would be free and clear of any claims, including claims relating to the Debtors' pension liabilities. The Buyer relied on these representations and, as the Court's Sale Order reflects, would not have entered into the APA if it had known that it could be required to pay up to an additional $58.7 million as a result of its acquisition of the Assets. It is not credible for the PBGC to argue that the Sellers or the Buyer intended the Mexican business acquired by the Buyer, valued by all interested parties (with the possible exception of the PBGC) at $10 million, to remain liable for the PBGC's pension claims. Accordingly, in the event that the PBGC's claim is permitted to proceed and the Buyer is not allowed an administrative expense claim against the Debtors in the amount of the PBGC's claim, the sale should be rescinded in its entirety. See, e.g., Paris Indus. Corp. v. ACE Hardware Corp. (In re Paris Indus. Corp.), 132 B.R. 504, 507 (D. Me. 1991) (where the District Court upheld the Bankruptcy Court's decision to enjoin an action in Illinois state court against the purchaser of the Debtor's manufacturing division because: (i) such action challenged the sale order entered by the Bankruptcy Court; and (ii) allowing the action to continue would give the purchaser grounds for seeking rescission of the sale, which was supposed to be free and clear of all liens, encumbrances and other interests).

WLM\201672.1

## CONCLUSION

**WHEREFORE**, in light of the foregoing, the Buyer asks this Court to enter an order: (i) enforcing the Sale Order injunction against the PBGC and directing the Debtors to take all steps necessary to protect the Buyer from pension-related liability; (ii) alternatively, allowing an administrative claim in the amount of $58.7 million or such lesser amount as the Buyer may be held liable to the PBGC; or (iii) rescinding the sale and ordering the return of the Purchase Price to the Buyer; and (iv) granting the Buyer such other and further relief as the Court deems just and proper.[4]

Dated: October 14, 2004
Wilmington, Delaware

**STROOCK & STROOCK & LAVAN LLP**
Lewis Kruger, Esq.
Christopher R. Donoho, Esq.
180 Maiden Lane
New York, NY 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

Counsel for WLR Recovery Fund II L.P. and WLR Cone Mills Acquisition LLC

/s/ Christopher M. Winter
**DUANE MORRIS LLP**
Michael R. Lastowski (DE I.D. 3892)
Christopher M. Winter (DE I.D. 4163)
1100 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901

---

[4] The Buyer believes that the relief sought herein, if granted, is sufficient to provide it with protection and compensation. The Buyer does not, however, hereby waive other claims or causes of action to which it might be entitled under the Bankruptcy Code or other applicable law.